IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
THOMASVILLE DIVISION

| | |
|---|---|
| MARK G. WOOD, M.D., and : | |
| SOUTHWEST GEORGIA : | |
| NEPHROLOGY AND : | |
| HYPERTENSION CENTER, : | |
|     Plaintiffs, : | Civil Action No. |
| : | 6:05-CV-53 (HL) |
| v. : | |
| : | |
| ARCHBOLD MEDICAL CENTER, : | |
| INC., et al., | |
|     Defendants. | |

**ORDER**

Before the Court is Defendants' Motion to Dismiss and/or Motion for Summary Judgment (Doc.20), in which Defendants argue they are entitled to summary judgment or in the alternative that many of Plaintiffs claims should be dismissed for failure to state a proper claim. For the reasons set forth herein, Defendants' Motion to Dismiss and/or Motion for Summary Judgment is granted in part and denied in part.

**I. FACTS**

The facts alleged in the complaint are as follows. Beginning in 1983, Plaintiff Mark G. Wood ("Plaintiff Wood") served as Director of Defendant Archbold Medical Center's ("Defendant Archbold") inpatient and out-patient dialysis units. After becoming discouraged with Defendant Archbold's refusal to update its dialysis program and facilities, Plaintiff Wood resigned his position as Director of the dialyses units and began preparations to build and operate a competing state of the art dialysis center. According to Plaintiff Wood, Defendant

Archbold, once it learned of the plan to open a competing facility, offered to reimburse him for the expenses he had occurred and pay him an additional amount if he would agree not to open his planned dialysis center. Plaintiff Wood refused the deal and over the next few years opened both home care dialysis and hemo-dialysis facilities.

Plaintiff Wood alleges that Defendant Archbold engaged in a myriad of tactics designed to interfere with the operation of Plaintiff Wood's dialysis facilities. As a result Plaintiff Wood's facilities began to suffer resulting in the eventual forced sale of the facilities. Plaintiff Wood also alleges that Defendant Archbold improperly used its peer review power to harass him and eventually revoke his privileges at the hospital. According to Plaintiff Wood, he now is unable to offer full-range nephrology services as a result.

Plaintiff Wood and Plaintiff Southwestern Georgia Nephrology and Hypertension Center, Plaintiff Wood's sole proprietorship, brought suit against Defendant Archbold, Defendant Archbold's administrators, and the individual members of Defendant Archbold's peer review board. The Plaintiffs assert eleven separate counts: (1) Sherman Act Violation - Conspiracy to Restrain Trade; (2) Sherman Act Violation - Conspiracy to Monopolize; (3) Sherman Act Violation - Refusal to Deal; (4) Tortious Interference with Business Relations and Prospective Business Relations; (5) Tortious Interference with Employment, Trade or Profession; (6) Tortious Interference with Business Relations or Employment; (7) Failure to Adhere to the Hospital's Bylaws; (8) Intentional Infliction of Emotional Distress; (9) Deceptive Trade Practices; (10) Punative Damages; and (11) Bad Faith Litigation Costs.

Defendants then filed the Motion to Dismiss and/or Motion for Summary Judgment that

is currently before the Court. Defendants first argue that Plaintiffs' claims should be dismissed as all Defendants are immune from liability under the Health Care Quality Improvement Act ("HCQIA") and Georgia's peer review statute. Defendants also argue that Plaintiffs' antitrust claims should be dismissed because Plaintiffs lack standing to assert the claims. Finally, Defendants argued that Plaintiffs failed to properly state their Refusal to Deal, Tortious Interference with Relations, Tortious Interference with Employment, Trade or Profession, Intentional Infliction of Emotional Distress and Deceptive Trade Practices claims.

## II. ANALYSIS

As an initial concern the Court notes that Defendants have filed a Motion to Dismiss or alternatively a Motion for Summary Judgment. Because this case is in its infancy and discovery has yet to commence, a summary judgment review is inappropriate at this time. Accordingly, the Court declines to convert Defendants' Motion into a Motion for Summary Judgment and will address Defendants' arguments under the framework appropriate for a Motion to Dismiss.

### A. Motion to Dismiss Standard

A Motion to Dismiss does not test whether the plaintiff will prevail on the merits of the case; it tests the legal sufficiency of the complaint. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). Accordingly, the Court must accept the facts alleged in the complaint as true and construe all reasonable inferences in the light most favorable to the plaintiff. Kirby v. Siegelman, 195 F.3d 1285, 1289 (11th Cir. 1999). If the facts contained in the complaint would allow the plaintiff to recover under any possible theory, the Motion to Dismiss must be denied. Linder v. Portocarrero, 963 F.2d 332, 336 (11th Cir. 1992). If, however, "it appears beyond

doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," the plaintiff's claim must be dismissed. Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

**B. Immunity Under the Health Care Quality Improvement Act ("HCQIA")**

Under the HCQIA, a professional review body, all members and staff of the body, and all individuals who participate in or assist the body are not liable in damages for any action arising out of a professional review action. See 42 U.S.C § 11111(a)(1) (2000). A professional review body is defined as "a health care entity and the governing body or any committee of a health care entity which conducts professional review action, and includes any committee of the medical staff of such an entity when assisting the governing body in a professional review activity." 42 U.S.C. § 11151(11) (2000). A professional review action is defined as "an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician . . ., and which affects . . . adversely the clinical privileges, or membership in a professional society, of the physician." 42 U.S.C. § 11151(9) (2000). Therefore, HCQIA immunity covers the individuals involved in a professional review action resulting in the revocation of a doctor's privileges.

HCQIA immunity only covers professional review actions that meet four conditions set forth in the statute. To qualify for immunity under the HCQIA, the professional review action must be taken as follows:

> 1) in the reasonable belief that the action was in the furtherance of quality health care,
> (2) after a reasonable effort to obtain the facts of the matter,

>(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
>(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C. § 11112(a). Further, there is a presumption that a professional review action conforms with the conditions set forth above; however, the presumption may be rebutted by a preponderance of the evidence. Bryan v. James E. Holmes Regional Medical Center, 33 F.3d 1318, 1333 (11th Cir. 1994).

To survive Defendants' Motion to Dismiss, Plaintiffs must have included sufficient facts in the complaint that would allow recovery. Therefore, only if it appears that Plaintiffs can prove no set of facts that would allow recovery can the Court grant Defendants' motion. Here, Plaintiffs have plead facts that, if proven, would not allow Defendants to claim immunity under the HCQIA. Plaintiffs allege facts sufficient to establish that the peer review action was not taken in the reasonable belief that it furthered quality health care, was not taken after a reasonable effort to obtain the facts of the situation, and was not warranted by the facts.[1] Plaintiff Wood also alleges that he did not receive adequate notice because he was never informed of the nature and extent of the allegations lodged against him, did not receive notice

---

[1] The complaint alleges that complaints lodged against Plaintiff Wood were baseless and the action taken by the hospital review committee was not warranted under the circumstances. (Compl. ¶ ¶38, 42-48, 52, 56-69) The complaint alleges the peer review committee failed to gather the relevant facts of the situation because the committee did not confer with Plaintiff Wood, review material submitted by Plaintiff Wood, or interview individuals identified by Plaintiff Wood. (Comp.¶ ¶ 82 84, 90, 101).

of hearings, and was denied a meaningful opportunity to present his version of the facts. (Compl.¶ ¶ 64, 65, 80, 99) Considering the facts alleged in the complaint and the exceedingly low burden Plaintiffs must overcome to survive a Motion to Dismiss, the Court cannot conclude that Plaintiffs can prove no set of facts that would allow recovery. Accordingly, insomuch as Defendants' Motion to Dismiss is based on HCQIA immunity, Defendants' Motion is denied.

**C. Immunity under Georgia's Peer Review Statute**

Georgia's Peer Review statute provides that "[n]o professional health care provider [or employee thereof] shall be held, by reason of the performance of peer review activities, to have violated any criminal law or to be civilly liable under any law unless he was motivated by malice toward any person affected by such activity." O.C.G.A. § 31-7-132(a) (2001). Thus, Georgia Law generally provides immunity from criminal and civil liability unless the health care provider was motivated by malice. Georgia courts have consistently held, however, that "to the extent that peer review immunity . . . is conditional upon the absence of motivating malice, it is preempted by the [HCQIA]." Patrick v. Floyd Medical Center, 255 Ga. App. 435, 444, 565 S.E.2d 491, 500 (Ga. App. 2002).

Although the HCQIA preempts Georgia's peer review immunity statute to the extent that they conflict, federal law does not completely preempt Georgia's peer review immunity. The HCQIA only provides immunity from monetary damages, while Georgia's statute provides immunity from equitable relief as well. Therefore, Georgia's peer review statute is not preempted by federal law to the extent that Georgia's statute also provides immunity from equitable relief. See Taylor v. Kennestone Hosp., Inc., 266 Ga. App. 14, 22 n.4, 596 S.E.2d 179,

186 n.4 ( 2004). Here, however, Plaintiffs did not move for equitable relief and only claimed monetary damages. Accordingly, for the purposes of this case Georgia's peer review immunity statute is preempted and the issue of immunity will be determined under the framework set forth in the HCQIA.

**D. Antitrust Standing**

"A two-pronged approach has slowly developed to examine whether a plaintiff is a proper party and thus should be afforded antitrust standing." Todarov v. DCH Healthcare Authority, 921 F.2d 1438, 1449 (11th Cir. 1991). First, a plaintiff must have suffered an "antitrust injury." Id. Second, a plaintiff must be an efficient enforcer of the antitrust laws. Id.

Antitrust injury is "injury of the type the antitrust laws were intended to prevent." Brunswick Corp. v. Pueblo Bowl-O-Mart, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697 (1977) (quoting Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 125, 89 S.Ct.1562, 1577 (1969)). Accordingly, antitrust injury naturally flows from that which makes a defendant's acts unlawful. Id. Therefore, the injury should reflect the anti-competitive effect either of the violation or of anti-competitive acts made possible by the violation. Id. Requiring a plaintiff to show that he or she has suffered antitrust injury is necessary because an antitrust plaintiff's injury should coincide with the public injury cased by the alleged violation. See Todorov, 921 F.2d at 1449-50. Ensuring that a plaintiff's injury is similar to the injury experienced by society as a whole increases the likelihood that the private enforcement of the antitrust laws will further the goal of increased competition. Id. at 1450.

The second prong in determining whether a party is a proper plaintiff to bring an antitrust

claim centers around whether the plaintiff is an efficient and effective enforcer of antitrust laws. Id. Because the application of a bright line test is impracticable in determining whether a plaintiff is an efficient and effective enforcer of antitrust laws, courts generally determine standing based on the specific circumstances of each case. Associated General Contractors, Inc. v. California State Council of Carpenters, 459 U.S. 519, 536, 103 S.Ct. 897, 908 (1983). The fundamental concern is to ensure that a plaintiff can efficiently vindicate the goals of the antitrust laws. Id. at 542, 103 S. Ct. at 910. Accordingly, a plaintiff who has suffered direct harm as a result of a defendant's alleged wrongdoing are generally efficient enforcers. Id., 103 S. Ct. at 911. Although a plaintiff who has suffered a direct injury is ideal, some courts have allowed more remote parties to bring antitrust actions to prevent leaving a significant antitrust violation undetected or unremedied. Id.

     According to the Complaint, Defendants' interference with Plaintiffs' operation and Defendants' termination of Plaintiff Wood's privileges have directly caused antitrust injury by reducing the already limited number of providers who offer a full range of nephrology services. Plaintiffs allege that Defendants originally offered to compensate Plaintiffs in order to avoid competition. According to the Complaint, after Plaintiffs refused the offer, Defendants then began interfering with the operation of the competing dialysis centers by refusing to offer certain necessary services only available at the hospital[2] to Plaintiffs' patients, contacting

---

[2]Although not discussed in detail by either party, it appears that certain nephrology services require hospitalization or the use of equipment only available in hospitals. Accordingly, to offer full-range nephrology services, access to the local hospital and its equipment is necessary.

Plaintiffs' insurance carrier, "blackballing" Plaintiffs' employees, and eventually terminating Plaintiff Wood's medical privileges at the hospital. This interference, according to Plaintiffs, forced Plaintiff Wood to sell at a loss to a third party the dialysis centers which Defendants later attempted to acquire. Further as a result of Defendants' alleged activities, Plaintiff Wood is no longer able to offer full-range nephrology services as his medical malpractice insurance was cancelled and his privileges at the only hospital in the area were terminated.

Considering the facts alleged in the Complaint, the Court determines Plaintiffs have suffered injury of the type the antitrust laws were intended to prevent. According to the Complaint, Plaintiffs have been pushed out of the full-range nephrology market by Defendants constant anti-competitive tactics. Plaintiffs' elimination from the market has resulted in a diminution of competition for these services in the area. Therefore, Plaintiffs have established, for standing purposes, that they suffered antitrust injury. Plaintiffs have also established through the allegations contained in the Complaint, that they are efficient and effective enforcers of antitrust laws. Plaintiffs were directly injured by Defendants' alleged activities and Plaintiffs' interest in remedying this alleged antitrust violation is in line with the goals of antitrust laws. Therefore, the Court determines that Plaintiffs have met their burden of proving antitrust standing at this stage of the litigation.

**E. Antitrust Refusal to Deal Claim : Essential Facilities**

"Two theories exist upon which to predicate a unilateral refusal to deal claim: (1) the intent test and (2) the essential facility test." Morris Communications Corp. v. PGA Tour, Inc., 364 F.3d 1288, 1294 (11th Cir. 2004) (citing Mid-Texas Communications Sys., Inc. v. AT&T,

615 F.2d 1372, 1387 n. 12 (5th Cir. 1980)[3]). Here, Plaintiffs assert an essential facilities theory to establish their refusal to deal claim. "Under the essential facility test, a company that has exclusive control over a facility essential to effective competition may not deny potential competitors access to that facility on reasonable terms and conditions if to do so would create or maintain monopoly power in the relevant market." Id. (citing Covad Communications Co., v. BellSouth Corp., 299 F.3d 1272, 1285 (11th Cir. 2002), cert. granted and judgment vacated on other grounds, 540 U.S. 1147, 124 S.Ct. 1143 (2004); MCI Communications, Inc. v. AT&T, 708 F2d 1081, 1132-33 (7th Cir. 1983)).

Further, a plaintiff has the burden of proving that a defendant controls an essential facility, has refused access to said facility, and that the facility cannot be practically or economically duplicated. See Verizon Communications, Inc. v. Law Offices of Curtis v. Trinko, LLP, 540 U.S. 398, 441, 124 S. Ct. 872, 881 (2004) (holding when access to facility exists no essential facility claim can succeed); Convad, 299 F.3d at 1285. Additionally, even with evidence of monopolistic intent, an essential facility claim may still fail if the offending company refused to allow access to the essential facility for valid business reasons other than the general elimination of competition. See Mid-Texas, 615 F.2d at 1388; Gen. Indus. Corp. v. Hartz Mountain Corp., 810 F.2d 795, 804 (8th Cir. 1987). Accordingly, to sustain an essential facility claim a plaintiff must establish the following: (1) the existence of a facility essential to

---

[3]The United States Court of Appeals for the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions issued prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1207-09 (11th Cir. 1981).

effective competition; (2) the defendant's exclusive control over the essential facility; (3) the defendant's refusal to allow access to the essential facility under reasonable terms and conditions; (4) the creation or maintenance of defendant's monopoly power as a result of said restricted access; and (5) the absence of a valid business reason for restricting access to the essential facility.

Plaintiffs have alleged sufficient facts to establish a refusal to deal claim under an essential facilities theory. First, Plaintiffs have identified the Archbold Medical Center as an essential facility that is essential to effective competition in the area. According to the Complaint, the hospital is the only facility in the area that has the equipment necessary to offer certain nephrology services and a facility of its kind could not be practically or economically duplicated. Second, it is clear from the facts alleged in the Complaint that Defendant exercises exclusive control over the facility. Third, Plaintiffs allege that Defendants have refused to allow access to the hospital under reasonable terms or conditions, and Plaintiffs have specifically included multiple examples of the allegedly unreasonable conditions Defendants attempted to enforce in the Complaint. Fourth, Plaintiffs have specifically alleged that by denying Plaintiff Wood medical privileges at the hospital, Defendants have refused to allow access to the hospital under reasonable conditions and Defendants' monopoly power has increased as a result. Fifth, Plaintiffs assert Defendants have no valid business reason, other than the general elimination of competition, for restricting access to the hospital. Accordingly, Plaintiffs have sufficiently stated a refusal to deal claim based on an essential facilities theory.

**F. Tortious Interference with Business Relations**

"To recover under a theory of tortious interference with business relations, a plaintiff must show defendant: (1) acted improperly and without privilege, (2) acted purposely and with malice with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff, and (4) caused plaintiff financial injury." Renden, Inc. v. Liberty Real Estate Ltd. Partnership, 213 Ga. App. 333, 334, 444 S.E.2d 814, 815 (1994) (citation omitted) (emphasis in original). "The exercise of an absolute legal right is not and cannot be considered an interference with a contractual or potential contractual relationship," because privilege means legitimate economic interests of the defendant or a legitimate relationship of the alleged interloper or meddler to the contract. Dalton Diversified, Inc. v. AmSouth Bank, 270 Ga. App. 203, 209, 605 S.E.2d 892, 898 (Ga. App. 2004) (quoting Disaster Svcs., v. ERC Partnership, 228 Ga. App. 739, 741-742, 492 S.E.2d 526, 528-29 (1997)). "Thus, if the defendant has a legitimate economic interest in either the contract or a party to the contract, then the defendant is not a stranger to the contract and acts with privilege." Id. (citing Disaster Svcs., 228 Ga. App. at 741, 492 S.E.2d 526).

Defendants first contend Plaintiffs have failed to state an adequate claim here because Plaintiffs did not allege facts necessary to establish the first element. Defendants maintain their actions were "clearly privileged" under both the Health Care Quality Improvement Act of 1986 ("HCQIA") (42 U.S.C. § 11101, et seq.) and the Georgia Peer and Medical Review Statutes. First, the Court has previously discussed the applicability of the HCQIA and Georgia's peer review statute to this case and determined that Plaintiffs have plead facts that, if proven, would

12

not allow defendants to claim immunity. Second, as discussed above, the requirement under a tortious interference with business relations claim that a defendant act without privilege refers to whether the defendant has a legitimate economic interest in the business relationship, not whether the defendant can assert some sort of federal or state immunity. Therefore, Defendants' Motion to Dismiss Count Four, insomuch as it is based on immunity under the HCQIA or Georgia's peer review statute, is denied.

Defendants also contend Plaintiffs have not met the third element of the claim because Plaintiffs have not shown that Defendants' actions caused or induced potential patients or referring physicians not to enter into business relationships with Plaintiffs.  In response, Plaintiffs contends the Complaint sufficiently alleges Defendants acted  maliciously to induce patients, referring physicians, and insurance corporations not to continue a business relationship with Plaintiff.  Among other allegations of the like, the Complaint includes the allegation that nurses who decided to work for Plaintiffs would be "blackballed" by the hospital as well as the allegation that Defendants successfully solicited Plaintiffs' patients. (Compl. ¶ 7) Furthermore, the Complaint includes the allegation that Defendants made "negative and defamatory statements" about Plaintiff Wood to members of the underwriting committee of Plaintiffs' insurance company. (Compl. ¶ 22).  Consequently, because the Complaint includes facts which, if proven, support Plaintiffs' claim, Defendants' Motion to Dismiss Count Four on this ground is also denied.

**G. Tortious Interference with Employment, Trade or Profession**

Under Georgia law, to adequately state a claim for tortious interference with

employment, trade or profession, a plaintiff must plead facts which, if proven, would support the following elements: "(1) an independent wrongful act or interference by a stranger to the contract; (2) malicious intent to cause injury; and (3) resulting damages. Barnwell v. Barnett & Co., 222 Ga. App. 694, 695,  476 S.E.2d 1, 2-3 (Ga. App. 1996) (citing Hylton v. American Assn., 214 Ga.App. 635, 638, 448 S.E.2d 741, 744 (1994);  Singleton v. Itson, 192 Ga.App. 78, 79, 383 S.E.2d 598, 599 (1989)).  Defendants contend that Plaintiffs have not met the third element of the above test because Plaintiff Wood has retained his job as the Medical Director of his facilities to date.

Here, the Complaint includes the alleged fact that Defendants' improper interference terminated his medical staff privileges at the Hospital and that such has resulted in economic loss, injury and damages (Compl. ¶ 32).  Furthermore, the Complaint states that Defendants' "wrongful conduct" forced Plaintiff Wood to sell his dialysis facilities "at a loss." (Compl. ¶ 11).  Therefore, Plaintiffs have included allegations as to their injuries within the Complaint which, if proven, would entitle Plaintiffs to relief. Accordingly, Defendants' Motion to Dismiss Count Five is denied.

**H. Intentional Infliction of Emotional Distress**

To properly plead an intentional infliction of emotional distress claim a plaintiff must set forth facts that, if proven, establish the following four elements: (1) the defendants' conduct must be intentional or reckless ; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe.  Trimble v. Circuit City Stores Inc., 220 Ga. App. 498, 499,

469 S.E.2d 776, 778 (Ga. App. 1996) (citation omitted). To meet the first element a defendant's conduct must have been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community ." Odem v. Pace Academy, 235 Ga. App. 648, 655, 510 S.E.2d 326, 332 (Ga. App. 1998) (citing Bowers v. Estep, 204 Ga. App. 615, 619, 420 S.E.2d 336, 339 (1992)). Further, in determining whether a defendant's conduct was extreme and outrageous, defendant's conduct must be "of such serious import as to naturally give rise to such intense feelings of humiliation, embarrassment, fright or extreme outrage as to cause severe emotional distress." Moses v. Prudential Ins. Co. of America, 187 Ga.App. 222, 225, 369 S.E.2d 541, 543 (Ga.App. 1988) (internal citation omitted) (emphasis in original).

As to the third element, emotional distress "'includes all highly unpleasant mental reactions such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea . . ..'" Peoples v. Guthrie, 199 Ga.App. 119, 121, 404 S.E.2d 442, 444 (Ga.App. 1991) (quoting Bridges v. Winn-Dixie of Atlanta, 176 Ga.App. 227, 230, 335 S.E.2d 445, 448 (Ga.App. 1985)). "'The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it.'" Id.  Further, "it is not the severity of a plaintiff's reaction that controls in these cases: 'The distress must be reasonable and justified under the circumstances, and there is no liability where the plaintiff has suffered exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor has knowledge.'" Id.

Defendants first contend Plaintiffs have not met the second element of the claim because

the Complaint does not include any factual allegations to support the contention that Defendants' conduct was extreme and outrageous.  In response, Plaintiffs contend the Complaint adequately alleged that Defendants acted extremely, outrageously and intentionally by interfering with Plaintiffs' ability to practice medicine, continuously seeking to terminate Plaintiff Wood's medical staff privileges at the Hospital, and generally harassing Plaintiff Wood. The complaint also includes allegations as to Defendants' interference with Plaintiffs' financial efforts, recruitment of nurses, and solicitation of patients (Compl. ¶ 7).  Furthermore, the Complaint alleges Defendants forced Plaintiff Wood to undergo psychiatric lock down when he suffered no psychological impairment (Compl ¶ 9).  Because the alleged facts in the Complaint, if proven, would allow Plaintiffs to establish the second element of an intentional infliction of emotional distress claim, Defendants' Motion to Dismiss Count Eight on this ground is denied.

Defendants also argue Plaintiffs have not met the fourth element necessary to establish a claim of intentional infliction of emotional distress because Plaintiff Wood's emotional distress is not severe. Defendants contend there are no factual allegations in the Complaint to support the claim that any of the Defendants' actions caused Plaintiff Wood's emotional distress. In response, Plaintiff Wood contends that Defendants' alleged extreme and outrageous actions have caused his emotional distress and lists several examples of such. The Complaint includes several allegations of Defendants' treatment and harassment of Plaintiff Wood. Accordingly, the Court cannot conclude that Plaintiffs can prove no set of facts that would allow recovery under an intentional infliction of emotional distress theory. Therefore, Defendants'

Motion to Dismiss Count Eight is denied.

**I. Deceptive Trade Practices**

1. O.C.G.A. § 10-1-372(a)(2)

Under Georgia's Uniform Deceptive Trade Practices Act, "[a] person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he . . . [c]auses likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services . . .. " O.C.G.A. § 10-1-3712(a)(2) (2000). The Georgia Supreme Court has explained the application of O.C.G.A. § 10-1-372(a)(2) as follows:

> "Georgia protects trade names by both common law and statute. One of these statutes, UDTPA, entitles a person to the protection of a trade name when another person's use of a similar name "causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services." . . . The requirements for obtaining relief under UDTPA are less stringent than other relevant statutory sections, and "all that is required [for relief under UDTPA] is that the use of a name cause confusion to others [who are] using reasonable care."

Future Prof'ls, Inc. v. Darby, 266 Ga. 690, 691, 470 S.E.2d 644, 646 (1996) (quoting O.C.G.A. § 10-1-372(a)(2) (1989)). Here, there are simply no allegations within the Complaint that implicate the use of a trade name to cause confusion. Accordingly, insomuch as Plaintiffs' claim is based on O.C.G.A.§ 10-1-372(a)(2), Plaintiffs' Deceptive Trade Practices claim is dismissed with prejudice.

2. O.C.G.A. § 10-1-372(a)(8)

Under Georgia's Uniform Deceptive Trade Practices Act, " [a] person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he . . .·

17

[d]isparages the goods, services, or business of another by false or misleading representation of fact . . .." O.C.G.A. § 10-1-372(a)(8) (2000).  Here, the Complaint includes several factual allegations against Defendants.  Such allegations include: the solicitation of Plaintiffs' patients, prohibition of nurses employed by Plaintiffs to visit patients, cancellation of contracts with Plaintiffs, and refusal to make community-donated blood available to Plaintiffs' program.(Compl. ¶¶6-7).  While each of these alleged actions are unfortunate, none are false or misleading representations of fact which is necessary to bring a claim under § 10-1-372 (a)(8).

Furthermore, the Complaint also includes the allegation that Defendant Hartman informed Plaintiff Wood's patients that Plaintiff Wood "could not be their doctor in the future" before Plaintiff Wood's privileges were in fact terminated. (Compl. ¶¶ 20-21).  This alleged action by Defendant Hartman also does not sustain a claim under O.C.G.A. § 10-1-372 (a)(8) because the statement was a true statement when expressed as Plaintiff Wood's privileges were due to expire within the week.  Accordingly, because the actions of Defendants, which Plaintiffs list in the Complaint, are not false or misleading representations of fact, Plaintiffs' claim for deceptive trade practices under  O.C.G.A.  § 10-1-327 (a)(8) is also dismissed with prejudice.

### III. CONCLUSION

For the reasons explained herein, Defendants' Motion to Dismiss and/or Motion for Summary Judgment (Doc.4) is granted in part and denied in part.

**SO ORDERED**, this the 28th day of June, 2006.

/s/ Hugh Lawson
**HUGH LAWSON, Judge**

scs