# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### VALDOSTA DIVISION

MARK G. WOOD, M.D.,

       Plaintiff,

       v.

ARCHBOLD MEDICAL CENTER, INC.,
JOHN D. ARCHBOLD MEMORIAL
HOSPITAL, INC.,
KEN B. BEVERLY,
JAMES L. STORY JR., M.D.,
MARSHALL DUNAWAY, M.D.,
MERRILL HICKS, M.D.,
RAUL G. SANTOS, M.D.,
MEL HARTSFIELD, M.D.,
VICTOR M. MCMILLAN, M.D.,
EDWARD HALL, M.D.,
NICHOLAS QUINIF, M.D.,
WESLEY W. SIMMS, M.D.,
RUDOLF HEHN, M.D.,
JAMES FALCONER, M.D.,
BRYAN R. GRIEME, M.D.,
and other unknown co-conspirators,

       Defendants.

_____

Civil Action No. 7:07-CV-109 (HL)

## ORDER

This case is before the Court on the following motions:

1.    Motion for Summary Judgment filed by Defendants Archbold Medical Center, Inc., John D. Archbold Memorial Hospital, Inc., James L. Story Jr., M.D., and Mel Hartsfield, M.D. (the "Hospital Defendants") (Doc. 462);

2. Motion for Summary Judgment filed by Defendants Marshall Dunaway, M.D., Merrill Hicks, M.D., Raul G. Santos, M.D., Victor M. McMillan, M.D., Edward Hall, M.D., Nicholas Quinif, M.D., Rudolf Hehn, M.D., James Falconer, M.D., and Bryan R. Grieme, M.D. (the "Physician Defendants") (Doc. 464);

3. Motion for Summary Judgment filed by Defendant Wesley W. Simms, M.D. (Doc. 466);

4. Motion for Summary Judgment on Defendants' Affirmative Defenses Claiming Immunity and Release (Doc. 468) filed by Plaintiff Mark G. Wood, M.D.;

5. Amended Motion for Summary Judgment on Defendants' Affirmative Defenses Claiming Immunity and Release and Hospital Defendants' Counterclaims I-IV (Doc. 500) filed by Plaintiff Mark G. Wood, M.D.; and

6. Motion for Summary Judgment filed by Defendant Ken B. Beverly (Doc. 472).

After considering the briefs, oral arguments, and evidence presented by the parties, the Court rules as follows: (1) the Hospital Defendants' Motion for Summary Judgment (Doc. 462) is granted; (2) the Physician Defendants' Motion for Summary Judgment (Doc. 464) is granted; (3) Defendant Simms' Motion for Summary Judgment (Doc. 466) is granted; (4) Plaintiff's Motion for Summary Judgment (Doc. 468) is denied; (5) Plaintiff's Amended Motion for Summary Judgment (Doc. 500) is granted, in part, and denied, in part; and (6) Defendant Beverly's Motion for Summary Judgment (Doc. 472) is granted.

## I.    FACTS AND BACKGROUND[1]

### A.    Parties

Defendant John D. Archbold Memorial Hospital, Inc. (the "Hospital") owns and operates a general acute care hospital in Thomasville, Georgia. (Doc. 463, ¶ 4). Defendant Archbold Medical Center, Inc. (the "Medical Center") is the sole corporate member of the Hospital. (Doc. 463, ¶ 3). The Hospital is governed by a Board of Trustees (the "Board"). The Board is responsible for the Hospital's property, business pursuant to the Georgia Nonprofit Corporation Law, the hospital licensing regulations of the Georgia Department of Human Resources, and the Bylaws of the Hospital. (Doc. 463, ¶ 18). The Board's responsibilities also include appointing physicians to the medical staff of the Hospital, delineating clinical privileges for the physicians, and periodically determining whether the appointment and clinical privileges of those physicians should continue. (Doc. 463, ¶ 19).

The Hospital's medical staff is composed of physicians and other health care practitioners who have been appointed to the medical staff and granted clinical privileges by the Board.[2] (Doc. 463, ¶ 20). Medical staff appointments and clinical

---

[1]The Court has endeavored to present a facts and background section that is as thorough an complete as possible. To keep the Order somewhat manageable, it was impossible to include every fact set forth by the parties, especially in light of the number of "material" facts set forth by the parties in their Rule 56 statements, to wit: Plaintiff - 1,049 facts (at least), the Hospital Defendants - 390 facts, the Physician Defendants - 143 facts, Defendant Beverly - 225 facts, and Defendant Simms - 32 facts.

[2]"Medical staff appointment" refers to the decision by the Board that a physician who has applied for appointment meets the general qualifications and criteria for membership on the medical staff and is therefore authorized to practice medicine at the Hospital. (Doc. 463,

privileges are granted by the Board after receiving recommendations from the medical staff. Medical staff appointments and clinical privileges are subject to re-evaluation and may be renewed by the Board after receiving recommendations from the medical staff every two years, and may also be terminated by the Board. (Doc. 463, ¶ 23).

The medical staff is organized under Medical Staff Bylaws adopted by the medical staff and approved by the Board. The medical staff is supposed to function pursuant to those Bylaws. (Doc. 463, ¶ 24).

The Medical Executive Committee (the "MEC") is a committee of the medical staff composed of the officers of the medical staff and the chairpersons of certain medical staff departments. The MEC's duties include recommending to the Board all matters relating to medical staff appointments, reappointments, clinical privileges, and corrective actions. (Doc. 463, ¶ 25).

Plaintiff is a nephrologist.[3] He is board certified in internal medicine. (Doc. 463-119). He currently serves as the medical director of the Fresenius dialysis centers in Thomasville and Bainbridge, as well as the DaVita dialysis center in Moultrie. He also has a private nephrology practice. (Doc. 463-131). He became a member of the

_____

¶ 21). "Clinical privileges" or medical staff privileges refers to the specific medical or surgical procedures that a medical staff appointee is authorized to perform at the Hospital based on his or her education, training, and experience. (Doc. 463, ¶ 22).

[3]Nephrology generally involves the care of patients who have kidney disease. (Doc. 463-142, p. 2).

medical staff at the Hospital in 1983, and served as the medical director of the inpatient and outpatient dialysis units at the Hospital from 1983-1994. (Doc. 469, ¶¶ 4-5).

Defendant Nicolas Quinif, M.D., is a urologist. (Doc. 463-15, p. 2). Defendant Rudolf Hehn, M.D., practices in the area of family medicine. (Doc. 463-16, p. 2). Defendant James Falconer practices in the area of internal medicine. (Doc. 463-17, p. 2). Defendant Victor McMillan, M.D., is a rheumatologist. (Doc. 463-18, p. 2). Defendant Edward Hall, M.D., is a general surgeon. (Doc. 463-19, p. 2). Defendant Bryan Grieme, M.D., is a radiologist. (Doc. 463-21, p. 3). Defendant Marshall Dunaway, M.D., practices in the area of internal medicine. (Doc. 463-22, p. 2). Defendant Wesley W. Simms is a pathologist. (Doc. 467-2).

Defendant Raul Santos, M.D., is a nephrologist. (Doc. 463-142, p. 2). Defendant Merrill Hicks is also a nephrologist. (Doc. 463-138, p. 2). Defendants Hicks and Santos own and operate a nephrology practice located in Thomasville, which is incorporated as Nephrology Consultants, Inc. ("NCI"). (Doc. 469, ¶ 49). Defendants Hicks and Santos are currently and have been since at least January 1995 and February 1996, respectively, under contract with the Hospital to serve as medical directors of the Hospital's inpatient dialysis unit and the Hospital's five outpatient dialysis facilities. (Doc. 469, ¶ 50).

Defendant James Story, M.D., was the Vice President of Medical Affairs for the Hospital from March 1997 to October 2000, and was President and CEO of the

Hospital from October 2000 to April 2007. (Doc. 469, ¶¶ 34, 36). Defendant Mel Hartsfield, M.D., was the Vice President of Medical Affairs from March 2001 to December 2006. Prior to that time, he served as an emergency room physician at the Hospital. (Doc. 463-14). Defendant Ken B. Beverly served as the Chief Executive Officer and President of the Medical Center from April 1992 to February 2008. (Doc. 469, ¶ 19). He was employed by and served as the CEO and President of the Hospital from 1985 to 1992. (Doc. 469, ¶ 21). Defendant Beverly was also a member of the Board from 1994 through February 2008. (Doc. 469, ¶ 24).

### B. Pre-1998 Evaluation Events

In 1994, Plaintiff advised the Hospital that he would be setting up a competing outpatient dialysis facility. (Doc. 469, ¶ 131). The decision to do so was based on several reasons, including Plaintiff's belief that the Hospital refused to upgrade its dialysis equipment and facilities, as well as the fact that many hospitals were divesting their dialysis facilities. (Docs. 463-88, p. 23; 520-29). Plaintiff resigned as medical director of the Hospital's outpatient facility in late 1994. (Doc. 469, ¶ 132).

In May of 1995, Plaintiff and others incorporated South Georgia Dialysis Services, LLC ("SGDS") for the purpose of owning and operating dialysis clinics. (Doc. 463-119). Plaintiff owned a minority interest in SGDS. SGDS opened a dialysis center in Thomasville in December of 1995. It opened its hemodialysis centers in Thomasville and Camilla sometime between October and December of 1996. (Docs. 463-124; 463-125). In early 1997, SGDS opened two additional hemodialysis clinics,

one in Quitman, and the other in Bainbridge. (Docs. 463-124; 463-125). Part of SGDS's business plan was to take virtually all of Plaintiff's dialysis patients away from the Hospital's outpatient facilities. (Doc. 520-11). It is admitted that Defendant Beverly did not like the fact that SGDS set up competing dialysis facilities, and had discussions with Plaintiff "about the fact that there are a lot of economic financial opportunities for us to do business together, because dialysis was - is a big business . . . in Thomasville . . . and the state and the nation, and it was only going to get bigger, and there were a lot of economic opportunities for us to work together." (Doc. 469, ¶ 137). Defendants Beverly and Hicks raised concerns about the "local competition" with Austin Trigg, a consultant with Renal Care Group, Inc. ("RCG"), asked for strategies for dealing with the competition, and inquired about whistle blower immunity. (Doc. 469, ¶¶ 136, 140).

When SGDS opened its competing facilities, the Hospital, including Defendant Beverly, implemented a policy whereby Hospital employees would not be eligible for re-hire if they went to work for Plaintiff at the outpatient clinics. (Doc. 469, ¶ 143). Nevertheless, when the SGDS facilities were opened, approximately 30 nurses left the Hospital to go work for SGDS. (Doc. 463-88, p. 22). Part of SGDS's business plan was to hire as many nurses as it could from the Hospital. (Doc. 520-11).

Fran Milberg, the head of the SGDS outpatient dialysis facilities, testified that after the facilities were opened she "bumped into Defendant Beverly once and he said you're working for the enemy, huh, or something like that, I mean, in jest, off the

cuff," though she thought maybe he meant what he said. (Doc. 521-16, p. 3). In 1995, Martha Heath, who worked in the renal unit at the Hospital, was told by someone with the Hospital (not an individual Defendant) that Plaintiff's nurses were not to be allowed to come visit Plaintiff's patients while they were hospitalized. This was not a formal written Hospital policy, and Ms. Heath never asked any of Plaintiff's nurses to leave the Hospital if they did come visit patients. (Doc. 521-8). Sometime during this same time period, the Hospital declined to install a Telex machine in Plaintiff's office for the receipt of lab information, and also cancelled a written contract with Plaintiff relating to the processing of renal biopsies. (Doc. 469, ¶ 160).

Also prior to 1998, the Hospital did not make blood available from the Hospital's blood bank to the SGDS outpatient dialysis facilities. However, the Hospital did not provide blood to any facilities not affiliated with the Hospital because of possible regulatory and patient care problems. (Doc. 521-17). While SGDS was able to obtain blood from the Southeastern Community Blood Center in Tallahassee, Florida, Ms. Milberg believes the director of that blood bank told her that she, the director, would have to talk to Defendant Beverly before delivering blood to the SGDS facilities. (Doc. 521-16). During the same time period, the Hospital distributed a Community Resource Sheet to hospitalized dialysis patients upon discharge which did not include the SGDS outpatient facilities as resources. (Doc. 469, ¶ 167). Plaintiff and one of his former employees, Dr. Stephanie Woollen, also testified that the Hospital did not rotate or assign any unassigned emergency room patients to

them after the SGDS facilities were opened, but Plaintiff was listed on the emergency room referral lists for 2003 through 2008, along with other specialists on staff. (Docs. 474-11; 474-56).

In 1997, Defendant Beverly told another physician on the medical staff that he wanted his patients back from Plaintiff and SGDS. (Doc. 469, ¶ 179). Also in 1997, the Hospital offered Dr. Woollen a salary of $350,000 to join NCI, in part so she would not leave Thomasville, as she had already expressed her intent to leave the community. Dr. Woollen declined the offer and eventually left Thomasville for a number of reasons, including what she called the Hospital's anti-competitive conduct, but also because she had a good business opportunity elsewhere, because Thomasville was far from home, because Plaintiff's office was not a warm and conducive place to practice, and because Plaintiff was passive aggressive in not completing his medical records in order to retaliate against the Hospital, which led to problems for her. (Doc. 521-4).

In the fall of 1997, efforts to sell the clinics owned by SGDS began. In March of 1998, SGDS sold its four dialysis service centers to Renex for $4.5 million. (Doc. 463-119).[4] After the sale to Renex, Plaintiff no longer had an ownership interest in the dialysis centers. (Doc. 463-125).

---

[4]The facilities were subsequently sold to RCG, and then to Fresenius, who is the current owner.

## C.    1998 Evaluation

On October 25, 1995, Gerald Muller, M.D., Chairman of the Hospital's Medical Records Quality Assurance Subcommittee, wrote a memorandum to Plaintiff notifying Plaintiff that he continued to have histories and physicals ("H&Ps") not dictated within 24 hours of admission as required under standards propounded by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO"). (Doc. 463-34). On November 21, 1995, W. Henry Gainey, M.D., Chairman of the MEC, wrote Plaintiff a letter notifying him of action taken by the MEC following its meeting with Plaintiff on November 20, 1995. Dr. Gainey stated that Plaintiff's high volume of delinquent H&Ps had adversely affected the percentages for timely completion for H&Ps for the entire staff, resulting in non-compliance with JCAHO standards. Plaintiff was notified that his H&Ps would be monitored daily, and if any H&Ps were not dictated within 24 hours of admission, Plaintiff's admission privileges would be immediately suspended. (Doc. 463-35). On January 24, 1996, James A. Thomas Jr., M.D., Chief of Staff, notified Plaintiff that he had two additional H&P deficiencies. Dr. Thomas directed Plaintiff to attend the next MEC meeting. (Doc. 463-36).

On June 6, 1996, Dr. Muller, Chairman of the Medical Records Quality Assurance Subcommittee, wrote Plaintiff a memo informing him that he had one outlier, or delinquent record, for the H&P review period, and that a trend had been noted for two consecutive months. Dr. Muller asked Plaintiff to comply with the

standard for H&Ps. (Doc. 463-37). On September 5, 1996, the Medical Records

Quality Assurance Subcommittee wrote Plaintiff a memorandum informing him that

he had a five-month trend of not dictating his H&Ps within 24 hours after admission.

Plaintiff was notified that the committee would monitor his H&Ps until September 24,

1996. (Doc. 463-38). On September 19, 1996, Dr. Thomas, Chairman of the MEC,

wrote Plaintiff a letter notifying him of action taken by the MEC. Plaintiff's H&Ps

would be monitored daily by the medical record department for a three month period,

and if any H&Ps were not dictated within 24 hours following admission, Plaintiff's

admission privileges would be suspended immediately. (Doc. 463-39).

On January 9, 1997, Plaintiff wrote a letter to Defendant Hehn, Chief of Staff,

complaining that Dr. Woollen had not been included in the Hospital's latest news

report, whereas Defendant Santos had been given a write up. Plaintiff stated that

"[t]his may just be a 'small matter' but it certainly reflects the double standards that

exist at this hospital. Archbold Hospital goes out of its way to assure that all referrals

make their way to Dr. Hicks and Dr. Santos," that his patients "have been

exceedingly intimidated at the Archbold dialysis facilities," that the Hospital had

"pulled out every stop to compete in a less than ethical manner,"  and that the

guarantees given Defendants Hicks and Santos "certainly could fall under the rubric

of anti-trust." (Doc. 463-126).

On January 27, 1997, Robert D. Webb, M.D., Chief of Staff, wrote Plaintiff a

letter notifying him that his admitting privileges were suspended as of January 27,

1997. At that time, Plaintiff had thirteen delinquent discharge summaries, and under the Medical Staff Rules, staff members were only allowed ten delinquent discharge summaries for the entire year. (Doc. 463-40). While Plaintiff's admitting privileges were suspended, he admitted three patients to the Hospital.[5] On February 3, 1997, the MEC, which included Defendant Hehn, recommended that a letter be sent to Plaintiff informing him that the fact he admitted patients while on suspension for medical record deficiencies would be documented in his credentials file and forwarded to the Medical Affairs Committee ("MAC") in accordance with the Medical Staff Bylaws. (Doc. 463-41).[6]

In light of Plaintiff's failure to abide by the Medical Staff Rules, an Ad Hoc Study Group (the "1997-1998 Study Group") was appointed by the MEC.[7] The 1997-1998 Study Group, which included Defendants Grieme, Hehn, and Story, met on March 12, 1997, and reviewed the facts regarding Plaintiff's non-compliance with rules.[8] Plaintiff was given the opportunity to speak, and stated that the three patients

---

[5]One admittance was later changed to "observation." (Doc. 512-3).

[6]The members of the MEC at that time were Defendant Hehn, James A. Thomas, M.D., John A. Blackmon, M.D., Oscar D. Jackson, M.D., J. Steven Johnson, M.D., John A. Mansberger, M.D., Robert D. Webb, M.D., and Lissa P. Murphy, M.D. (Doc. 463-41).

[7]Study groups are also referred to in the record as Ad Hoc Committees and Ad Hoc Study Groups.

[8]The members of the 1997-1998 Study Group were Defendants Grieme, Hehn, and Story, John Mansberger, M.D., Keith Bryson, M.D., Henry Gainey, M.D., Steve Johnson, M.D., and Robert Webb, M.D. (Doc. 512-3). None of the members of the Study Group were competing nephrologists.

should have been admitted to his partner, Dr. Woollen. He stated that the Admitting Office should not have allowed him to admit. He also recommended that a space for physicians to dictate their records without interruption be provided. Plaintiff suggested that this could fix the dictation problem. The 1997-1998 Study Group informed Plaintiff that it was his responsibility to make arrangements when admitting privileges have been suspended, and it was noted that guidelines previously set out by the MEC stated that it was not the admitting officer's job to enforce suspensions of admitting privileges. Plaintiff stated that he would try to comply with the rules. The 1997-1998 Study Group unanimously voted to recommend to the MEC a 72-hour suspension of Plaintiff's admitting privileges for non-compliance with the Medical Staff Rules. (Doc. 512-3).

On March 17, 1997, the MEC, including Defendants Hehn, Grieme, and Quinif, met and voted to accept the 1997-1989 Study Group's recommendation, with referral to the Board. (Doc. 463-42).[9] On March 25, 1997, the Board voted to impose a 72-hour suspension of Plaintiff's admitting privileges. Defendants Beverly and Hehn were members of the Board and were present at the meeting. Defendant Dunaway was a member of the Board, but was absent from the meeting. (Doc. 463-

---

[9]The members of the MEC at that time were Defendants Hehn, Grieme, and Quinif, Robert D. Webb, M.D., Oscar D. Jackson, M.D., Steven Johnson, M.D., John Mansberger, M.D., and Charles R. Sanders, M.D. (Doc. 463-42). None of the members of the MEC were competing nephrologists.

7).[10] On March 31, 1997, Jason H. Moore, President of the Hospital, wrote Plaintiff a letter notifying him that after consideration of the recommendations of the 1997-1998 Study Group, MEC, and MAC, the Board had voted to impose a 72-hour suspension of Plaintiff's admitting privileges as of April 2, 1997. (Doc. 463-43).

On May 8, 1997, Defendant Hehn, Chief of Staff, wrote Plaintiff a letter notifying him that his admitting privileges were suspended as of May 9, 1997. Plaintiff had fourteen total delinquent discharge summaries at that time in violation of the Medical Staff Rules. (Doc. 463-44). On June 2, 1997, Defendant Hehn, Chief of Staff, wrote Plaintiff a letter notifying him that his admitting privileges were suspended as of June 3, 1997, as he had sixteen total delinquent discharge summaries. (Doc. 463-45). On October 17, 1997, Defendant Hehn, Chief of Staff, wrote Plaintiff a letter notifying him that his admitting privileges were suspended from October 18 to October 19, 1997 because of a delinquent discharge summary. (Doc. 463-46). On October 31, 1997, Defendant Hehn, Chief of Staff, wrote Plaintiff a letter notifying him that his admitting privileges were yet again suspended from November 1 to November 2, 1997 because of delinquent discharge summaries. (Doc. 463-47).

On January 21, 1998, Defendant Hehn, Chief of Staff, wrote Plaintiff a letter setting out the MEC's expectations for the future. Specifically, the MEC expected Plaintiff to comply with the medical record timeliness guidelines, to meet continuing

---

[10]There were a total of twenty people on the Board at that time, with seventeen attending the Board meeting. (Doc. 463-7).

education guidelines, to have 50% meeting attendance, to follow the accepted procedure for submitting forms, and to do his best in following the standards of care expected from the medical staff and following rules. Plaintiff was warned that any future problems would be dealt with according to Section V of the Medical Staff Bylaws, "Question of Marginal Practice, Disruptive Behavior, Disregard for Rules, Physical or Mental Impairment or Unethical Conduct." (Doc. 463-48). Nevertheless, on January 27, 1998, Defendant Hehn, Chief of Staff, again had to notify Plaintiff by letter that his admitting privileges were suspended from January 27 to January 28, 1998. Plaintiff had thirteen delinquent discharge summaries at that time. (Doc. 463-49).

The 1997-1998 Study Group, which included Defendants Hehn, Story, and Grieme, was reconvened and met on February 11, 1998. Plaintiff, though notified of the meeting, did not attend. After reviewing Plaintiff's medical record timeliness, patient volume, and meeting attendance, the 1997-1998 Study Group voted to impose a three-day suspension of Plaintiff's admitting privileges for the next breach of the medical records standard, and a seven-day suspension for any subsequent breach. The 1997-1998 Study Group specifically stated that it did not feel it necessary to refer Plaintiff to the Physician Well Being Committee ("PWBC") at that time. (Doc. 463-50). The recommendation was forwarded to the MEC, and on February 16, 1998, the MEC, including Defendants Hehn, Grieme, and Quinif, voted to accept the 1997-1998 Study Group's plan of action for future disregard of rules

by Plaintiff. (Doc. 463-51). The Board, including Defendants Beverly, Dunaway, and Hehn, met on February 24, 1998, and considered the recommendation. The Board discussed Plaintiff's repeated non-compliance with the Medical Staff Rules and the fact that subsequent to the last meeting, Plaintiff had twenty additional delinquencies. Based on these circumstances, the Board voted to instruct the administration to notify Plaintiff, in writing, of a seven-day suspension of his admitting privileges, effective March 2, 1998, and to request that Plaintiff provide a written plan of caring for his patients requiring admission during the suspension period. The Board also voted to reappoint Plaintiff to the medical staff for a six-month probationary period. (Doc. 463-8).[11] On February 24, 1998, Mr. Moore, President of the Hospital, wrote a letter to Plaintiff notifying him of the seven-day suspension. (Doc. 463-52).

On June 8, 1998, John Mansberger, M.D., Chief of Staff, wrote Plaintiff a letter notifying him that his admitting privileges were suspended for 24 hours starting on June 9, 1998. Plaintiff had five delinquent discharge summaries at that time. (Doc. 463-76, p. 63). The 1997-1998 Study Group, including Defendants Hehn, Grieme, and Story, met again on June 19, 1998. Plaintiff was notified of the meeting but declined to attend. After reviewing Plaintiff's medical record non-compliance and a statement from Plaintiff that he had no other excuse than he was involved in a divorce and had a lot on his mind, and after discussing concerns with patient care,

---

[11]Nineteen members of the Board were present at the meeting, with one absent.

the morale of the nursing staff involved with Plaintiff, and Plaintiff's personal problems that might have interfered with his ability to practice medicine competently, the 1997-1998 Study Group voted to suspend Plaintiff's admitting, consulting, and emergency room privileges for seven days, and voted to refer Plaintiff to the PWBC for an evaluation. These recommendations were forwarded to the MEC. (Doc. 463-53). On June 19, 1998, the MEC, including Defendants Hehn, Quinif, and Story, voted to accept the 1997-1998 Study Group's recommendations. (Doc. 463-54). The Board, including Defendants Beverly and Dunaway, met on June 23, 1998. The Board voted to impose a seven-day suspension of Plaintiff's admitting, consulting, and emergency room privileges. The Board also voted to require Plaintiff to provide a written plan for his patients requiring admission to the Hospital during the suspension period. Finally, the Board voted to refer Plaintiff to the PWBC. (Doc. 463-9).[12] Plaintiff was notified of the Board's decision by letter dated June 24, 1998 from Mr. Moore, President of the Hospital. The suspension was to begin on June 29, 1998. (Doc. 463-76, p. 64).

On June 30, 1998, Defendant Hehn, Chairman of the MEC, wrote a letter to the PWBC referring Plaintiff to the Committee for evaluation. Defendant Hehn stated in the letter that the 1997-1998 Study Group was organized because Plaintiff was having "repeated difficulties with medical record violations, documentation of his continuing medical education, and relationships with nursing staff. Over the past

---

[12]Thirteen members of the Board were present at this meeting, with seven absent.

years the problem has continued, and there have been clinical care concerns as well." Defendant Hehn specifically asked that the PWBC determine whether Plaintiff had any impairment in his ability to adequately perform his duties as a staff physician at the Hospital. (Doc. 463-54).

In July 1998, Defendant Hicks informed Austin Trigg of RCG that he was meeting with the Hospital administration to tell them he was leaving unless some changes were made in the Hospital's policy toward the medical staff and in the dialysis program. According to a memorandum prepared by Mr. Trigg, Defendant Hicks told him that the chances were 50-50 that he would leave to go to Tupelo to join a new practice, and it was a quality of life decision for his family. Defendant Santos also apparently expressed some interest in moving away from Thomasville. (Wood Group Exhibit 22, RCG WOOD 0000812).

On July 30, 1998, the PWBC met to discuss Plaintiff. The PWBC was made up of Defendants Dunaway, Hehn, and Story, Keith Bryson, M.D., Michael Gee, M.D., and John Mansberger, M.D. The members discussed Plaintiff's history and past issues. It was noted that quality assurance evaluations had raised several concerns about Plaintiff's clinical judgment, there was a concern about a lack of adequate after hours availability by Plaintiff, the nursing staff was hesitant to contact Plaintiff because he was argumentative, Plaintiff's work habits had changed, and his physical appearance had deteriorated. The PWBC voted that Defendant Story and Dr. Mansberger would meet with Plaintiff and inform him that he had been

addressed by PWBC, and that a decision had been reached to require him to be evaluated. Plaintiff was to be given a list of institutions outside of Thomasville recommended by the Medical Association of Georgia, and he was to have one week to make arrangements for the evaluation. If he refused to be evaluated, Plaintiff would be summarily suspended. (Doc. 463-55). On August 3, 1998, Defendant Story and Dr. Mansberger met with Plaintiff to inform him of the PWBC's recommendation. (Doc. 463-56). Plaintiff was asked to undergo a urine screening test, which was negative. (Doc. 469, ¶ 194). Plaintiff stated that he would have to talk with his personal psychiatrist before he would decide whether to agree to the evaluation. (Doc. 463-56). According to the notes from Plaintiff's psychiatrist, Plaintiff was told the reasons for the evaluation recommendation were questionable clinical competence, lack of cooperation with colleagues, poor meeting attendance, and late medical records. (Doc. 520-18).

In response to the PWBC's decision, A. Kenneth Fuller, M.D., Plaintiff's psychiatrist, wrote a letter to Defendant Story on August 5, 1998 stating his belief that there was no need for an evaluation. Dr. Fuller requested a meeting with the PWBC. Dr. Fuller ended his letter by stating that "[h]azing and harassment have no place in the disciplining of physicians." (Doc. 463-57). Dr. Fuller met with Defendant Story and Dr. Mansberger, and afterwards sent another letter to Defendant Story, this one on August 7, 1998, again stating his belief that an evaluation was not necessary. Dr. Fuller proposed meeting with the PWBC and Plaintiff on a monthly

basis. (Doc. 463-58). On August 8, 1998, Plaintiff wrote a letter to Defendant Story declining the PWBC's recommendation that he undergo an evaluation. (Doc. 463-59).

Notwithstanding the letters from Dr. Fuller and Plaintiff, the PWBC, including Defendants Dunaway, Hehn, and Story, decided at their meeting on August 28, 1998 that Plaintiff should be evaluated at an out-of-town institution. (Doc. 463-60). On August 28, 1998, Defendant Dunaway, Acting Chairman of the PWBC, wrote Plaintiff a letter notifying him of the PWBC's recommendation that he undergo an evaluation, and that failure to cooperate with the recommendation would be grounds for suspension of his medical staff privileges. (Doc. 463-61). According to Plaintiff, he was told by Defendant Story that he had to have the evaluation or would be kicked off the medical staff. Plaintiff felt coerced to go for the evaluation. (Doc. 512-22).

On September 23, 1998, Mr. Moore, President of the Hospital, wrote Plaintiff a letter notifying him that the Board approved the MEC's recommendation for Plaintiff's conditional reappointment to the medical staff. The reappointment was contingent on Plaintiff undergoing the evaluation. (Doc. 463-62).

On September 26, 1998, Plaintiff wrote to one of the investors in SGDS, Marguerite Williams. He alleges in the letter that he had problems with the Hospital since he decided to offer a competing dialysis services. Plaintiff stated that the Hospital ran off his former partner, showed "abject favoritism" to the competing

nephrology group, that the Hospital abused the peer review process, and generally treated him unfairly. (Doc. 463-149).

Plaintiff underwent a 96-hour evaluation from October 11 through October 14, 1998 at the Ridgeview Institute in Smyrna, Georgia, Georgia (the "1998 Evaluation").[13] Paul Earley, M.D., of Earley Associates, PC, was the medical director of the Impaired Physicians Program at Ridgeview. (Doc. 463-125). Plaintiff was strip searched upon arrival and was under constant watch for the entire 96 hours. ( Doc. 469, ¶ 203). Around the time Plaintiff underwent the 1998 Evaluation, a number of doctors and nurses on staff at the Hospital, as well as other members of the community, wrote to Dr. Earley on Plaintiff's behalf, some of which stated beliefs that the Hospital was angry about the competition from the SGDS facilities. (Doc. 469, ¶¶ 204-207).

In the evaluation report, Dr. Earley found that Plaintiff tended to be a conflict avoider, had a tendency to reinforce negative perceptions of those he has a conflict with, i.e., the Hospital, and could be passive-aggressive. Dr. Earley determined that Plaintiff did not suffer from substance abuse, that while previously diagnosed as

---

[13]Prior to the 1998 Evaluation, Dr. Fuller wrote a letter to Dr. Earley outlining Dr. Fuller's treatment of Plaintiff. After discussing Plaintiff's treatment, Dr. Fuller concluded the letter by stating: "Archbold Memorial Hospital has a history of monopolizing local medical services and has been vigorous in their pursuit to limit competition. In my experience, the Physician Well-Being Committee at Archbold Memorial Hospital functions more as an arm of the hospital administration than the medical staff. The hospital will lean heavily on, if not harass, physicians who go against their wishes or threaten their domain." (Doc. 463-154, pp. 21-24).

being depressed, Plaintiff's depression did not impair his ability to practice medicine, and that he had a number of current life stressors. Dr. Earley made several recommendations for both Plaintiff and the Hospital, including:

1.  Dr. Wood should, with due haste, move from being a physician who is delinquent on medical records towards one who completes medical records in an exemplary fashion. . . .As he moves forward over the next six months to one year, he must maintain an excellent completion rate of his medical records. In addition, the hospital should discontinue having his medical records on the ward. Dr. Wood should go to medical records himself - the hospital should not make special accommodations for Dr. Wood's delinquency in medical records now or at any time in the future. This first action is a sentinel action - it informs Archbold Hospital he (Dr. Wood) is changing and the situation is not hopeless.

2.  Dr. Wood should attend all medical staff meetings. . . .In addition, Dr. Wood should join the appropriate committees on the medical staff. Our long term goal with Dr. Wood is that once attitudes about his behavior change and he becomes a team player within the Archbold system, that he himself become a member of the Physician Wellness Committee.

3.  Dr. Wood, with the hospital's assistance, should discuss a cross coverage between himself and the other nephrology practice. We must acknowledge that this will be a difficult thing for Dr. Wood to do. With the assistance of Dr. Story or Dr. Dunaway or any other hospital representative, we suggest a meeting with Dr. Wood regarding cross coverage. This will free up Dr. Wood so he may complete his medical records, so he is not continually on call and will decrease the probability of burnout. Dr. Wood has strong feelings about the other nephrology practice and the hospital needs to be aware that these feelings will take time to mend. In this endeavor,

we recommend that the hospital become an ally with Dr. Wood. . . .

> 6. We strongly recommend that Dr. Wood and the hospital not use attorneys to communicate. Attorneys are helpful in delineating legal situations, in this case however, direct contact between Dr. Wood through phone conversation and face to face meetings will decrease the level of hostility and conflict. In fact, we suggest one or two representatives of the hospital meet face to face in a non-threatening environment with Dr. Wood. One good suggestion would be to go out to dinner every other week for a period of several weeks. If this proves fruitful, continue this. If this does not prove fruitful, contact us to discuss why it is not helpful for either party.

(Doc. 463-63).[14]

On October 29, 1998, Mr. Moore, President of the Hospital, wrote Plaintiff a letter conditionally approving a one-month reappointment to the medical staff subject to the following conditions:

> (1) Cooperate with all hospital staff and physicians to insure the provision of quality patient care;
>
> (2) Continue evaluation as recommended by the physician group at Ridgeview Institute in Smyrna, Georgia and the Archbold Medical Staff's Physician Well Being Committee;
>
> (3) No delinquent medical records as defined in the Medical Staff Rules & Regulations;
>
> (4) Attend all scheduled medical staff meetings and department of medicine meetings unless there is an

---

[14]After the 1998 Evaluation, Dr. Earley traveled to the Hospital himself. He testified that he wanted to "sniff out" what he could from the Hospital in relation to Plaintiff, but that he saw no overt signs that Plaintiff was being treated differently because he was a competitor of the Hospital.

emergency, and in that case, communicate the reason for absence with the department chairman;

(5) Attend any scheduled Acute Dialysis Committee meetings unless there is an emergency, and in that case, communicate the reason for absence with the department chairman;

(6) Provide appropriate coverage for patients, including arranging for patient care in case of absence or illness and;

(7) Comply with all Medical Staff Bylaws and Rules & Regulations.

(Doc. 463-75, p. 19).

On November 17, 1998, Plaintiff, Dr. Earley, and the PWBC, including Defendants Dunaway, Hehn, and Story, participated in a conference call. (Doc. 463-64). On December 7, 1998, the PWBC, including Defendants Dunaway, Hehn, and Story, discussed Dr. Earley's recommendations, which included that medical record, staff meeting, and continuing education requirements should be strictly adhered to, that Plaintiff should participate in hospital committees more, and that Plaintiff should have better interaction with nurses and the medical staff. The PWBC also noted that quarterly updates were expected from Dr. Earley. (Doc. 463-65).

With regard to the recommendations for the Hospital, Defendant Dunaway testified that Plaintiff was not put on a medical staff committee because the PWBC did not want to overburden Plaintiff with additional meetings to attend. Also, no meal between Plaintiff and anyone with the Hospital was planned because the PWBC did

not think that was an appropriate suggestion. Finally, the PWBC did not attempt to facilitate cross coverage for Plaintiff because Plaintiff was in discussions with another nephrology group to merge their practices. (Doc. 512-4).

On December 15, 1998, Michael McHugh, a Licensed Clinical Social Worker who works with Dr. Earley, wrote a letter to Defendant Story regarding a meeting members of Earley Associates had with the PWBC. The letter noted that Plaintiff was determined to be in compliance with all previously made recommendations, including completing medical records in a timely fashion, attending medical staff meetings, and maintaining continuing education requirements. Additional recommendations were discussed at the meeting, including meeting with the new Director of the Dialysis Unit, joining a committee, developing a positive communication with staff, and maintaining an open communication process to allow the PWBC to receive quarterly reports on the progress of the recommendations. (Doc. 463-75, pp.16-17).

Plaintiff and his now ex-wife, Susan, divorced in December of 1998. Their divorce decree contained a provision that if Plaintiff instituted a lawsuit against the Hospital or any of its affiliates, directors, or Board members and recovered any money, Ms. Wood was to receive one-half of the net recovery settlement or judgment. (Doc. 463-125). Plaintiff contends that even though this provision was included, he had no intention to sue the Hospital at that time. (Doc. 463-125).

At its February 1, 1999 meeting, the PWBC, including Defendants Dunaway, Hehn, and Story, noted that Plaintiff had been 100% compliant with all of Dr. Earley's recommendations. The PWBC voted to recommend to the MEC that Plaintiff be reappointed to the medical staff for one year. (Doc. 463-66). On February 2, 1999, Defendant Dunaway, Chairman of the PWBC, wrote a letter to Defendant Hehn, Chairman of the MEC, and recommended the one-year appointment. (Doc. 463-67). On February 23, 1999, Mr. Moore, President of the Hospital, wrote Plaintiff a letter notifying him of his reappointment to the medical staff for one year. (Doc. 463-68).

On October 5, 1999, Plaintiff's medical records had been 100% completed. (Doc. 469, ¶ 217). On December 7, 1999, Dr. Earley sent a letter to Dr. Story stating that Plaintiff had been in written and telephone correspondence with Dr. Earley, and they discussed his relationship with the Hospital and his ability to work within the hospital setting, among other things. Dr. Earley noted that Plaintiff was functioning at or about his meaningful baseline, as Plaintiff described an improvement in his attitude and an increased ability to work with others. Dr. Earley stated, however, that this did not mean that Plaintiff did not struggle with authority figures or working within hospital systems. He noted that some conflicts may continue to exist between Plaintiff and the Hospital, but that it was apparent that his involvement with the case was coming to a close. (Doc. 463-155, p. 4).

At its December 9, 1999 meeting, the PWBC, including Defendants Dunaway, Story, and Quinif, noted that Plaintiff had met his requirements for medical records,

his attendance at meetings had been acceptable, and that his attitude had improved. The PWBC voted to recommend to the MEC that Plaintiff be given full medical staff privileges for one year and that Plaintiff and Dr. Earley maintain some type of relationship for at least one more year, with twice yearly reports from Dr. Earley. (Doc. 463-69).

On January 10, 2000, Defendant Dunaway, Chairman of the PWBC, wrote Plaintiff a letter stating that the PWBC had received reports from Dr. Earley and Plaintiff had been doing well complying with the various requirements. Plaintiff was notified that the PWBC was recommending to the MEC that he be given staff privileges for one year. Defendant Dunaway also recommended that some type of "loose relationship" be maintained with Dr. Earley for at least one more year, possibly two, and that Dr. Earley provide twice yearly reports to the PWBC. (Doc. 463-75, p. 21). Plaintiff subsequently wrote Dr. Earley a letter dated February 9, 2000, in which Plaintiff notified Dr. Earley of the PWBC's recommendation that Plaintiff and Dr. Earley maintain a loose relationship every six months, for another year or so. (Doc. 463-155, p. 7).

On August 10, 2000, Melissa Butler, a radiology tech at the Hospital, submitted a note regarding Plaintiff. When Ms. Butler called Plaintiff to ask him a question about his patient, Plaintiff "responded in his usual sarcastic tone," commented that she was not using her common sense, and hung up on her. Also written on Ms. Butler's note was a handwritten note from John Leile, head of the

Hospital's C.T. Department, which read, "This is all too common an experience with Dr. Wood. I doubt there is a C.T. Tech that has not had multiple unpleasant experiences trying to communicate with Dr. Wood. His attitude is certainly not professional nor in the best interest of the patient." (Doc. 463-75, p. 32).

The PWBC, including Defendants Dunaway, Hehn, and Story, met on September 5, 2000, and reviewed Plaintiff's credentials file and the conditions of his reappointment to the medical staff in 1998. The PWBC noted that Plaintiff had not attended any of the seven Acute Dialysis Committee meetings from November 1999 to August 2000, he attended four out of seven meetings of the Department of Medicine, and zero Infection Control Committee meetings. His reappointment in 1998 was conditioned on him attending all scheduled medical staff, Department of Medicine, and Acute Dialysis Committee meetings unless there was an emergency, and in that case, he was to communicate personally the reason for absence to the department chairperson. The PWBC voted that Plaintiff had not fulfilled his obligations as outlined in the October 29, 1998 reappointment letter. The PWBC voted to recommend to the MEC that Plaintiff be put on probation for the next quarter, and if meetings were not attended, the PWBC would recommend that Plaintiff lose his privileges for an extended period of time. (Doc. 463-75, pp. 23-24).

On October 3, 2000, Defendant Story, Acting President of the Hospital, wrote Plaintiff a letter stating that Plaintiff had failed to attend meetings as required by the reappointment letter of October 29, 1998. Plaintiff was notified that the Board had

approved the MEC's recommendation to place him on probation for three months, that his meeting attendance would be monitored, and if his attendance was not satisfactory, disciplinary action would be taken, including possible limitation of privileges. (Doc. 463-75, p. 26).

Also in 2000, the Hospital implemented a policy for the dialysis unit providing that third shift dialysis patients were to be dialyzed for only three hours at a time. The policy was necessary, in part, due to the understaffed status of the dialysis unit. (Doc. 463-76, pp. 2-14). Plaintiff openly criticized the three-hour rule as compromising patient care. (Doc. 463-76, p. 28).

### D.    2001 Action

On February 7, 2001, Carole Edwards, a Registered Nurse at the Hospital, and Head Nurse for the Hospital's Renal Unit, wrote a letter to Defendant Story regarding Plaintiff. Ms. Edwards stated that she had attempted to reach out and talk to Plaintiff and include him in meetings and decisions, but had been met with "negative comments and criticisms." Ms. Edwards stated that Plaintiff refused to follow the Renal Unit's policies, and had been misstating the urgency of the treatments he ordered, which in turn misled the staff. She also discussed problems with Patients SS and LC. Ms. Edwards concluded the letter by stating that she had "received insults and verbal abuse" from Plaintiff, and that the Renal Unit was "spending time reacting to Dr. Wood's moods and we are not making progress." (Doc. 463-75, p. 28-30).

On February 8, 2001, the PWBC, including Defendants Dunaway, Hehn, and Story met and heard from Defendant Hicks, who was the Hospital's Dialysis Medical Director. Defendant Hicks reported several concerns about Plaintiff:

1. Dr. Wood is not a team player.

   The dialysis hours of operation are 7:00 a.m. to 7:00 p.m. Dr. Wood does not come in to see patients early therefore treatment is delayed, forcing dialysis nurses to work late. (Dr. Wood's orders are usually four-hour treatments.)

   The nighttime is reserved for true emergencies - Dr. Wood tells the nurses it is an emergency but does not come in. Current policy is that the attending physician will be in attendance to insert a catheter or provide management of patient.

2. Dr. Wood is abusive to nurses as well as his colleagues. He discredits staff and makes them feel responsible for patients' demise.

   Dr. Hicks has witnessed disruptive behavior on Dr. Wood's part on numerous occasions.

3. Quality Issues:

   Dr. Hicks stated that he does not review Dr. Wood's charts, therefore he could not attest to any particular quality issues. Dr. Hicks, however, relayed several recent cases of misrepresentation on Dr. Wood's part, where he demanded that the patient was an emergency but did not come in to place the catheter for up to 24-36 hours later.

   Dr. Wood's length of stay is longer than the other nephrologist.

(Doc. 463-75, pp. 34-35).

The letter from Ms. Edwards was presented, and the PWBC also reviewed Plaintiff's medical record and meeting attendance compliance. The PWBC recommended terminating Plaintiff's privileges or taking other serious disciplinary action for Plaintiff's inability to meet his meeting attendance requirements, for his repeated medical record deficiencies over a three-year period, for his repeated episodes of disruptive behavior after prolonged counseling, and for his failure to comply with the PWBC's recommendation to keep in contact with Dr. Earley, as no report had been received for two six-month periods. The PWBC referred the recommendation to the MEC. (Doc. 463-75, pp. 34-36).

On February 19, 2001, the MEC voted to appoint a formal study group relating to Plaintiff (the "2001 Study Group"). Keith Beverly, M.D., was to inform Plaintiff of the existence of the group and invite him to attend. (Doc. 463-79).

The 2001 Study Group met on February 26, 2001. No individual Defendants were members of the 2001 Study Group.[15] Plaintiff attended the meeting. At the meeting, Plaintiff informed the 2001 Study Group that his son was his priority and usurped any meetings or medical records timeliness standards. Plaintiff told the 2001 Study Group that he could not attend the morning dialysis meetings because he took his son to school at that time. Plaintiff stated that he did not miss meetings or have delinquent medical records on purpose, that he had communicated with Dr.

---

[15]The members of the 2001 Study Group were Jack Mansberger, M.D., Keith Beverly, M.D., Noel Haskins, M.D., Lissa Murphy, M.D., James Smith, M.D., Thomas Meecham, M.D., Michael Gee, M.D., and Cordell Bragg, M.D. (Doc. 463-75, p. 47).

Earley, and that he did not have a problem with any of the nurses in the Hospital. Finally, Plaintiff told the 2001 Study Group that he believed his attitude was much better. After Plaintiff was excused, the 2001 Study Group voted that Plaintiff should be required to sign an agreement stating that he would abide by the Medical Staff Rules, attend 50% of all medical staff and committee meetings, comply with the rules for medical record completion, and work with his peers and have no incident reports or complaints from the staff or disruptive behavior. The 2001 Study Group voted to recommend that failure to do so would mean voluntary relinquishment of medical staff privileges, and that Plaintiff would be asked to sign the agreement, but if he did not, he would be suspended for 30 days. These recommendations were referred to the MEC. (Doc. 463-75, pp. 47-48).

On March 16, 2001, Dr. Earley wrote a letter to Defendant Dunaway, in which he stated that he had three telephone sessions with Plaintiff in December 1999, June 2000, and February 2001. Dr. Earley noted that Plaintiff's conversations were focused on difficulties in his relationship to the Hospital. "Of note is on the last telephone conversation is a sense that the hospital continues to misunderstand him, and to not provide him with the best possible environment to practice the best possible medicine. . . .[H]is belief system is that there are more difficulties in relating to the hospital recently."  (Doc. 463-75, p. 38).

The MEC met on March 19, 2001. It was presented to the MEC that Defendant Dunaway communicated with Dr. Earley and that Dr. Earley stated that

he had had three phone conversations with Plaintiff. (Doc. 469, ¶ 305). The MEC, including Defendant Quinif, voted that Plaintiff should sign the agreement proposed by the Study Group, and that if Plaintiff refused to do so, he would voluntarily relinquish his medical staff privileges.[16] The MEC voted to recommend to the Board that Plaintiff be reappointed for one month if he signed the agreement. (Doc. 463-80). On or about March 27, 2001, the Board approved another one-month reappointment for Plaintiff. (Doc. 469, ¶ 306).

On April 13, 2001, Defendant Story, President of the Hospital, wrote a letter to Plaintiff stating that the MAC had reviewed the findings of the MEC and the Study Group, and that the MAC would make a recommendation to the Board to approve Plaintiff's reappointment to the medical staff, subject to his signing the written agreement. Plaintiff was notified that the agreement would contain language stating that he agreed that failure to comply with the terms of the agreement would yield immediate, voluntary termination of his medical staff privileges. (Doc. 463-75, p. 42).

Plaintiff signed the agreement containing the voluntary termination language on April 17, 2001 (the "April 17, 2001 Agreement"). Plaintiff specifically agreed to the following:

1.    I will comply with the rules of the medical staff.

_____

[16]The members of the MEC at that time were Defendant Quinif, John A. Blackmon, M.D., Michael Gee, M.D., Dominic Monda, M.D., Sandra B. Reed, M.D., James E. Smith, M.D., Timothy H. Ward, M.D., and Keith Beverly, M.D. (Doc. 463-80).

a. I will attend 50% of the combined total regular and special meetings, of the department assigned, and of the committees assigned. In addition, I will attend the annual meeting of the Archbold Division medical staff. . . .

b. I will complete medical records as outlined in the Rules and Regulations of the Medical Staff.

2. I will demonstrate, to the satisfaction of the Peer Review Committee of the Division to which I am assigned, to the Medical Executive Committee, and to the Board, a willingness and capability based on current attitude and evidence of performance to work with and relate to other staff members, members of other health disciplines, ARHS management and employees, patients, and the community in general, in a cooperative, professional manner that is essential for maintaining a hospital environment appropriate to quality and efficient patient care.

There must be no documented and substantiated incident reports or staff complaints of episodes of disruptive behavior. In this connection, I understand that I must maintain a therapeutic relationship with Dr. Earley and that the Physician Well-Being Committee will receive at least 2 written reports per year from Dr. Earley with his recommendations as appropriate.

I understand and agree that failure to comply with this agreement will yield immediate, voluntary termination of my medical staff privileges and membership of the medical staff of John D. Archbold Memorial Hospital, Inc., Grady General Hospital and Brooks County Hospital.

(Doc. 463-75, p. 43).

On April 24, 2001, Defendant Story, President of the Hospital, wrote Plaintiff a letter notifying him the Board approved Plaintiff's reappointment to the medical staff, subject to the provisions of the April 17, 2001 Agreement. (Doc. 463-75, p. 45).

In May 2001, Robert Qualheim, M.D., another nephrologist, joined Plaintiff's practice. (Doc. 469, ¶ 311).

On June 6, 2001, Ms. Edwards submitted a Quality Improvement Program Report ("QUIP Report") in which she stated that Plaintiff positioned a patient's catheter improperly. (Doc. 463-76, p. 40). On June 10, 2001, Evelyn Considine, Assistant Head Nurse of the Renal Unit, wrote a memo regarding Plaintiff and his patients, HA and DH. Ms. Considine stated that Plaintiff was rude to her and two other nurses, and concluded by stating that Plaintiff "needs to be more considerate of other people's feelings. It's bad enough when the work load is heavy without enough help. Crushing your spirit on days like last Saturday just made the day much harder and added more stress in an already stressful situation." (Doc. 463-75, pp. 63-64).

On June 12, 2001, the MEC voted to reconvene the 2001 Study Group to determine if the recent reports of disruptive behavior on Plaintiff's part was a violation of the April 17, 2001 Agreement. (Doc. 463-81).

On June 15, 2001, Ms. Edwards submitted another QUIP Report in which she stated that Plaintiff had improperly ordered staff to dialyze a patient who was too unstable, as the patient had no pulse for a long period of time. (Doc. 463-76, p. 42).

On June 16, 2001, Defendant Hicks wrote a letter to James E. Smith, M.D., Chief of Staff. In the letter, Defendant Hicks discussed Patient FB, one of Plaintiff's patients. Defendant Hicks stated that Plaintiff improperly ordered dialysis on FB, even though she had no pulse for an extended period of time. Defendant Hicks stated that Plaintiff had a number of recurring problems, including blaming nurses when he did not get his way, demanding dialysis without regard to nursing availability or the patient's need, and a lack of accountability. (Doc. 463-76, p. 38).

Ms. Edwards submitted another QUIP Report on June 27, 2001. In that Report, she stated that Plaintiff made derogatory comments about care being given by Hospital staff, was trying to circumvent rules, was blaming the dialysis unit for problems they did not create, and was not following rules about scheduling patients. (Doc. 463-76, p. 44).

The 2001 Study Group met again on June 27, 2001. Plaintiff was on vacation and was not informed about the meeting. Ms. Edwards and Defendant Santos presented several incidents about Plaintiff and his disregard for the rules on the Renal Unit. Incident reports were presented relating to Plaintiff's general attitude and comments to the nursing staff, patients, and family members. The 2001 Study Group voted unanimously that:

> Upon review of the documentation presented, and with referral to the CEO of Archbold Hospital, a Motion was made, seconded and carried that Dr. Wood had in fact exhibited disruptive behavior, been the recipient of many complaints from staff and failed to relate to other staff

members, and employees in a cooperative, professional manner as required by the Agreement.

The recommendation was to be referred to the MEC and to the CEO of the Hospital.[17] The 2001 Study Group decided there was no need to inform Plaintiff of the recommendation at that time. (Doc. 463-75, pp. 50-51).

The MEC met on July 12, 2001. No individual Defendants were members of the MEC.[18] The MEC reviewed background information pertaining to Plaintiff, as well as the findings and recommendation of the 2001 Study Group. The MEC concluded that Plaintiff breached the April 17, 2001 Agreement. The MEC noted that since Plaintiff signed the April 17, 2001 Agreement, documentation had been presented of his continued disruptive behavior and general disregard for rules. The MEC specifically noted the following:

1.  Many of the nursing staff are fearful and intimidated of contacting Dr. Wood for fear of verbal insult and intimidation. This often results in delayed treatment of patients and delayed administration of interventions to address patients [sic] immediate concerns.

2.  Dr. Wood's disruptive conduct has an adverse impact on staff morale and threatens the functioning of the dialysis unit. His conduct also adds undo [sic] stress to the working environment of the dialysis staff and physician colleagues, and as a

---

[17]Defendant Beverly was not the CEO of the Hospital at that time.

[18]The members of the MEC were Michael Gee, M.D., N. Clay Haskins, M.D., Patricia Patterson, M.D., Sandra Reed, M.D., James E. Smith, M.D., B. Keith Beverly, M.D., Lissa Murphy, M.D., and Frederick Nusbickel, M.D.

consequence, impairs the hospital's ability to recruit and retain adequate staff to meet the dialysis needs of its patients.

3. Dr. Wood has on several occasions ordered "emergency" dialysis on non-emergent patients during non-business hours in direct conflict with approved written dialysis procedures. In one instance, he ordered "emergency" dialysis on a Sunday after providing a pass for the patient to leave the hospital to check her home on Saturday -- hardly indicative of a patient needing emergency dialysis. Another physician examined the patient on Sunday and determined there was no need for emergency dialysis. On yet another occasion he delayed dialysis during regular hours on a critically elderly patient necessitating after hours dialysis on Sunday yet another example of failure to consider staff needs in making dialysis decisions.

4. Dr. Wood has made derogatory remarks to the critical care unit staff about the dialysis staff, some of which were repeated to patient family members.

5. Some of these incidents of unprofessional conduct also raise quality of care concerns, such as Dr. Wood's ordering nurses to continue dialysis on a patient who had recently coded with a long period of exhibiting no pulse. In another case, Dr. Wood ordered a patient to undergo dialysis after being informed the patient's catheter was improperly positioned for such a procedure.

(Doc. 463-75, p. 55).

As a result of the violations of protocol and demonstrated disruptive behavior that negatively impacted patient care, the MEC accepted Plaintiff's voluntary resignation, which was required by the April 17, 2001 Agreement, but decided to

allow Plaintiff to appeal the decision. The MEC recommended that Plaintiff be summarily suspended if he contested the voluntary resignation. Patricia Patterson, M.D., abstained from the vote on Plaintiff. (Doc. 463-75, pp. 53-56). Dr. Patterson abstained from the vote because she "had concerns about the issues, whether they really involved patient care or other interactions that were not directly related to patient care." She recalled the problem seemed to be more of a "behavioral conflict than adverse patient care." (Doc. 463-88, p. 7).

On July 18, 2001, Defendant Story, President of the Hospital, wrote Plaintiff a letter notifying him that the MEC determined he violated the April 17, 2001 Agreement and of the MEC's decision to accept his voluntary resignation. Defendant Story notified Plaintiff that he would be allowed to appeal and told him that he would be summarily suspended if he contested the resignation. (Doc. 463-75, pp. 58-60). A memo was sent from James E. Smith, M.D., Chief of Staff, to the Admitting Office, Emergency Department, Medical Records Department, and Nursing Department notifying them that Plaintiff had resigned from the medical staff and had no admitting privileges effective July 18, 2001. (Doc. 463-155, p. 16). Also on July 18, 2001, Dr. Qualheim sent a memo to the medical staff stating that Plaintiff had not voluntarily resigned. (Doc. 463-155). Plaintiff decided to appeal the voluntary resignation.

On September 28, 2001, Defendant Story, President of the Hospital, sent Plaintiff a notice of hearing regarding his appeal of the voluntary resignation. Defendant Story provided Plaintiff with the names of the hearing officer and the

hearing panel, the MEC's proposed witnesses, and the reasons Plaintiff was

deemed to have breached the April 17, 2001 Agreement, including failing to maintain

a therapeutic relationship with Dr. Earley. The letter also stated that concerns had

been raised about Plaintiff's treatment of seven patients, and the patient numbers

were provided.[19] Plaintiff was notified that he could be represented by counsel, call

witnesses, cross-examine witnesses, and present evidence. (Doc. 463-76, pp. 47-

49).

On November 20, 2001, Dr. Earley wrote a letter to Defendant Dunaway and

the PWBC, and stated that no therapeutic relationship was ever established with

---

[19]Because of privacy concerns, patients are referred to by their initials or medical record numbers. The patients referenced in the letter, along with the treatment concerns, were:

MR # 098820 - Plaintiff ordered dialysis on a hypotensive severely anemic patient without adequately assessing her condition and failing to be present to assist with her emergent care.

MR # 119312 - Plaintiff ordered "emergency" dialysis on Sunday after providing the patient with a pass on Saturday in direct conflict with approved written dialysis protocols.

MR # 119689 - Plaintiff transferred a patient to the floor from the ICU despite worsening CXR. The patient subsequently sustained respiratory arrest, coded, and died.

MR # 160910 - Plaintiff ordered nurses to continue dialysis on an unstable patient who had experienced cardiac arrest in spite of nursing staff objections.

MR # 177653 - Plaintiff delayed ordering dialysis during regular hours on a critically ill elderly patient necessitating after hours dialysis on Sunday.

MR # 208290 - Plaintiff ordered an excessive dose of Demerol on a patient with abdominal pain who coded and expired shortly afterward.

MR # 217075 - Plaintiff ordered a patient to undergo dialysis after being informed the patient's catheter was improperly positioned.

Plaintiff. Instead, he was working to improve the relationship between Plaintiff and the Hospital. (Doc. 463-75, p. 40).

On November 21, 2001, counsel for the Hospital wrote Plaintiff's counsel to notify her of changes in the Hospital's witnesses for the upcoming appeal hearing. (Doc. 512-6).

An appeal hearing on what the MEC deemed Plaintiff's voluntary resignation, and what Plaintiff considered to be a summary suspension, was held from November 28 through November 30, 2001 (the "2001 Appeal Hearing"). Plaintiff was represented by counsel at the 2001 Appeal Hearing, was allowed to present witnesses and evidence, and was allowed to cross-examine witnesses. (Docs. 463-70 - 463-74). The 2001 Appeal Hearing Panel consisted of Thomas C. Perry, Powell Jones, and Defendant McMillan. None of the Panel members were nephrologists; in fact, Messrs. Perry and Jones were not physicians. (Doc. 463, ¶ 92).

Together, the parties offered approximately 80 exhibits. (Doc. 463, ¶ 97). The MEC offered the testimony of seven witnesses in support of its recommendation, all of whom were cross-examined by Plaintiff's attorneys. (Doc. 463, ¶ 98).

Plaintiff testified, and also offered the testimony of 36 witnesses on his behalf. (Doc. 463, ¶ 99). For instance, Gregory Knowlton, a nephrologist, provided expert testimony in support of Plaintiff. (Doc. 469, ¶ 359). Dr. Knowlton testified that he could not imagine permitting the suspension of a physician for patient care concerns premised solely upon the input of a direct competitor on staff at the hospital. (Doc.

469, ¶ 360). He stated that in that situation, he would have had uninvolved specialists in a similar field or independent experts review the cases and concerns. (Doc. 469, ¶ 361). In addition, some members of the nursing staff testified that Plaintiff was a "fine physician," and that they would not hesitate to have Plaintiff treat them. (Docs. 463-70, pp. 53-54; 463-71, pp. 34, 44; 463-72, pp. 2, 4).[20]

Following the hearing, Plaintiff and the Hospital each submitted a post-hearing brief for consideration. (Doc. 469, ¶¶ 364-65).

In its decision dated January 28, 2002, the 2001 Appeal Hearing Panel unanimously found that "there was some evidence submitted that Dr. Wood has been a disruptive physician, but by a preponderance of evidence it is the Panel's finding that: (1) Dr. Wood's "voluntary resignation" be immediately vacated, and (2) Dr. Wood be immediately reinstated as an active member of the medical staff of the Hospital with full medical staff privileges." (Doc. 463-83).

On or about February 5, 2002, the Board approved the immediate reinstatement of Plaintiff's active medical staff privileges at the Hospital. (Doc. 46, ¶ 369). On February 15, 2002, Defendant Story, President of the Hospital, wrote Plaintiff a letter notifying him that the Board had approved the immediate vacation of the voluntary resignation and immediate reinstatement of privileges. Plaintiff was put on notice that he had to comply with the Medical Staff Rules and Regulations,

---

[20]The Court notes that when asked during the 2001 Appeal Hearing whether she believed the action against Plaintiff's privileges was politically motivated, Dr. Patterson responded, "I really can't answer that, because I really don't know." (Doc. 463-72, p. 7).

had to attend 50% of the combined total regular and special meetings of the department and committees assigned, along with the annual staff meeting, had to complete medical records as outlined in the Medical Staff Rules, and had to demonstrate a willingness and capability to work with and relate to other staff members. (Doc. 463-84). On February 28, 2002, Defendant Story, President of the Hospital, wrote Plaintiff a letter notifying him that the Board had reappointed him to the medical staff for two years. (Doc. 463-92, p. 9).

From July 18, 2001 through February 15, 2002, Plaintiff could not admit or treat any of his patients at the Hospital. The Hospital did not report Plaintiff's loss of privileges to the Georgia Board of Medical Examiners ("BOMEX") or to the National Practitioner's Data Bank (the "Data Bank"). (Doc. 469, ¶ 342).

In January 2003, Dr. Qualheim terminated his relationship with Plaintiff. (Doc. 469, ¶ 378). He became an employee of NCI on March 1, 2003. (Doc. 469, ¶ 379). Part of the reason Dr. Qualheim left Plaintiff was that there was not enough business to sustain a two-man practice, while NCI needed an additional doctor. Prior to leaving Plaintiff's practice, Dr. Qualheim and Dr. Santos discussed the possibility of the two practices merging into one. According to Dr. Qualheim, Plaintiff was aware of the proposed merger and was very interested in that prospect. When the idea for the merger fell apart, Dr. Qualheim told Plaintiff that he was thinking about going to work for NCI. It was Dr. Qualheim's understanding from Defendant Santos prior to going to work for NCI that "Dr. Hicks was the liaison . . . with meetings with Bill

Sellers - - that I would be offered [a contract] . . . I would have a guaranteed salary and that . . . Dr. Hicks and Dr. Santos were not paying me. . . ." He understood that he would be a medical director for the dialysis unit at the Hospital and would receive a third of the medical director fees. He was to receive $360,000 in salary from NCI, of which $125,000 was medical director fees from the Hospital. When asked if such an arrangement was proper or improper, Dr. Qualheim stated that he has "seen that executed all the time, anywhere I've ever been with hospitals." Dr. Qualheim testified that he never felt the Hospital was attempting to steal him away from Plaintiff or trying to interfere with his employment relationship with Plaintiff. (Doc. 463-167). Prior to the time Dr. Qualheim joined NCI, Plaintiff and Dr. Qualheim negotiated a release of Dr. Qualheim from his restrictive covenants with Plaintiff that allowed Dr. Qualheim to practice at NCI in competition with Plaintiff in exchange for payment of approximately $100,000 to Plaintiff. (Doc. 463, ¶ 380).

Also in January 2003, the Hospital, through Defendants Beverly and Story, hired Health Care Consulting Associates, LLC ("HCCA"), an outside consulting group, to evaluate certain areas of clinical effectiveness and operational performance at the Hospital. (Doc. 469, ¶ 384). The HCCA consultants worked for the Hospital for approximately two years and spent a considerable amount of time at the Hospital. (Doc. 469, ¶ 385). Joel Donovan, one of the consultants, testified that "it was made pretty clear to us . . . that Dr. Wood was someone that really needed to be looked at. And that we had the very strong feeling and opinion that he

was being zeroed out and being looked at for ways to get him separated from his privileges. . . ." (Doc. 469, ¶ 394). When questioned further, Mr. Donovan testified that no one told him to "go after" Plaintiff. (Wood Group Exhibit 4, Donovan Dep.). In the final report, the consultants stated: "Mr. Beverly's style is a significant issue for the organization. He is viewed as a 'bully,' second guessing others and ridiculing them and humiliating them in front of peers," and that ". . .[Defendant Story] was viewed as Mr. Beverly's puppet by employees and physicians." (Doc. 469, ¶¶ 391-92).

Dr. Fuller testified during the course of this case that Defendant Beverly had a "reign of domination at the hospital," and that he had such control that he could get the medical staff to perform peer review when it was not warranted. (Doc. 469, ¶¶ 466-67). Defendant Simms testified that the Board was controlled by Defendant Beverly, and a former Hospital administrator testified that Defendant Beverly exerted some influence over the Board. (Doc. 469, ¶¶ 649-50).

In 2003, Defendant Simms was elected by his peers to the non-salaried position of Chief of Staff of the Hospital. The Chief of Staff serves a one-year term, beginning March 1 and ending February 28 of the following year. Being Chief of Staff is a three-year obligation. The physician elected Chief of Staff first serves a year as Chief of Staff Elect. He then becomes Chief of Staff and a member of the Board. In the third year, he serves as immediate past Chief of Staff and Chairman of the MEC. (Doc. 467-3).

Defendant Simms became Chief of Staff Elect on March 1, 2003. He assumed the positions of Chief of Staff and member of the Board on March 1, 2004. As Chief of Staff, Defendant Simms was also an *ex officio* member of the MEC. Defendant Simms rotated off the Board on February 28, 2005, and became Chairman of the MEC. (Docs. 467-2; 467-4; 467-5).

In the spring and summer of 2004, the Hospital, including Defendants Beverly and Story, and Defendants Hicks and Santos entered into discussions with RCG, which at that time owned the outpatient facilities where Plaintiff served as medical director, about a possible joint venture. Plaintiff was not involved in the discussions, and refers to the discussions as "secret." Austin Trigg of RCG testified that it was in the interest of both the Hospital and RCG for the discussions to remain confidential, and it was RCG's policy that until something had been decided definitely not to discuss the venture with any employees or medical directors, which would include Plaintiff. (Doc. 520-16). RCG provided to the Hospital some of its patient census and financial records. (HOSP 100005-100036). The joint venture was put on hold by the Hospital because of issues relating to Plaintiff's medical staff privileges, which are addressed *infra*. (Doc. 520-16).

### E.     2004-2005 Action

On May 3, 2004, Rosalba Moore, a Hospital lab tech, wrote an occurrence report regarding Plaintiff. Ms. Moore stated that Plaintiff hung up the telephone on her before repeating back lab test results. (Doc. 463-92, p. 11). Plaintiff did so even

though there was a Hospital rule and medical standard requiring him to repeat back the results. (Doc. 463-95, pp. 40-43).

On May 26, 2004, the Physician Well-Being Committee ("PWBC") met. (Doc. 469, ¶ 406). At that meeting, Defendant Hartsfield reported that "there have been several reports of Dr. Wood and disruptive behavior. . . ." (Doc. 469, ¶ 407). The PWBC decided that the matter involving Ms. Moore would be "discussed informally with Dr. Wood. Dr. McMillan, Department Chairman, Dr. Simms, Chief of Staff and Dr. Hartsfield will participate in this meeting." (Doc. 469, ¶ 408). It was felt by the PWBC that it "appears that a pattern of disruptive behavior is once again developing." (Doc. 469, ¶ 409). The PWBC determined that "if such behavior continues . . . [it] will have zero tolerance in this matter. . . .Informal meeting shall be documented." (Doc. 469, ¶ 410).

On May 27, 2004, Defendant McMillan, Chairman of the Department of Medicine, prepared a memo to his file regarding his meeting with Plaintiff about the May 3, 2004 occurrence report and letters from a nurse. Defendant McMillan noted that Plaintiff explained the course of events, and he found Plaintiff's actions to be medically appropriate. Plaintiff did acknowledge that he may have been abrupt with Ms. Moore, but that he was working on improving that behavior. (Doc. 463-92, p. 15).

The PWBC met again on May 28, 2004. (Doc. 469, ¶ 413). Defendant Hartsfield reported that Defendant McMillan met with Plaintiff to discuss one

occurrence report and two letters from a nurse on the dialysis floor. "It was the impression of Dr. McMillan that Dr. Wood complied with the Policy & Procedure." (Doc. 469, ¶ 414). The PWBC decided to "continue monitoring [Plaintiff] through peer review and hospital processes"; otherwise, no action was needed at that time. (Doc. 469, ¶ 415).

On June 29, 2004, Defendant Grieme, Chairman of the MEC, wrote Plaintiff notifying him of the illegibility of his documentation, which was creating difficulty with accurate interpretations. Plaintiff was notified that the Medical Record Review Committee would intermittently review his records for legibility and would report its findings to the MEC. (Doc. 463-92, p. 17). Plaintiff offered to dictate his progress notes subsequent to that date, but he never received a response to his offer. (Doc. 469, ¶¶ 419-20).

The PWBC met again on July 9, 2004. (Doc. 469, ¶ 421). During that meeting, "Dr. Hartsfield reported there has been another incident involving Dr. Wood where he did not answer his pager or his phone when called. Since this is a patient safety issue, Dr. Hartsfield will address this recent incident with Dr. McMillan, Department of Medicine Chairman. Report as appropriate." (Doc. 469, ¶ 422).

On July 22, 2004, Kristy Culp, a Registered Nurse at the Hospital, submitted a report about Patient AB, one of Plaintiff's patients. (Doc. 463-92, pp. 19-20). Patient AB had a hematoma on her leg that was swelling before Ms. Culp's eyes.

Ms. Culp called Plaintiff three times for instructions on how to treat the problem. The third time, she called Plaintiff to

> [I]et him know that the thigh was really, really big and that it seemed like all the fluid and blood was going into this thigh, is the way it looked. . . .I said, I think she's bleeding into this thigh. He said, Well, you need to hold pressure. I said, I can't figure out where to hold pressure. It's huge and she can't tolerate me touching it, there's so much pain there. She was just screaming in pain. She would not let me try to palpate it to, you know, figure out what was going on. He said, Apply some type of pressure dressing. And I said, Well, I don't know where to put it and I'm not comfortable wrapping this leg circumferentially. Her pulse is already getting weaker. So he was just like, Well, I don't know what to do. Do you have any better ideas? And I was like, No. And then he said, Well, just call me when there's a real emergency. And that was the end of the conversation.

(Doc. 463-85, p. 40).

Ms. Culp had to seek intervention from Defendant Hall, who took the patient to surgery. (Docs. 463-85, p. 40; 463-92, pp. 19-20). Following the incident, Defendant Hall suggested that Ms. Culp write down what had happened because she was so upset and she thought things had not been handled correctly by Plaintiff. Defendant Hall told Ms. Culp that if she did not write up the incident, nothing would change. (Docs. 463-85, p. 41; 463-87, p. 62). Defendant Hall's surgical group had been involved in Patient AB's care prior to the July 22, 2004 incident. (Doc. 469, ¶ 428). On July 21, 2004, Valerie Bush, a Physician's Assistant who worked for Defendant Hall's surgical group, was called by one of the dialysis unit nurses, who

requested that Ms. Bush look at the patient's life sites, as a small hematoma had formed. (Doc. 463-87, p. 23). After she saw the patient, Ms. Bush spoke with Plaintiff, and told him that she would tell Defendant Hall about the patient, which she did at the end of the day. (Doc. 463-87, pp. 23-24). Defendant Hall did not see the patient on July 21, and does not recall Ms. Bush asking him to come see the patient on July 21. (Doc. 463-85, pp. 55-56).

On July 24, 2004, Cheryl Barton, Assistant Nurse Manager of the ICU, prepared a memo to the director of Critical Care and Nephrology stating that on July 8, 2004, after multiple tries she was unable to contact Plaintiff to inform him of a grave change in the condition of Patient JD, one of Plaintiff's patients. Ms. Barton ended up having to have another doctor assume care of the patient. (Doc. 463-92, p. 22). On July 24, 2004, Sharon Herring prepared a memo to Jeff Byrd, M.D., head of the Hospital's lab, stating that after returning pages from the lab, Plaintiff spoke to the lab workers in a very sarcastic manner when they were trying to give him lab results. (Doc. 463-92, p. 13).

On August 12, 2004, Defendant Story, President of the Hospital, wrote a letter to Defendant Grieme, Chairman of the MEC, and requested that a formal study be conducted with respect to certain reported actions of Plaintiff. Defendant Story specifically referred to the incidents involving Ms. Moore, Patient AB, and Patient JD. He also referred to Patient MB, who was a patient of Plaintiff's who was hospitalized for a week and had problems with his arm. It was reported that Plaintiff failed to

appropriately consult a surgeon concerning post-surgical complications, but instead discharged the patient. Patient MB was readmitted to the Hospital a couple of weeks later, was determined to have an infected pseudoaneurysm of the shunt on his arm, and had to have immediate surgery. (Doc. 463-92, p. 24).

On August 16, 2004, the MEC, including Defendants Grieme, Hall, McMillan, and Simms, met.[21] The MEC recommended eight physicians to serve on the study group, and the MEC voted for Defendant Simms, Chief of Staff, to appoint five physicians from the list to the study group, with Defendant Hehn to serve as Chairman of the study group. (Doc. 463-92, pp. 28-29). Defendant Simms selected Defendants Hehn, Quinif, and Falconer, Clay Haskins, M.D. and Karen Bramblett, M.D., to serve on the study group (the "2004 Study Group"). Defendant Simms chose these physicians because "all of them had in some way, I felt, some expertise regarding management of critical patients and that they would be impartial, I felt. I didn't think there was anybody there with an ax to grind, and they were willing to serve." (Doc. 467-13).

Plaintiff contends that all of the members of the 2004 Study Group had some sort of improper "financial connection" to the Hospital. For instance, Defendant Hehn's medical practice's real estate limited partnership leased space from the Hospital. His medical practice also had a contract with the Hospital to supervise the

---

[21]The 2004 MEC consisted of Defendants Grieme, Hall, McMillan, and Simms, John A. Blackmon, M.D., Amy A. Cooper, M.D., Archibald A. McNeill, M.D., and Timothy H. Ward, M.D.

nurse practitioners who worked in the rural clinics. (Doc. 520-8, p. 4). Defendant Falconer served on the Hospital's EKG reading panel, for which he was paid. (Doc. 469, ¶ 96). Defendant Quinif's medical practice is party to an oral lease agreement with the Hospital or Medical Center for practice space. (Doc. 469, ¶ 93). The Court has not been directed to any evidence in the record showing a similar "financial connection" between Drs. Haskins and Bramblett and the Hospital.

Sometime prior to August 17, 2004, Plaintiff met with Defendants McMillan, Simms, and Hartsfield to discuss the facts and circumstances surrounding Patient AB's care. (Doc. 469, ¶ 444). On or about August 17, 2004, Defendants McMillan and Hehn orally informed Plaintiff that a study group had been formed regarding Plaintiff. Both Defendants state that they never represented to Plaintiff that the study group had been convened to discuss just Patient AB, though Plaintiff says they did. The file memo written by Defendant McMillan states that he "communicated by telephone with Dr. Mark Wood to inform him that an Ad hoc Committee has been formed to study complaints that have been registered against him." (Doc. 463-92, p. 34). Defendant McMillan invited Plaintiff to attend the 2004 Study Group's meeting, but Plaintiff stated that he would provide a letter and did not think it was necessary to attend the meeting. (Doc. 463-92, pp. 34, 36).

On August 17, 2004, Plaintiff wrote a letter to Defendant McMillan containing an explanation of his treatment of Patient AB. Plaintiff stated that he accepted responsibility for the delay in surgical intervention, as he was the attending

physician. He acknowledged that he was slow to change a diagnostic mind set, that he did not make sure that the needs or concerns of the nurse were adequately addressed, and that he was simply fatigued. Plaintiff also, however, pointed the finger at the nursing staff with regard to the patient's treatment. (Doc. 463-92, p. 32).

The 2004 Study Group, including Defendants Hehn, Falconer, and Quinif, met on August 19, 2004. Plaintiff did not attend. (Doc. 463-93, pp. 15-16). Defendant Hartsfield, who was not a member of the 2004 Study Group, attended meetings, interviewed Hospital employees for the committee, and advised the committee on procedural and logistical issues. (Doc. 463-85, pp. 27-28).

Defendant Hehn stated the purpose of the 2004 Study Group as: "(1) Review history, recommendations and outcomes 1996-present; (2) Determine if Dr. Wood is meeting the standards for medical staff membership; (3) Plan for reviewing evidence of how Dr. Wood is meeting the standard; and (4) Report conclusions and recommendations to Medical Executive Committee within 30 days." According to the minutes from the meeting, the 2004 Study Group reviewed the following documents: (1) an outline of Plaintiff's history from 1996 to present; (2) the August 12, 2004 letter from Defendant Story; (3) documentation from Defendant McMillan regarding his meeting with Plaintiff on May 27, 2004 about Ms. Moore's report; (4) the June 29, 2004 letter from Defendant Grieme regarding Plaintiff's handwriting; (5) the report from Ms. Culp about Plaintiff and Patient AB; (6) the report from Ms. Barton about Plaintiff and Patient JD; (7) the July 24, 2004 memo from Ms. Herring; and (8) the

letter Plaintiff wrote Defendant McMillan about Patient AB. The 2004 Study Group also discussed Patient MB. After reviewing this documentation, the 2004 Study Group recommended the following plan of action: "(1) Conduct Chart Review - Assemble all [Quality Assurance] issues that involved Dr. Wood - Dr. Falconer to review and report at next meeting; (2) Interview head nurses on 2 East and ICU - Dr. Quinif to conduct interviews and report at next meeting; (3) Schedule interviews with Kristi Culp, Cheryl Barton, Dr. Hall - Dr. Hehn to schedule interviews for next meeting; and (4) Allow Dr. Wood an opportunity to respond." The 2004 Study Group also recommended that Defendant McMillan send a letter to Plaintiff about their next meeting. (Doc. 463-93, pp. 15-16).

On August 23, 2004, Defendant McMillan wrote a memo to Plaintiff notifying him that the 2004 Study Group met on August 19, 2004 and reviewed his letter of August 17, 2004. Plaintiff was informed that the 2004 Study Group was meeting again on August 24, 2004, and that the 2004 Study Group would like to meet with him. (Doc. 463-93, p. 20). Plaintiff wrote back to Defendant McMillan on August 23, 2004, stating that he had expressed his perspective and would not meet with the 2004 Study Group without counsel present. (Doc. 463-93, p. 22). In the alternative, Plaintiff offered to meet with Defendant Hehn one-on-one without counsel present, but the 2004 Study Group did not believe that to be appropriate. (Doc. 463-93, pp. 22, 24). It is admitted that individual members of the 2004 Study Group met one-on-

one with people other than Plaintiff and outside of the full committee. (Doc. 469, ¶ 452).

The 2004 Study Group, including Defendants Hehn, Falconer, and Quinif, met again on August 24, 2004. The 2004 Study Group discussed Plaintiff's offer to meet separately with Defendant Hehn. The 2004 Study Group voted unanimously that Plaintiff would continue to be invited to the meetings, but meeting outside of the committee could jeopardize peer review protection. Plaintiff did not attend the meeting. (Doc. 463-93, p. 24).

The 2004 Study Group interviewed Ms. Barton, Ms. Culp, Defendant Hall, and Andrea Wilkins.[22] A summary of each interview was made, signed by the interviewee, and attached to the minutes from the meeting.

Ms. Barton was asked to comment on her memo dated July 24, 2004. She informed the 2004 Study Group that on July 8, 2004, she attempted to page Plaintiff concerning a patient of his in the CCU (Patient JD). Ms. Barton stated that the patient's condition had deteriorated rapidly and she started paging Plaintiff around 4:00 a.m. and continued every fifteen minutes until approximately 6:45 a.m.[23] She also called Plaintiff's home, but never received an answer, and the hospital operator also attempted to contact Plaintiff. The patient coded around 4:20 a.m. Ms. Barton

---

[22]Ms. Wilkins was a nurse tech who worked with Ms. Culp on Patient AB. She discussed Patient AB with the 2004 Study Group. (Doc. 463-94, p. 44).

[23]The Court notes that nursing records show that Plaintiff was paged approximately four times over an hour. (Doc. 512-25, p. 16).

also told the 2004 Study Group that working with Plaintiff was difficult. She stated that Plaintiff was rude and it was difficult to get directions from him. When asked for directions regarding a patient, Plaintiff would often respond, "What do you want me to do?" He would also often ask, "Why are [you] calling me?" when she called about a patient. (Doc. 463-93, p. 29).

Ms. Culp discussed Patient AB with the 2004 Study Group. She told the 2004 Study Group about contacting Plaintiff during the night as the patient's condition worsened. At approximately 6:00 a.m., Ms. Culp observed that the hematoma on the patient's leg was "huge." She told the 2004 Study Group that she was quite sure the patient was acutely bleeding into her left thigh at that time. She paged Plaintiff and informed him that three units of packed red blood cells had been infused and the leg was a lot larger and tighter, and that she was very concerned. Plaintiff told her to hold pressure, but Ms. Culp responded that the thigh was so large, she did not know where to apply pressure. Plaintiff told Ms. Culp that if she had a better idea to do it, and that if she did not know what to do, he did not know what to do. Plaintiff told her to apply a circumferential dressing around the left thigh, to which Ms. Culp responded that she did not feel comfortable applying a circumferential dressing to the thigh. Plaintiff told her to call back if there was a real emergency and hung up. Ms. Culp told the 2004 Study Group she was upset and angry with Plaintiff over his unwillingness to offer assistance. She returned to the patient's room, marked the hematoma, and observed the swelling to be progressing rapidly. She paged

Defendant Hall, who was the on-call surgeon. She told him she was concerned about the patient, and Defendant Hall promptly came to see the patient. He assessed her condition and took the patient to surgery. (Doc. 463-93, pp. 32-33).

Ms. Culp also told the 2004 Study Group about concerns she had regarding Plaintiff aside from the events with Patient AB. She stated that Plaintiff often would not answer questions regarding his patients, but rather made condescending and sarcastic remarks. She told the 2004 Study Group, "I don't mind Dr. Wood being a jerk, but lately he has not been taking care of his patients and that is where I draw the line." She said that she had observed Plaintiff not entering a patient's room when on rounds before writing a progress note in the patient's chart, that it was difficult for young nurses to call him, and that the nurses were less likely to call him because of how they were received. She told the 2004 Study Group she was convinced that the nurses' fear of Plaintiff created a dangerous circumstance for the patients. (Doc. 463-93, p. 33).

The 2004 Study Group heard from Defendant Hall. The first patient he discussed was Patient AB. After receiving a call from someone in the Intensive Care Unit who asked him to come quickly and see the patient, Defendant Hall went to the ICU and examined the patient, who had a massive hematoma on her left thigh. He stated that the thigh was "grotesquely swollen," and discovered the patient had a clotting problem. He called in the surgical team and took the patient to the operating room. During the operation he discovered a dissecting hematoma and a laceration

of the branch of the left femoral artery. Defendant Hall told the 2004 Study Group that Ms. Culp was very upset and angry over her interaction with Plaintiff. (Doc. 463-93, p. 40).

Defendant Hall also discussed Patient MB with the 2004 Study Group. He stated that he received a telephone call from a unit secretary about a consult to see the patient. There was no mention of the consult being urgent. When Defendant Hall and his assistant walked into the patient's room, a pseudoaneurysm ruptured in the patient's arm. Defendant Hall operated on the patient's arm. The patient had been to a vascular surgeon in Tallahassee and had an access placed in his arm. The patient developed a painful swollen arm, and was admitted to the Hospital for one week by Plaintiff and placed on antibiotics. Defendant Hall admitted that he called Plaintiff and was quite angry. He was critical that Plaintiff had not requested a surgery consult during the prior admission since it was an admission with a complication from a surgical procedure. Defendant Hall also told Plaintiff that he was frustrated with having to deal with Plaintiff, but that he would continue to care for Plaintiff's patients. (Doc. 463-93, p. 40).

Defendant Hall told the 2004 Study Group that Plaintiff was "incredibly difficult" to deal with. He said that he and his staff had problems reading Plaintiff's writing, and that he overheard nurses saying that they did not want to call Plaintiff because he is rude to them. Defendant Hall stated that when he first arrived at the Hospital, he considered Plaintiff a friend. He told the 2004 Study Group that "whereas at one

point [Plaintiff] was considered an excellent physician, [Defendant Hall] thinks over the last several years [Plaintiff's] skills and abilities have declined to the extent that [Defendant Hall] feels [Plaintiff] is not safe now in attending to patients in the hospital." (Doc. 463-93, p. 41).

The 2004 Study Group heard from Defendant Falconer, who performed a review of Plaintiff's charts. (Doc. 469, ¶ 462). For the chart review, Defendant Falconer reviewed Plaintiff's entire Quality Assurance file, from the time Plaintiff started on staff until August 19, 2004, including cases that were scored a "0," which means care was appropriate. (Doc. 469, ¶¶ 463-64). Defendant Falconer testified that he was "looking for problems" during the chart review. (Doc. 469, ¶ 465).

Defendant Falconer told the 2004 Study Group about Patients AB, MB, and CB. In each case, the Department of Medicine Quality Assurance Subcommittee found that Plaintiff's care was not appropriate in some manner. For Patients AB and MB, the subcommittee assigned scores of "3b," which means "care is not appropriate, a significant adverse effect has occurred - patient management which results in anatomical impairment, disability or death." (Docs. 463-93, pp. 25, 33; 463-95, p. 17). Patient CB was assigned a score of "2," which means that the care was inappropriate and there was a potential for an adverse effect on the patient. (Doc. 463-93, pp. 25, 33).

The 2004 Study Group also heard from Defendant Hehn, who relayed a report from the Lab Supervisor, who reported that Plaintiff was rude and hard to deal with,

and that he hung up on her when she tried to give a blood culture report. (Doc. 463-93, pp. 24, 36). Defendant Quinif reported that he and Defendant Hartsfield met with Ms. Considine, who stated that new nurses were afraid to call Plaintiff because he was rude, but she believed he was a good doctor. Defendant Hartsfield reported that he met with Carla Moore, Nurse Manager on 2 East, who stated that Plaintiff could be rude, but she believed he was a good doctor. (Doc. 463-93, p. 25).

The 2004 Study Group determined that there was no need to interview anyone else or to obtain additional information, and that a serious problem had been identified. They also determined that based on the information presented, it was not a viable option to go through the PWBC. The 2004 Study Group identified four problems: (1) quality issues (poor medical decisions); (2) accessibility issues (not answering page, indifference); (3) communication issues (failure to communicate, legibility); and (4) disruptive physician (rude, nurses are afraid to call). The 2004 Study Group unanimously voted to recommend that Plaintiff's privileges be revoked and to refer that decision to the MEC. (Doc. 463-93, pp. 24-26).

On August 27, 2004, Defendant Dunaway, Chairman of the PWBC, wrote a letter to Defendant Hehn, Chairman of the 2004 Study Group, stating that the PWBC met in session and determined it would not be appropriate to accept a referral of Plaintiff. "After deliberation and consideration of the Committee's long and difficult history of attempting to cooperatively work with Dr. Wood and the repeated failures of their interventions with Dr. Wood, it was the [PWBC's] unanimous decision that

it would not be appropriate to accept such a referral and have delegated the matter to the Ad Hoc Investigative Committee." (Doc. 463-93, p. 46). There are no minutes from a PWBC meeting in August 2004. (Doc. 469, ¶ 516). Defendant Simms, who was a member of the PWBC at the time the letter was written, was not aware that the PWBC met to discuss Plaintiff as reflected in the letter. (Doc. 469, ¶¶ 513-14).

On August 31, 2004, the 2004 Study Group, including Defendants Hehn, Quinif, and Falconer, voted to approve a letter drafted by Defendant Hehn to be sent to Defendant Grieme, Chairman of the MEC. (Doc. 463-93, p. 48). The letter to Defendant Grieme was dated September 3, 2004, and it outlined the 2004 Study Group's procedures and findings with regard to Plaintiff. The 2004 Study Group's first step was to decide the goals of the committee, and concluded that its goals were to: (1) investigate the complaints as outlined in Defendant Story's letter to the MEC; (2) review Plaintiff's overall medical care and practice; (3) determine if Plaintiff met the standard of medical care and behavior expected for a physician on the medical staff of the Hospital; and (4) keep Plaintiff informed of the 2004 Study Group's progress, give him the opportunity to meet with the 2004 Study Group, and keep an open mind during the investigation. Defendant Grieme was informed that the 2004 Study Group reviewed Plaintiff's medical records, interviewed Hospital staff, met with nurses from the ICU, reviewed Plaintiff's Quality Assurance record, talked with Defendant Hall, and read correspondence from Plaintiff, Defendant Story, Defendant McMillan, and the nursing staff. The letter also noted that Defendant

Hehn and Defendant McMillan asked Plaintiff to meet with the 2004 Study Group, and while Plaintiff offered to talk with Defendant Hehn separately, he refused to meet with the 2004 Study Group unless his attorney was present.

The 2004 Study Group's findings were summarized as follows:

1. The nursing staff tried several times to inform Dr. Wood that [Patient AB] was very ill, and had a massively enlarging thigh hematoma. It was very clear that this patient needed to be seen by Dr. Wood, and the nursing staff informed him of this. A witness confirmed the clarity of the information given on the phone and this is documented in the record. Dr. Wood did not come in to see the patient and the charge nurse, in desperation, called another physician who was not directly involved in the case. This physician subsequently saw the patient and took her to surgery. . . .It was our opinion that this patient would have died had the second physician not intervened.

2. Dr. Wood admitted Patient M.B., who had a large infected eroding pseudoaneurysm, and consulted Dr. Hall. Dr. Wood either did not recognize the seriousness of the condition, or chose not to communicate this to the consulting surgeon. Dr. Hall received the consult on a routine phone call from the ward secretary and saw the patent [sic] later that day. The pseudoaneurysm was very large, had obvious overlying skin necrosis, and ruptured shortly after Dr. Hall saw the patient. The patient had significant damage to the arm, limiting future vascular access sites. The Department of Medicine QA Subcommittee evaluated this as a (3b); they also found serious documentation issues.

3. Patient J.D. coded in the ICU. The charge nurse paged Dr. Wood, and then tried to call him by telephone. When they could not reach him, they

called the emergency room physician, and later another physician who came in from home and assumed care of the patient. Over the next three hours, the hospital operator and charge nurse attempted to contact Dr. Wood about every 15 minutes by pager and telephone. When they could not reach him, a security guard was sent to Dr. Wood's house. The guard found him at home and asked him to call the hospital. By this time the patient had died. It is unclear why Dr. Wood did not answer his telephone calls or pages.

4.     Dr. Wood admitted Patient C.B. to 2-East at 10:00 a.m. and ordered laboratory studies and an EKG. She was in poor condition and this was reported to Dr. Wood. The patient died about 16 hours later. Dr. Wood never reviewed the laboratory data or the EKG. Although the patient was a No Code, the Department of Medicine QA Subcommittee was concerned by the lack of care and rated this as a "2." Dr. Wood contested the conclusions of the review. However, the QA Subcommittee conclusions were upheld at the Department of Medicine meeting.

5.     A laboratory technician attempted to call Dr. Wood about Patient M.T. When Dr. Wood returned the phone call, he was sarcastic and rude. The technician attempted to tell him that his patient had four (4) blood cultures positive for gram negative rods, but he refused to listen and hung up before she could complete the report.

6.     Dr. Wood is difficult to reach via telephone or pager. When reached he is often sarcastic or rude. Dr. Wood is also seen by the nursing staff as indifferent or indecisive. Nurses report that he makes comments such as "What do you expect me to do?" "Call back when you have a real emergency" or "Why are you calling me?" The nurses are frustrated, and sometimes avoid calling Dr. Wood

because they are afraid of his reaction, or feel that their patient care questions will not be answered.

7.     Dr. Wood does not communicate well with the rest of the medical staff. He rarely calls regarding consults. The writing on his charts is difficult to read. The medical record review committee has given Dr. Wood three notices that his documentation is illegible and is a patient safety concern.

8.     Dr. Wood's behavior stands out in a negative manner from the rest of the medical staff. Both of the nurses we interviewed said that he is the most difficult physician on staff "by far." The ICU charge nurse says this opinion is widely held throughout the intensive care unites [sic]. The 2-East floor unit reported the same thing although she felt that some of the nurses deal with Dr. Wood better than others.

9.     In our opinion, Dr. Wood's behavior as well as the quality of his patient care has deteriorated over the last six months.

10.     The Physicians Well Being Committee is very familiar with Dr. Wood. Dr. Wood was referred to the Well Being Committee in 1997, and in 1998 he was required to have an assessment by Early [sic] and Associates for disruptive behavior and failure to follow medical staff rules. He improved but then relapsed into his old behaviors, and in 2000 he was referred back to the PWBC. After attempts to work with Dr. Wood again, the PWBC concluded that he was not willing to work with the committee, and there was nothing else that they could do to help him change his behavior. The PWBC therefore referred him back to the Medical Executive Committee.

11.     We reviewed [Plaintiff's] previous loss of privileges and his reinstatement to the medical staff. We have

seen a pattern where Dr. Wood will improve for a few months after corrective action is taken, but then reverts to his previous behavior.

12. On the positive side, the charge nurses on 2-East and acute dialysis both felt that [Plaintiff's] medical care was adequate, and that he was "a good physician." They qualified the statement by remarking that he was difficult to work with, abrupt, and sometime [sic] rude.

(Doc. 463-94, pp. 3-5).

Based on those findings, the 2004 Study Group concluded the following:

1. The care rendered by Dr. Wood does not meet the standard of care for physicians on our medical staff. At least three patients have been injured as a result of his actions or omissions. Things are rapidly getting worse.

2. Dr. Wood has an indifferent attitude. He has been unable or unwilling to care for his patients when the nurses request help.

3. Dr. Wood is often slow to respond to his pages and at times is inaccessible by pager or telephone.

4. Dr. Wood ~~either~~ will not, or cannot communicate with other members of the medical staff when necessary for patient care.

5. Dr. Wood has a history of rudeness, abruptness, and sarcasm. Our nurses generally tolerate this type of behavior fairly well, but Dr. Wood's behavior is well outside of the norm. Many nurses are afraid to call him, or are frustrated when they deal with him. Nurses have told us of being in tears.

6. Dr. Wood has a history of previous probations, referrals to the Physicians Well Being Committee,

> and loss of privileges. Although there has been temporary improvement, these actions have not resulted in long-term change in Dr. Wood's behavior or attitude. The ad hoc committee does not think probation, outside evaluation, or limitation of privileges will be helpful.

(Doc. 463-94, pp. 5-6) (alteration in original).

The 2004 Study Group noted that "[r]emoval from the medical staff is a serious step," and tried to balance Plaintiff's needs against the needs of his patients, the medical staff, and Hospital employees. The 2004 Study Group considered Plaintiff's letters and his promises to improve, and while the 2004 Study Group thought Plaintiff to be "intelligent and knowledgeable," its "overriding concern [was] the quality of patient care at our hospital. His actions and his relationship with the rest of the medical team do not meet our standard." The 2004 Study Group recommended that Plaintiff's medical staff appointment and clinical privileges at the Hospital and affiliated hospitals be revoked. (Doc. 463-94, p. 6).

The MEC, including Defendants Grieme, Hall, McMillan, and Simms, held a special called meeting on September 4, 2004. Each member of the MEC was provided with a copy of the 2004 Study Group's report and recommendation, the various witness statements, and the August 27, 2004 letter from the PWBC. Defendant Hehn appeared before the MEC, summarized the 2004 Study Group's findings as outlined in its report, and made the recommendation to revoke Plaintiff's privileges. The MEC voted unanimously to provide a copy of the 2004 Study Group's

report to Plaintiff and to invite Plaintiff to a special called MEC meeting. (Doc. 463-94, pp. 8-12). On September 10, 2004, Defendant Grieme, Chairman of the MEC, wrote a letter to Plaintiff enclosing the 2004 Study Group's report and inviting Plaintiff to attend the upcoming MEC meeting. (Doc. 463-94, p. 14).

On September 14, 2004, the Medical Record Review Committee prepared a memo to the MEC which stated that three of Plaintiff's charts were found where the progress notes, admissions summaries, and physician's orders were illegible. (Doc. 463-95, p. 20). The Medical Record Committee prepared a memo to Plaintiff on that same day containing the same information. (Doc. 463-95, p. 21). Plaintiff responded with a letter dated September 19, 2004 to Frances Turner, Director of Medical Records, in which he stated that his handwriting had not changed in twenty years and offered to dictate his progress notes. (Doc. 463-95, p. 18).

On September 20, 2004, the MEC, including Defendants Grieme, Hall, McMillan, and Simms, met for a special called meeting. Plaintiff attended the meeting and distributed a letter outlining his response to the 2004 Study Group's report. Plaintiff also provided copies of his 2001 post-hearing brief for the MEC's review. (Doc. 463-94, pp. 33-39, 41-42). Plaintiff read his response to the 2004 Study Group's report to the MEC. (Doc. 463-94, p.45). While Plaintiff stated in his response that the MEC should contact several nurses and physicians to get their take on the events, Defendants McMillan, Hall, and Grieme have each testified that there was not any additional information they felt had not been made available that

would have been important to their decision-making process. (Docs. 464-8; 464-9; 464-12). At least some of the members of the MEC reviewed the 2001 post-hearing brief prior to the vote. (Docs. 467-8; 464-9). The MEC discussed Plaintiff's statement and voted unanimously to ratify the 2004 Study Group's recommendation that Plaintiff's privileges be terminated. (Doc. 463-94, p. 41-42).

On September 24, 2004, Defendant Story, President of the Hospital, wrote Plaintiff a letter notifying him that the MEC recommended terminating his privileges and that he had 30 days to request a hearing. A copy of the MEC's findings, conclusions, and recommendations was enclosed. (Doc. 463-94, pp. 44-46). In its report, the MEC found as follows:

1.  The Ad Hoc Study Group's investigation was thorough and fair, and constituted a reasonable effort to obtain the facts relative to the matters raised in the letter requesting the investigation.

2.  The findings and conclusions of the Ad Hoc Study Group as set forth in its report to the MEC are reasonable and credible, and the MEC hereby adopts those findings and conclusions as its own.

3.  The MEC considered Dr. Wood's response to the Ad Hoc Study Group's report and finds it to be inadequate. In that response, Dr. Wood failed to adequately address the concerns raised by the Ad Hoc Study Group, cited irrelevant information, provided less than credible explanations for his behavior, attempted to place blame for adverse outcomes on others and failed to accept responsibility for his own actions. In the opinion of the MEC, Dr. Wood's response simply amplified the

concerns raised by the Ad Hoc Study Group about his professional conduct.

4. The MEC concludes that there had been confirmed and documented patterns of professional conduct on the part of Dr. Wood and incidents involving him that may have adversely affected or could adversely affect the health or welfare of patients, the medical staff, the hospital or its employees.

5. Based on the information that it considered, the MEC believes that its recommendation is in the furtherance of quality health care.

(Doc. 463-94, pp. 45-46).

Plaintiff requested a hearing in a letter to Defendant Story dated October 20, 2004. (Doc. 463-94, p. 49).

On November 1, 2004, Defendant Simms, Chief of Staff, prepared a memo to Plaintiff regarding Patient MB, also known as Patient 293365. The memo stated that the patient's record was presented to Plaintiff's peers at a recent meeting of the Department of Medicine and evaluated as a "3b." Plaintiff was notified that the MEC agreed with the "3b" evaluation. (Doc. 463-95, p. 17).

On November 16, 2004, counsel for Archbold informed counsel for Plaintiff in writing that the hearing would take place on January 12, 2005. (Doc. 463-98). On December 10, 2004, Defendant Story, President of the Hospital, wrote Plaintiff a letter notifying him that the appeal hearing would begin on January 12, 2005. The members of the hearing panel and proposed witnesses for the MEC were identified. Defendant Story informed Plaintiff that neither he nor his attorneys were to contact

any of the proposed witnesses in advance of the hearing. (Doc. 463-95, pp. 5-6). On December 17, 2004, counsel for the Hospital supplemented its proposed list of witnesses via letter to Plaintiff's counsel, and also responded to counsel's query about subpoenaing witnesses and interviewing witnesses. Counsel stated that the Hospital would object to any subpoenas, as there was no authority for subpoenas under the law or in the appeal procedures, but agreed that Plaintiff's counsel could contact the witnesses identified by the Hospital. (Docs. 463-99; 463-102).

On December 22, 2004, June Davis, a Registered Nurse in the Hospital's Emergency Department, prepared a memo regarding her unpleasant interaction with Plaintiff and what she believed to be improper treatment of a patient. (Doc. 463-95, pp. 49-50).[24]

On December 29, 2004, counsel for the Hospital notified Plaintiff's counsel again in writing that the Hospital would not agree to having subpoenas issued to compel the attendance or testimony of third party witnesses at the appeal hearing. While counsel for Plaintiff stated during a telephone conversation that certain Hospital employees felt intimidated or feared that they would suffer retribution if they testified on Plaintiff's behalf, counsel did not provide any specifics. Further, counsel for the Hospital stated that he offered to have the Hospital prepare a letter that counsel for Plaintiff could give to potential witnesses informing them that they were free to testify on behalf of Plaintiff and would not be penalized in any way if they

---

[24]This patient, Patient JM, is further discussed in connection with the 2005 Appeal Hearing.

chose to do so. Plaintiff declined the offer of the letter. Counsel for the Hospital also stated that Defendant Hartsfield made the assurance that no employee would suffer any negative consequences if he chose to testify on behalf of Plaintiff. (Doc. 463-103).

On December 30, 2004, counsel for Plaintiff provided the Hospital with Plaintiff's list of witnesses for the appeal hearing. (Doc. 463-104). On December 31, 2004, counsel for the Hospital notified Plaintiff's counsel in writing of the addition of five witnesses to the Hospital's witness list. (Docs. 463-100; 463-101). Counsel for Plaintiff also provided a list of additional witnesses on that date. (Doc. 463-105). On January 4, 2005, counsel for the Hospital provided Plaintiff's counsel with copies of the exhibits the Hospital planned to offer into evidence at the appeal hearing. The Hospital reserved the right to offer additional exhibits at the appeal hearing. (Doc. 463-106). On January 5, 2005, Plaintiff's counsel provided the Hospital with the names of three additional witnesses. (Doc. 463-107).

Plaintiff objected to two proposed members of the 2005 Appeal Hearing Panel, Drs. Calvin Reams and Michael Gee, alleging that they had a conflict of interest because their medical partners were scheduled to testify as witnesses at the hearing. (Docs. 463-97; 463-108). While the Hospital disputed whether there was a true conflict, the two members of the Panel were replaced with Drs. James K. Hester and Thomas G. Reynolds. Plaintiff's counsel was notified of the change in a writing dated January 7, 2005. The Hospital also again addressed Plaintiff's allegations that

the Hospital had intimidated employees or that employees feared the Hospital would retaliate against them if they testified on behalf of Plaintiff. (Doc. 463-97, pp. 22, 24-26).

The appeal hearing took place from January 12 through January 14, 2005 (the "2005 Appeal Hearing"). None of the individual Defendants were members of the 2005 Appeal Hearing Panel. No members of the Panel were nephrologists or in direct economic competition with Plaintiff. Plaintiff was represented by counsel, presented evidence and witnesses, and cross-examined the MEC's witnesses. Defendants Grieme, Hehn, Falconer, Hall, Simms, McMillan, and Hartsfield each testified. Ms. Culp and Ms. Davis testified. Plaintiff also testified and presented expert testimony. (Docs. 463-85 - 463-88). The Hospital did not retain an independent expert to review any of the patient care issues. (Doc. 469, ¶ 555). A total of 30 witnesses testified, seventeen of whom were offered by Plaintiff. Stipulated testimony from five other witnesses was offered by Plaintiff. One hundred thirteen exhibits were submitted, including 55 from Plaintiff. The parties each submitted a post-hearing brief for consideration. (Docs. 463-110; 463-111).

The cases of Patients AB, MB, CB, and JD were all discussed during the 2005 Appeal Hearing. Ms. Culp testified that when she received Patient AB, the patient was extremely critical. Ms. Culp called Plaintiff to get more orders for the patient's treatment. The treatment was doing no good, and Ms. Culp described the patient's thigh as "red and taut" and "way, way bigger than it was on the initial assessment,

which had only been an hour and a half or 45 minutes before." (Doc. 463-85, pp. 39-40). Ms. Culp called Plaintiff to tell him what was happening with the patient's leg, and when she told Plaintiff that she was not comfortable wrapping the patient's leg circumferentially, Plaintiff asked if she had any better ideas, told her to call when there was a real emergency, and hung up on her. (Doc. 463-85, p. 40). Ms. Culp testified that she did not inform Plaintiff about the enlarging hematoma until the third telephone call, as she did not notice that the patient's thigh was expanding until she removed the blankets from the patient, which occurred after the second call to Plaintiff. (Doc. 463-85, p. 42). Ms. Culp testified that she did not ask Plaintiff to come in and see Patient AB that evening. (Doc. 463-85, p. 43).

After Plaintiff hung up on her, Ms. Culp went back to the patient and watched the hematoma grow and the patient's pulse weaken. Ms. Culp decided to call the on-call surgeon, Defendant Hall, who, after seeing the patient's leg, called in the Operating Room team to take the patient to surgery. (Doc. 463-85, p. 40). At the 2005 Appeal Hearing, Ms. Culp described Plaintiff as being "sarcastic" when she called him with her concerns, which made her frustrated. (Doc. 463-85, p. 40).

Defendant Hall testified about Patient AB. He stated that when he went to the patient's room, her thigh was "grotesquely enlarged, that it was basically about to pop." (Doc. 463-85, p. 54). Some of the skin was already necrotic. Defendant Hall took the patient to the operating room and stopped the bleeding into her thigh. He eventually had to operate on the patient again, leaving her with a large defect in her

thigh. (Doc. 463-85, p. 54). Defendant Hall also testified that he had seen Patient AB off and on during her hospitalization and had been informed of the hematoma prior to the incident involving Plaintiff. (Doc. 463-87, pp. 672-73).

Valerie Bush testified during the hearing about Patient AB. The note she wrote in the patient's chart after she saw the patient was missing from the medical records. Ms. Bush testified that the note was a "quick note" of four or five lines, and most likely contained information about the size of the hematoma, her impression of the hematoma, the patient's hemoglobin, and an assessment, plan, and treatment recommendation. (Doc. 463-87, pp. 22, 25). Ms. Bush learned as early as December 2004 that the note was missing from the chart. (Doc. 469, ¶ 572). She brought the matter to the attention of the Hospital and Defendant Hartsfield. (Doc. 469, ¶ 573). As of the date she testified at the 2005 Appeal Hearing, no one had asked Ms. Bush to locate the record, and she had made no effort to locate the record. (Doc. 469, ¶ 575). Ms. Bush did, however, testify about the note and her involvement in Patient AB's care. (Doc. 463-87, pp. 21-27).

Plaintiff testified at the 2005 Appeal Hearing that he did not believe it necessary to come see Patient AB based on the patient's response to Plaintiff's previous medical instructions, based on the information communicated to him by Ms. Culp, and based on his own personal knowledge of the patient. (Doc. 463-87, p. 6).

Defendant Hall later testified about Patient MB. Defendant Hall received a telephone call from a secretary about a consult for the patient. When he went in to

see the patient, Defendant Hall found a young man with a tremendously swollen vascular access on his arm. The patient had "what was obviously a pseudoaneurysm that literally ruptured and began to bleed as I walked into the room, totally not what I expected." (Doc. 463-85, p. 56). Defendant Hall immediately took the patient to surgery, and admittedly called Plaintiff angry because Plaintiff had waited an entire week to request a surgical consult. (Doc. 463-85, p. 57). This case was also assigned a score of "3b."

Defendant Falconer testified that Patient AB was given a rating of "3b" by the Quality Assurance Committee, which was upheld by the Department of Medicine. (Doc. 463-85, p. 48). He also testified about Patient CB, who was assigned a rating of "2." The Quality Assurance Committee determined that the EKG and blood work ordered by Plaintiff were not reviewed timely. The Department of Medicine voted to uphold the rating. (Doc. 463-85, p. 47).

The case of Patient JD was also discussed during the 2005 Appeal Hearing. This was the case where Ms. Barton attempted to contact Plaintiff several times when the patient coded, but was unable to get Plaintiff to respond to her pages and telephone calls. In fact, a security guard was finally dispatched to Plaintiff's home to get him. When asked about the incident during the 2005 Appeal Hearing, Plaintiff stated that both his pager and phone batteries were dead, and that he could not hear his land line at his home because of a fan. (Doc. 463-88, p. 47).

Finally, the emergency room incident related by Ms. Davis on December 22, 2004 was discussed. Ms. Davis testified that she had a conversation with Plaintiff about Patient JM. Plaintiff advised Ms. Davis over the telephone to admit the patient. About fifteen minutes later, Plaintiff called back and told Ms. Davis to discharge the patient. Ms. Davis was uncomfortable with this order, as the patient was obviously sick. She discussed the matter with Glen Anderson, M.D., the physician on duty in the Emergency Room. (Doc. 463-87, pp. 32-33). Dr. Anderson spoke with Plaintiff on the telephone, who said that his order was a joke. (Doc. 463-88, p. 10). Plaintiff did not know prior to the 2005 Appeal Hearing that Patient JM was going to be addressed, but during the hearing, Plaintiff admitted that this behavior was inappropriate and unprofessional. (Doc. 463-88, p. 29).

Plaintiff also presented testimony from a number of witnesses, including other doctors and nurses, who testified that Plaintiff is an excellent physician and communicates well; that he would be their physician of choice; that he provided care for their family members; that he always returned pages, and returned them promptly; that they would like to see him back on the medical staff; and that they never had any problems working with him. (Docs. 463-86, pp. 42, 48; 463-87, pp. 2, 16, 19, 27, 57, 80-81; 463-88, pp. 6, 9, 12, 16, 18). Certain staff members testified that they were afraid for their job security by testifying on Plaintiff's behalf, or that others were scared to testify for fear of retribution from the Hospital. (Doc. 469, ¶¶ 559, 562, 565, 566).

John Welchel, M.D., testified on Plaintiff's behalf at the 2005 Appeal Hearing. Dr. Welchel is a surgeon, not a nephrologist. Dr. Welchel's general opinion is that there were no problems in the care of Patients AB, CB, and MB by Plaintiff. In the case of Patient AB, however, Dr. Welchel admitted that the case was "a little worrisome," and that if Plaintiff in fact told the nurse to call him back if she had "a real emergency," that statement was not appropriate. (Doc. 463-86, pp. 53, 55). With regard to Patient MB, Dr. Welchel testified that if the fistula did not improve, or if it seemed to be deteriorating, "then you would certainly call a surgeon in." (Doc. 463-86, p. 51). Also, with regard to Patient CB, while Dr. Welchel testified that it was not unusual that Plaintiff did not seek out the EKG results immediately, he also stated that "when you bring patients into the hospital and you're the primary doctor, you order the EKG and you look at the EKG and you make the determination of what's to be done." (Doc. 463-86, p. 53).

Gregory Knowlton, M.D., who also testified at the 2001 Appeal Hearing, testified at the 2005 Appeal Hearing on Plaintiff's behalf. Based on his experience and review of the medical records, he found that Plaintiff's diagnosis and follow-up care with respect to Patient AB was reasonable. (Doc. 463-86, p. 6). Dr. Knowlton opined that "there is nothing in the records of Patient A.B. that suggests that Dr. Wood's practice represents a threat," (Doc. 463-86, p. 3), and testified that failure to respond to a page because of a battery problem and bad handwriting were not standard of care issues. (Doc. 463-86, p. 7). Dr. Knowlton did admit, however, that

under the circumstances presented, he would not have told the nurse to call him back when she had a real emergency. (Doc. 463-86, p. 9). He also testified that the process used with respect to the investigation of Plaintiff and the recommendation about his medical staff appointment and privileges in 2004 and 2005 was "pretty fair." (Doc. 463-86, p. 11).

Plaintiff acknowledged at the 2005 Appeal Hearing that none of the members of the Hearing Panel were in direct competition with him. He had no reason to believe the members of the Panel were biased against him. (Doc. 463-87, p. 14). He testified that while he was able to present witnesses and evidence, he did not believe he was able to have all of the witnesses he wanted because some people were afraid they would lose their jobs if they testified against the Hospital. (Doc. 463-88, p. 45). He also stated that he was not allowed to subpoena witnesses for the hearing. (Doc. 463-88, p. 47).

On March 9, 2005, the 2005 Appeal Hearing Panel issued its written decision. The Panel, by a vote of two to one, found that the findings of fact contained in the report of the 2004 Study Group, as adopted by the MEC, were supported by evidence produced at the hearing. The Panel further found that the recommendation of the MEC to terminate Plaintiff's privileges was not unreasonable, was supported by substantial evidence brought before the Panel, and was not otherwise unfounded. The Panel noted that as stated in the MEC's recommendation, "there have been patterns of professional conduct on the part of Dr. Wood and incidents involving him

that affected or could adversely affect the health and welfare of patients, the medical staff, the hospital or its employees." The Panel recommended that Plaintiff's privileges be terminated. (Doc. 463-112).

Plaintiff was informed of the 2005 Appeal Hearing Panel's decision by letter from Defendant Story, President of the Hospital, dated March 17, 2005. Defendant Story notified Plaintiff that he could request an Appellate Review of the decision. (Doc. 463-113). Plaintiff made the request in a letter dated April 7, 2005. (Doc. 463-114).

On April 22, 2005, Robert Balfour, Chairman of the Board, wrote Plaintiff notifying him of the appellate review hearing scheduled for May 23, 2005. Plaintiff was informed that he and counsel would be allowed to appear and argue, and was given the names of the review panel members. (Doc. 463-10). Plaintiff did not object to any of the review panel members. The appellate hearing took place on June 3, 2005. (Doc. 469, ¶ 633).[25] On June 24, 2005, the Appellate Review Panel, which did not include any of the individual Defendants, issued its written ruling. The Panel unanimously found that there was substantial compliance with the Hospital's Bylaws throughout the process involving Plaintiff and that the recommendation of the 2005 Appeal Hearing Panel was supported by evidence contained in the record and was not made arbitrarily, capriciously, or with prejudice. The Appellate Review Panel

_____

[25]An appellate review panel does not re-hear evidentiary presentations or function as a hearing panel. Instead it considers the record upon which the recommendation or action being appealed was made. (Doc. 469, ¶¶ 634-35).

recommended that the decision of the 2005 Appeal Hearing Panel to revoke Plaintiff's privileges be made final. (Doc. 463-115). Two members of the Appellate Review Panel were members of the Board, and the other was chosen by Defendant Story to serve on the Panel. Under the Medical Staff Bylaws, an appellate panel "may include members of the Hospital Governing Body, but [ ] may not include persons in direct economic competition with the individual appealing." (Doc. 463-6, p. 2). None of the members of the Appellate Review Panel were in direct economic competition with Plaintiff.

On July 26, 2005, the Board heard from Defendant Hartsfield, who discussed the recommendations of the 2004 Study Group, MEC, the 2005 Appeal Hearing Panel, and the Appellate Review Panel to terminate Plaintiff's privileges. It was noted that Plaintiff would still be able to see patients in his facility or in the other hospitals where he has privileges. He would not, however, have privileges at the Hospital or its affiliates, and would not be able to admit patients into those hospitals. The Board, including Defendant Dunaway, voted unanimously to terminate Plaintiff's medical staff privileges effective August 1, 2005. According to the minutes from the meeting, Defendants Beverly, Story, and Quinif and three other Board members abstained from voting (Doc. 463-11), though Defendants Beverly and Quinif both testified in their depositions that they believed they voted in favor of the termination.[26]

---

[26]Eighteen members of the Board were present at the hearing. Two were absent.

On July 27, 2005, Defendant Story, President of the Hospital, wrote Plaintiff a letter notifying him of the Board's affirmation of the MEC's recommendation that Plaintiff's privileges be terminated. (Doc. 463-116).

Plaintiff's counsel requested that the Board reconsider its decision to terminate Plaintiff's privileges. (Doc. 463-117). On September 27, 2005, the Board, including Defendant Dunaway, voted not to reverse its decision to terminate Plaintiff's privileges. According to the minutes from the meeting, Defendants Beverly, Story, and Quinif abstained from voting. (Doc. 463-12). Plaintiff was notified of this decision in a letter from Defendant Story, President of the Hospital, on September 28, 2005. (Doc. 463-118).

Following Plaintiff's termination of privileges, the Hospital submitted a report to the Data Bank. (Doc. 469, ¶ 656). In the report, the Hospital stated as the reason for the action taken: "Dr. Wood's medical staff appointment and clinical privileges were terminated because, in the opinion of the Hospital's Board of Trustees and Medical Executive Committee, Dr. Wood failed to work or relate to others at the Hospital in a cooperative or professional manner as required to provide appropriate patient care." (Doc. 469, ¶ 657). While the Data Bank initially informed the Hospital that the report did not meet the Data Bank's legal requirements, the Hospital was subsequently informed the Hospital that the report was adequate and no further action was required. ((Doc. 520-41).

### F.     TPA Captive

TPA Captive, Inc. is a physician-owned malpractice insurance company. (Doc. 469, ¶ 666). Plaintiff was a shareholder of TPA Captive and malpractice insurance policy-holder until December 31, 2004. (Doc. 469, ¶ 667). In 2004, Defendants Dunaway, Hicks, Santos, McMillan, Hall, Quinif, Hehn, Falconer, and Grieme were shareholders in TPA Captive. (Doc. 465, ¶ 110). At a meeting in the fall of 2004, the Underwriting Committee of TPA Captive voted to terminate Plaintiff's malpractice insurance. (Doc. 465, ¶ 111). Defendants Santos, Hall, and McMillan were members of the Underwriting Committee. The Underwriting Committee determined that Plaintiff was a risk that the other members of the group were not willing to assume. (Doc. 463-87, p. 52). Plaintiff obtained insurance from another carrier before his policy with TPA Captive expired. (Doc. 469, ¶ 691).

### G.     Plaintiff's Damages Claims

Plaintiff contends that beginning in 1998, Defendants have conspired in various ways to monopolize the outpatient dialysis facilities market in the Thomasville area, to interfere with Plaintiff's ability to practice medicine, and to deprive Plaintiff of his business, all resulting in damage to Plaintiff and a diminution in the quality of care offered to patients. (Docs. 463-125, pp. 29-30; 463-132).

Plaintiff claims significant damages based on his loss of income from his Hospital practice, loss of income from capitation fees and caring for dialysis patients, loss of income from his outpatient practice, and loss of income from medical

directorships. He contends that because of the events with the Hospital some physicians no longer refer patients to him, and believes he should be compensated for that. (Docs. 463-120; 512-14). He also alleges that because of Defendants' actions he has suffered from emotional distress in the forms of anguish and suffering, severe fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and extreme outrage. (Docs. 463-132; 463-170).

Plaintiff's damages expert, R. James Alerding, CPA, has opined that damages sustained by Plaintiff from July 13, 2001 through 2021 due to the alleged actions of Defendants are $28,315,416. (Doc. 463-158, p. 5).[27] This total amount consists of the following components: (1) damages in the form of lost profits relating to Plaintiff's nephrology practice - $10,165,807; (2) damages in the form of lost profits relating to the SGDS dialysis facilities - $14,061,240; (3) losses relating to the sale of the SGDS dialysis facilities - $3,280,708; (4) damages relating to the anticipated sale of Plaintiff's practice - $337,885; and (5) additional costs incurred by Plaintiff, including attorney's fees and insurance premiums - $469,777. (Doc. 463-158, p. 26).

---

[27]Mr. Alerding also performed two supplemental calculations where damages were calculated from July 13, 2000 and August 3, 1998. In his opinion, the damages incurred by Plaintiff due to the alleged actions of Defendants from July 13, 2000 onwards are $29,917,710, and from August 3, 1998 onwards are $33,565,083. (Doc. 463-158, p. 11).

The date 2021 is not a typo. Mr. Alerding assumed, based on information from Plaintiff, that Plaintiff would have continued to operate his practice and the SGDS facilities until his retirement in 2021.

## II.    PLAINTIFF'S CLAIMS AGAINST THE DEFENDANTS

Plaintiff names the Defendants in the counts of his Second Amended

Complaint as follows:

1.    Count I - Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and Section 4 of the Clayton Act, 15 U.S.C. § 15 (Conspiracy to Restrain Trade) - the Hospital, the Medical Center, Defendants Hicks, Santos, Quinif, Hehn, Falconer, McMillan, Hall, Grieme, and Simms;

2.    Count II - Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 and Section 4 of the Clayton Act, 15 U.S.C. § 15 (Conspiracy to Monopolize) - the Hospital, the Medical Center, Defendants Hicks, Santos, Quinif, Hehn, Falconer, McMillan, Hall, Grieme, and Simms;

3.    Count III - Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 and Section 4 of the Clayton Act, 15 U.S.C. § 15 (Refusal to Deal/Essential Facilities) - the Hospital;

4.    Count IV - Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 and Section 4 of the Clayton Act, 15 U.S.C. § 15 (Attempted Monopolization) - the Hospital, the Medical Center, Defendants Hicks and Santos;

5.    Count V - Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 and Section 4 of the Clayton Act, 15 U.S.C. § 15 (Monopolization) - Defendants Hicks and Santos;

6.    Count VI - Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 and Section 4 of the Clayton Act, 15 U.S.C. § 15 (Monopoly Leveraging) - the Hospital and Medical Center;

7.    Count VII - Tortious Interference with Business Relations and Prospective Business Relations (interference with patients, referring physicians, and TPA Captive) - the Hospital, the Medical Center, Defendants Beverly, Story, Hartsfield, Hicks, Santos, Dunaway, Quinif, Hehn, Falconer, McMillan, Hall, Grieme, and Simms;

8.    Count VIII - Tortious Interference with Employment, Trade, or Profession (interference with the Nephrology Center and RCG) - the

Hospital, the Medical Center, Defendants Beverly, Story, Hartsfield, Hicks, Santos, Dunaway, Quinif, Hehn, Falconer, McMillan, Hall, Grieme, and Simms;

9.      Count IX - Tortious Interference with Business Relations or Employment (interference with Dr. Qualheim) - the Hospital, the Medical Center, Defendants Beverly, Story, Hartsfield, Santos and Hicks;

10.     Count X - Failure to Adhere to the Hospital's Bylaws - the Hospital and the Medical Center;

11.     Count XI - Intentional Infliction of Emotional Distress - the Hospital, the Medical Center, Defendants Beverly, Story, Hartsfield, Hicks, Santos, Dunaway, Hehn, McMillan, Hall, Quinif, Falconer, Grieme, and Simms;

12.     Count XII - Punitive Damages - the Hospital, the Medical Center, Defendants Beverly, Story, Hartsfield, Hicks, Santos, Dunaway, Hehn, McMillan, Hall, Quinif, Falconer, Grieme, and Simms; and

13.     Count XIII - Bad Faith - the Hospital, the Medical Center, Defendants Beverly, Story, Hartsfield, Hicks, Santos, Dunaway, Hehn, McMillan, Hall, Quinif, Falconer, Grieme, and Simms.

The Defendants have moved for summary judgment in their favor on all of Plaintiff's claims.

## III.    HOSPITAL DEFENDANTS' COUNTERCLAIMS

The Hospital Defendants have filed four counterclaims against Plaintiff. Counterclaims I and II relate a medical staff reappointment application signed by Plaintiff in December of 2002 (the "2002 Reappointment Agreement"). By signing the 2002 Reappointment Agreement, Plaintiff agreed that if reappointed to the medical staff he would seek consultations whenever necessary or required, abide by generally recognized ethical principles applicable to his profession, and provide

continuous care and supervision as needed to all patients in the Hospital for whom he had responsibility. (Doc. 401-4).

The Hospital alleges in Counterclaim I that Plaintiff breached these contractual obligations in 2004 by taking, or failing to take, the actions which ultimately led to the termination of Plaintiff's medical staff privileges in 2005. The president and chief executive officer of the Hospital has filed an affidavit in which he states that as a result of Plaintiff's breach of contract: (1) the Hospital was forced to spend enormous amounts of money in legal fees and costs associated with the 2004-2005 Action, as well as this lawsuit; (2) that the Hospital has advanced attorney's fees and costs on behalf of the other Defendants in this litigation; (3) that Plaintiff has acted in bad faith, been stubbornly litigious, and has caused the Hospital unnecessary trouble and expense; and (4) that the Hospital's operations have been significantly disrupted by Plaintiff as a result of his breach of contract, causing the Hospital further damages. The examples of this disruption given include "the harm caused to the Hospital's nursing and support staff as a result of Dr. Wood's rude and boorish conduct, the cost and expense including legal fees associated with the investigation of Dr. Wood's behavior in 2004 and the hearing and appeal that were occasioned by Dr. Wood's behavior, and the reluctance of the Hospital's medical staff to participate in peer review activities as a result of this litigation." (Doc. 519-12).

In Counterclaim II, Defendants Story and Hartsfield bring a breach of contract action against Plaintiff based on the 2002 Reappointment Agreement. Defendants

Story and Hartsfield argue that they were authorized representatives of the Hospital as described in the release and immunity provisions of the 2002 Reappointment Agreement between Plaintiff and the Hospital, and were therefore intended beneficiaries of the contract. Defendants Story and Hartsfield state that because of Plaintiff's alleged breach of the 2002 Reappointment Agreement they were forced to spend money in legal fees and costs in defending the action, and that Plaintiff has acted in bad faith, been stubbornly litigious, and has caused them unnecessary trouble and expense, including have to take several days away from their jobs to respond to Plaintiff's discovery and prepare for and give a deposition.

Counterclaims III and IV are both declaratory judgment claims. The Hospital Defendants have requested in Counterclaim III that the Court declare that the various applications signed by Plaintiff in connection with this reappointment to the medical staff are valid and effective, and that the applications preclude Plaintiff from recovering damages on any of the counts contained in Plaintiff's Second Amended Complaint. The Hospital Defendants have requested in Counterclaim IV that the Court declare that they are immune from damages under the Health Care Quality Improvement Act, 42 U.S.C. § 11101, *et seq.* ("HCQIA").

Plaintiff has moved for summary judgment on the Hospital Defendants' counterclaims.

## IV.    DEFENDANTS' AFFIRMATIVE DEFENSES

The Hospital Defendants (Doc. 401, ¶¶ 294-299, 302), the Physician Defendants (Docs. 402-408, ¶¶ 295-301; 409, ¶¶ 293-299; 410, ¶¶ 295-301), Defendant Beverly (Doc. 483, ¶¶ 292-296, 298), and Defendant Simms (Doc. 415, ¶¶ 295-301) have all asserted certain affirmative defenses. Specifically, they assert that they are immune from liability under HCQIA, immune from liability under the Georgia peer review statute, O.C.G.A. § 31-7-132, immune from liability under the Georgia medical review statute, O.C.G.A. § 31-7-141, and are entitled to a release from liability based on Plaintiff's reappointment applications.

Plaintiff has moved for summary judgment on all of Defendants' affirmative defenses.

## V.    ANALYSIS AS TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

The Physician Defendants can be separated into two groups for purposes of this Order: (1) the Peer Review Defendants (Defendants Dunaway, Hehn, McMillan, Hall, Quinif, Falconer, and Grieme); and (2) Defendants Hicks and Santos.

The Hospital Defendants, Peer Review Defendants, Defendant Simms, and Defendant Beverly contend that they are immune from damages under HCQIA for the peer review actions. HCQIA immunity precludes a plaintiff from recovering

monetary damages for state or federal claims. 42 U.S.C. § 11111(a)(1); <u>Bryan v.</u>
<u>James E. Holmes Reg'l Med. Ctr,</u>, 33 F.3d 1318, 1321 and n. 30 (11th Cir. 1994).[28]

Defendants Hicks and Santos contend that Plaintiff's claims against them fail
as a matter of law on their merits, entitling them to summary judgment.

## A.    2002 Reappointment Agreement

Before discussing HCQIA and its applicability to the various peer review
actions, there is one argument made by Plaintiff that the Court must address.
Plaintiff contends that all of the Defendants are bound by the 2002 Reappointment
Agreement in which Plaintiff agreed to extend immunity to the Hospital and anyone
participating in a peer review action within the bounds of state and federal law, but
the immunity would not protect any person whose actions were motivated by bad
faith or who knowingly provided false information about Plaintiff. (Doc. 463-32).
Plaintiff argues that all of the Defendants who claim HCQIA immunity are barred
from that immunity because their actions were motivated by bad faith or they
knowingly provided false information about Plaintiff.

The Court has previously held that in this case, "the issue of immunity will be
determined under the framework set forth in the HCQIA." (Doc. 42). Under HCQIA,
bad faith is irrelevant. While not deciding the issues, the Court doubts that anyone
other than the Hospital could be bound by the Agreement, or that HCQIA immunity

---

[28]The immunity afforded by HCQIA does not extend to equitable relief, but Plaintiff has not
made any equitable claims.

can be modified through a contract or waived without an express waiver. Any decision about immunity will be based on HCQIA, not the 2002 Reappointment Agreement.

## B.     HCQIA

This case is about peer review, the process by which physicians and hospitals evaluate and discipline staff doctors. Congress enacted HCQIA "to encourage such peer review activities, 'to improve the quality of medical care by encouraging physicians to identify and discipline other physicians who are incompetent or who engage in unprofessional behavior.'" Bryan, 33 F.3d at 1321 (citation omitted). HCQIA grants limited immunity from liability for money damages to persons who participate in professional peer review activities. 42 U.S.C. § 11111(a).

HCQIA provides a "professional review body" with immunity from damages whenever a "professional review action" is taken. A "professional review body" is a "health care entity and the governing body or any committee of a health care entity which conducts professional review activity, and includes any committee of the medical staff of such an entity when assisting the governing body in a professional review activity." 42 U.S.C. § 11151(11). Under HCQIA, the professional review body, any person acting as a member or staff to the body, any person under a contract or other formal agreement with the body, and any person who participates with or assists the body with respect to the action are all entitled to immunity from damages. 42 U.S.C. § 11111(a)(1).

A "professional review action" under HCQIA is:

> [A]n action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician. Such term includes a formal decision of a professional review body not to take an action or make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action.

42 U.S.C. § 11151(9).[29]

In order for a professional review body to have immunity under HCQIA for a professional review action, the action must be taken:

1. in the reasonable belief that the action was in the furtherance of quality health care;

2. after a reasonable effort to obtain the facts of the matter;

3. after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances; and

4. in the reasonable belief that the action was warranted by the facts known after such reasonable

---

[29]There is no question that the 2004-2005 Action and 2001 Action were professional review actions within the ambit of HCQIA. The 1998 Evaluation, however, was a professional review activity completed as part of a professional review action. That matter is addressed further *infra* in connection with the analysis of Defendants' Motions for Summary Judgment regarding the 1998 Evaluation.

> effort to obtain facts and after meeting the
> requirement of paragraph (3).

42 U.S.C. § 11112(a).

"A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence." Id.

The Eleventh Circuit has determined that HCQIA immunity from damages should be decided at the summary judgment stage. The rebuttable presumption contained in § 11112(a), however, creates "an unusual summary judgment standard," which the Eleventh Circuit has articulated as follows:

> Might a reasonable jury, viewing the facts in the best light for [the plaintiff], conclude that he has shown, by a preponderance of the evidence, that the defendants' actions are outside the scope of section 11112(a)? If not, the court should grant the defendant's motion. In a sense, the presumption language in HCQIA means that the *plaintiff* bears the burden of proving that the peer review process was *not* reasonable.

Bryan, 33 F.3d at 1333 (emphasis in original).

In determining whether the four § 11112(a) requirements have been met, a court must apply an objective test that "looks to the totality of the circumstances" to determine whether the action satisfies the statutory provisions. Imperial v. Suburban Hosp. Ass'n, 37 F.3d 1026, 1030 (4th Cir. 1994).

### 1. 2004-2005 Action

The Court will first address the 2004 peer review process, which led to the termination of Plaintiff's privileges in 2005 (the "2004-2005 Action"), as this forms the basis for the majority of Plaintiff's claims.

### i. Reasonable belief that action was in furtherance of quality health care

The first question for the Court is whether the action to terminate Plaintiff's privileges was taken "in the reasonable belief that the action was in the furtherance of quality health care." 42 U.S.C. § 11112(a)(1).

This prong of the HCQIA test is met if "the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients." Bryan, 33 F.3d at 1334-35 (citations omitted). "[T]he Act does not require that the professional review result in an actual improvement of the quality of health care," Imperial, 37 F.3d at 1030; Poliner v. Texas Health Sys., 537 F.3d 368, 378 (5th Cir. 2008), and does not require that the conclusions reached by the reviewers were in fact correct. Poliner, 537 F.3d at 378. "Assertions of hostility" are irrelevant to the reasonableness standards of § 11112(a). "The test is an objective one, so bad faith is immaterial." Bryan, 33 F.3d at 1335 (citing Austin v. McNamara, 979 F.3d 728, 734 (9th Cir. 1992)).

It is clear to the Court that the decision to terminate Plaintiff's privileges was made in the reasonable belief that the action was in the furtherance of quality health

care. The 2004-2005 Action was prompted by the events involving Patients AB, MB, JD, and CB, along with complaints of disruptive behavior from nurses who said Plaintiff had not been taking care of his patients, that nurses were scared to call Plaintiff, and that it was difficult to get directions from Plaintiff. The Board, which was the ultimate decision maker, the 2004 Study Group, MEC, 2005 Appeal Hearing Panel, and Appellate Review Panel were all presented with evidence that Plaintiff's patient care and behavior fell below the standards for physicians on the medical staff. While Plaintiff contends that his patient care was appropriate, "[q]uality health care" is not limited to "clinical competence, but includes matters of general behavior and ethical conduct." Meyers v. Columbia/HCA Healthcare Corp., 341 F.3d 461, 469 (6th Cir. 2003). *See also* Everhart v. Jefferson Parish Hosp. Dist. No. 2, 757 F.2d 1567, 1573 (5th Cir. 1985) ("[Q]uality patient care demands that doctors possess at least a reasonable 'ability to work with others.'")

Plaintiff contends that the 2004-2005 Action was not done in furtherance of patient care. Instead, he argues that it was done as part of a continuing effort to drive him out of the relevant markets and control competition. He believes Defendants' actions were all a pretext to eliminate competition. Among other things, Plaintiff points to the discussions between the Hospital and RCG about the possible joint venture of which Plaintiff was not made aware, and which was discontinued once the matter regarding termination of Plaintiff's privileges arose. Regardless of any secret discussions or anti-competitive motives, courts all over the country have

held that a plaintiff's "urging of purported bad motives or evil intent or that some hospital officials did not like him provides no succor." Poliner, 537 F.3d at 379. The Eighth Circuit in Sugarbaker v. SSM Health Care reached a similar conclusion, holding that

> [T]o the extent Dr. Sugarbaker's case relies on inferences of a conspiracy to oust him, we conclude that such inferences do not create any genuine issues of fact in this case. In the HCQIA immunity context, the circuits that have considered the issue all agree that the subjective bias or bad faith motives of the peer reviewers is irrelevant. We agree with the views of our sister circuits and now hold that bad faith on the part of the reviewers is irrelevant to the objective inquiry under 42 U.S.C. § 11112(a).

190 F.3d 905, 914 (8th Cir. 1999) (internal citations omitted). *See also* Pamintuan v. Nanticoke Mem. Hosp., 192 F.3d 378, 389 (3d Cir. 1999);[30] Bryan, 33 F.3d at 1335;[31] Austin v. McNamara, 979 F.2d 728, 734 (9th Cir. 1992); Deming v. Jackson-Madison County Gen. Hosp. Dist., 553 F.Supp.2d 914, 925 (W.D. Tenn. 2008).[32]

---

[30]"We judge Nanticoke Memorial's actions using an objective test, thus the good or bad faith (or subjective motivations) of the reviewers is irrelevant."

[31]At trial the plaintiff asserted that the members of the board of directors and executive committee were primarily motivated by personal animosity and not by concern for patient care. The Eleventh Circuit held that "Bryan's 'assertions of hostility do not support his position [that the Hospital is not entitled to the HCQIA's protections] because they are irrelevant to the reasonableness standards of § 11112(a). The test is an objective one, so bad faith is immaterial.'"

[32]The plaintiff contended that the peer review process was motivated by "personal and professional hostility toward him because he posed an economic threat to his competitors." The court held that whether the reviewers were subjectively motivated by bad faith was irrelevant.

Plaintiff next argues that the review was unfocused and unlimited. He contends that the 2004 Study Group made false findings and reports regarding Patients AB, MB, JD, and CB; that medical records were missing from Patient AB's medical chart; that all of the original medical records pertaining to the cases have been destroyed;[33] and that significant medical records were not provided to Plaintiff during the appeal hearing. Plaintiff also believes the Hospital should have sought an independent review or evaluation of the cases involving patient care.

While Plaintiff contends there was some false information about Patients AB, MB, JD, and CB in the 2004 Study Group's report, and that Defendant Dunaway's letter about Plaintiff's interaction with the PWBC was untrue, even assuming the information was false, it does not appear that the information contained therein was "so obviously deficient so as to render Defendants' reliance 'unreasonable.'" Poliner, 537 F.3d at 380 (quoting Gabaldoni v. Wash. County Hosp. Ass'n, 250 F.3d 255, 261 (4th Cir. 2001)). In any event, the committees and panels and the Board had a plethora of information before them to review concerning Plaintiff's clinical skills and general behavior aside from the 2004 Study Group's report and Defendant Dunaway's letter.

With regard to the note missing from Patient AB's chart, Ms. Bush testified fully about the note and her care of the patient, even if she could not testify as to

_____

[33]The medical records which Plaintiff contends were destroyed were in fact converted to electronic format. Counsel for Plaintiff admitted during oral argument that she received the records in electronic format.

exactly what was in the note. Further, Plaintiff has not shown how that note not being in the chart affected the decisions of the 2004 Study Group, MEC, Appeal Hearing Panel, Appellate Panel, and Board. In fact, Defendant Hehn testified that while it is always nice to have a complete medical record, "I can't think of any page that would have been missing that would have affected our decision about what happened with Dr. Wood." (Doc. 520-8, pp. 11-12).[34]

To the extent Plaintiff argues that the peer review action could not be deemed objectively reasonable because his expert witnesses testified during the 2005 Appeal Hearing that management of the four cases was appropriate and there was no justification to remove Plaintiff from the medical staff, his argument fails. Even if the peer review bodies were incorrect in determining that Plaintiff's care was inappropriate, a showing "that the doctors reached an incorrect conclusion on a particular medical issue . . . does not meet the burden of contradicting the existence of a reasonable belief that they were furthering quality health care. . . ." Sugarbaker, 190 F.3d at 914 (citations and internal quotation marks and alterations omitted). Again, HCQIA does not require that the conclusions reached be correct. Poliner, 537 F.3d at 378.

---

[34]While Dr. Welchel testified during his deposition in this case that he would have liked to have seen the missing medical record and that its absence denied him a complete real-time documentation of several important alleged observations, conversations, and events leading up to Patient AB's operation, Dr. Welchel ultimately determined that Plaintiff's care of Patient AB was, in his opinion, proper.

The evidence shows that the Board and other peer review bodies acted in the reasonable belief that termination of Plaintiff's privileges would restrict incompetent behavior or would protect patients. While Plaintiff contends that Defendant Beverly controlled the Board, the inference being that Defendant Beverly made the Board members vote in favor of the termination, the problem is that there is no evidence that any member of the Board capitulated to the demands of Defendant Beverly, or that he coerced the Board's decision. Even Defendant Simms, who testified that Defendant Beverly controlled the Board, did not testify, or at least the Court has not been directed to any testimony from him, about a particular instance of when or how Defendant Beverly controlled the Board. For instance, did Defendant Beverly ever pressure Defendant Simms to vote a particular way on a particular matter while Defendant Simms was on the Board? As the record stands now, the only evidence before the Court are allegations from Defendant Simms and Dr. Fuller that Defendant Beverly controlled the Board. Plaintiff did not depose any of the Board members who voted to terminate his privileges, other than the individually named Defendants who served on the Board at that time. Without some sort of evidence that Defendant Beverly actually did something with respect to the Board members, the allegation that Defendant Beverly controlled the Board is meaningless.

There are also problems with Dr. Fuller's testimony that Defendant Beverly controlled the medical staff and could make them perform unwarranted peer review, which is the only testimony as to that issue. First of all, Dr. Fuller testified in 2009

about the relationship between Defendant Beverly and the medical staff in 2004, but Dr. Fuller has not served on the Hospital's medical staff since 1990. Further, there is no evidence of Defendant Beverly controlling the medical staff, other than Dr. Fuller's supposition that everyone involved in the peer review process knew Defendant Beverly wanted to punish Plaintiff and agreed to put the review action into motion leading to the termination of Plaintiff's privileges.

For both of these issues relating to Defendant Beverly, the testimony presented by Plaintiff is nothing more than speculation, and the law is clear that speculation and conjecture are not sufficient to defeat summary judgment. <u>Lee v. Celotex Corp.</u>, 764 F.2d 1489, 1492 (11th Cir.1985).[35]

The Court finds that Plaintiff has failed to present evidence to rebut the presumption that the 2004-2005 Action was taken in the reasonable belief that it furthered quality health care.[36]

_____

[35]The same goes for Mr. Donovan's testimony. He had the impression that Defendant Beverly and the Hospital wanted to separate Plaintiff from his privileges, but had to admit no one ever told him to actually do anything with respect to Plaintiff.

[36]While Defendant Simms now states that if he had known about certain events, including the discussions between the Hospital and RCG, at the time he voted to terminate Plaintiff's privileges, he would have urged the MEC to send the matter to an external reviewer, his after-the-fact belief does not change the Court's opinion. What matters is what the peer reviewers knew at the time of the peer review, and even assuming there was something wrong with the discussions between the Hospital and RCG as to Plaintiff, that sort of alleged bad faith conduct would not trump HCQIA immunity.

### ii.    Reasonable effort to obtain the facts

The second question for the Court is whether the peer reviewers made "a reasonable effort to obtain the facts of the matter." 42 U.S.C. § 11112(a)(2).

Plaintiff complains that the 2004 Study Group's investigation was accomplished in a short period of time; that the 2004 Study Group did not interview any physicians other than Defendant Hall, who was personally involved in the treatment of Patients AB and MB; that the 2004 Study Group did not obtain statements from physicians and staff members who worked with Plaintiff and testified at the 2001 proceeding; that no independent review of the incidents was requested; that the 2004 Study Group relied on the allegedly false letter from Defendant Dunaway and the PWBC; that the letter Plaintiff wrote about the Patient AB case was not provided to the 2004 Study Group; and that the 2004 Study Group would not meet with Plaintiff.

As for the MEC, Plaintiff states that the members did not read his written response to the 2004 Study Group's report or his 2001 post hearing brief prior to voting; that the MEC would not talk to a number of doctors and nurses at the Hospital who had first-hand information about the allegations made against Plaintiff; that the MEC did not ask Plaintiff any questions during his presentation; and that the MEC voted to ratify the 2004 Study Group's recommendation to terminate Plaintiff's privileges after only a few minutes of discussion.

Plaintiff also complains that the Hospital did not retain an independent expert to review the allegations against him. He contends that people were afraid to testify on his behalf at the 2005 Appeal Hearing because they had been threatened and intimidated by the Hospital, and the Hospital refused to agree to have subpoenas issued so Hospital employees could testify under the cover of a subpoena.[37]

"The HCQIA does not require the ultimate decisionmaker to investigate a matter independently, but requires only a 'reasonable effort to obtain' the facts." Poliner, 537 F.3d at 380 (quoting Gabaldoni, 250 F.3d at 261). The Court is to consider "the totality of the process leading up to" the professional review action. Poliner, 537 F.3d at 380.

Looking at the process as a whole, the Court finds that no reasonable jury could conclude that the Defendants involved in the 2004-2005 Action failed to make a reasonable effort to obtain the facts. By the time the Board voted to terminate Plaintiff's privileges, the review process had been ongoing for almost a year and involved over 30 physicians and non-physicians serving on five different levels of committees and panels who reviewed the allegations against Plaintiff. Plaintiff had the opportunity to respond to the 2004 Study Group's report. The MEC and 2005 Appeal Hearing Panel each heard directly from Plaintiff. Plaintiff ultimately had a three-day hearing where he was permitted trial-type rights before a hearing panel.

---

[37]The witness and subpoena issue is more fully addressed *infra* in connection with the third prong of the HCQIA immunity test.

The 2005 Appeal Hearing Panel heard lay and expert testimony from physicians, nurses, and staff members, many of whom testified about their personal experiences with Plaintiff in terms of his patient care and general behavior. Even if witnesses were not heard from previously by the 2004 Study Group or the MEC, Plaintiff had the option of calling them during the 2005 Appeal Hearing and presenting their testimony before that body.[38] The members of the 2005 Appeal Hearing Panel were active during the hearing, asking questions themselves as they found necessary. Plaintiff had the opportunity to present to the 2005 Appeal Hearing Panel his arguments and evidence regarding the matters about which he complains. Plaintiff was also given extensive appeal rights. Again, even if there were some problems with the 2004 Study Group's report or Defendant Dunaway's letter, the various committees and panels were provided with numerous other sources of information for use in making their decisions.[39]

Plaintiff spends a great deal of time pointing out the flaws of other physicians on staff at the Hospital who were not subjected to peer review actions. For instance, complaints have been lodged against Defendants Hall, Hicks, and Falconer about

---

[38]Defendants McMillan, Hall, Quinif, Falconer, and Grieme have each testified that there was no additional information that could have been presented to the 2004 Study Group or MEC that would have changed their decisions. (Docs. 464-8; 464-9; 464-10; 464-11; 464-12).

[39]Defendant Simms testified that while retrospectively he wished the 2004 Study Group had done more investigating or that the matter had been handled by an external reviewer, at the time of the MEC's vote, he believed the 2004 Study Group used reasonable efforts to obtain the facts. (Doc. 467-9).

their behavior and use of language around the Hospital, but none of them have been subjected to peer review. Plaintiff also states that Defendant Hall had worse problems with his medical record deficiencies, but he was never referred to the PWBC or made to undergo an impairment evaluation. Plaintiff's basic argument is that he was not the worst doctor at the Hospital. However, as both the Third and Ninth Circuit have recognized, "nothing in the statute, legislative history, or case law suggests the competency of other doctors is relevant in evaluating whether [the hospital] conducted a reasonable investigation into [a doctor's] conduct." Pamintuan, 192 F.3d at 389 (quoting Smith v. Ricks, 31 F.3d 1478, 1486 (9th Cir. 1994)).

It appears to the Court that Plaintiff believes he was entitled to a perfect effort in obtaining the facts. HCQIA, however, only requires a "reasonable effort." Poliner, 537 F.3d at 380. Other courts have determined that a reasonable effort to obtain facts was made in cases where processes similar to the ones in this case took place. See, e.g., Meyers, 341 F.3d at 464-65 (plaintiff doctor was investigated by a credentials committee, an MEC, and a committee of three board members. He was also represented by counsel and given the right to confront witnesses.); Bryan, 33 F.3d at 1335 (plaintiff doctor's conduct had been evaluated by three peer review bodies and the plaintiff had the opportunity to present evidence throughout the proceeding). Reviewing the 2004-2005 Action as a whole, Plaintiff has failed to

present sufficient evidence to overcome the presumption that a reasonable effort to obtain the facts was made.[40]

### iii. Adequate notice and hearing procedures

The third prong of the HCQIA immunity test is whether the professional review action was taken "after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances." 42 U.S.C. § 11112(a)(3). Section 11112(b) provides a list of procedures that, if followed, constitute a "safe harbor" under which the requirements of § 11112(a)(3) are deemed to be met:

> (b)    Adequate notice and hearing
>
> A health care entity is deemed to have met the adequate notice and hearing requirement of subsection (a)(3) of this section with respect to a physician if the following conditions are met (or are waived voluntarily by the physician):
>
> (1)    Notice of proposed action
>
> The physician has been given notice stating - -
>
> (A)(i)  that the professional review action has been proposed to be taken against the physician;
>
> (ii)    reasons for the proposed action;

---

[40] *See also* <u>Patton v. St. Francis Hosp.</u>, 260 Ga. App. 202, 206, 581 S.E.2d 551, 556-57 (2003) (holding that the hospital's efforts to obtain the facts of the matter were objectively reasonable as five panels (the Department of Medicine, a study committee, the medical staff executive committee, an appellate review subcommittee of the Board of Trustees, and the full Board of Trustees) reviewed the matter over the course of a year, and the investigation included an eleven-hour hearing at which counsel represented the plaintiff and called and cross-examined witnesses and presented evidence).

(B)(i)  that the physician has the right to request a hearing on the proposed action,

(ii)  any time limit (of not less than 30 days) within which to request such a hearing, and

(C)  a summary of the rights in the hearing under paragraph (3).

(2)  Notice of hearing

If a hearing is requested on a timely basis under paragraph (1)(B), the physician involved must be given notice stating - -

(A)  the place, time, and date, of the hearing, which date shall not be less than 30 days after the date of the notice, and

(B)  a list of the witnesses (if any) expected to testify at the hearing on behalf of the professional review body.

(3)  Conduct of hearing and notice

If a hearing is requested on a timely basis under paragraph (1)(B) - -

(A)  subject to subparagraph (B), the hearing shall be held (as determined by the health care entity) - -

(i)  before an arbitrator mutually acceptable to the physician and the health care entity,

(ii)  before a hearing officer who is appointed by the entity and who is not in direct economic competition with the physician involved, or

(iii)  before a panel of individuals who are appointed by the entity and are not in direct economic competition with the physician involved;

(B)     the right to the hearing may be forfeited if the physician fails, without good cause, to appear:

(C)     in the hearing the physician involved has the right - -

(i)     to representation by an attorney or other person of the physician's choice,

(ii)    to have a record made of the proceedings, copies of which may be obtained by the physician upon payment of any reasonable charges associated with the preparation thereof,

(iii)   to call, examine, and cross-examine witnesses,

(iv)    to present evidence determined to be relevant by the hearing officer, regardless of its admissibility in a court of law, and

(v)     to submit a written statement at the close of the hearing; and

(D)     upon completion of the hearing, the physician involved has the right - -

(i)     to receive the written recommendation of the arbitrator, officer, or panel, including a statement of the basis for the recommendations, and

(ii)    to receive a written decision of the health care entity, including a statement of the basis for the decision.

42 U.S.C. § 11112(b).

A professional review body's failure to meet these conditions does not, in itself, constitute failure to meet the standards of § 11112(a)(3). 42 U.S.C. § 11112(b).

A review of the record shows that Defendants met the safe harbor provisions of § 11112(b). In a letter dated September 24, 2004, Plaintiff was given notice that a professional review action had been proposed to be taken against him, the reasons for the proposed action, that he had the right to request a hearing, that he had 30 days within which to request a hearing, and that his rights with regard to the hearing were set forth in the Hospital's Hearing and Appeal Procedure, which was enclosed in the letter. (Doc. 463-94, p. 44). 42 U.S.C. § 11112(b)(1). In a letter dated December 10, 2004, the Hospital provided Plaintiff with the place, time, and date of the hearing, which was not less than 30 days after the date of the notice, and also provided a list of the Hospital's witnesses expected to testify at the hearing. (Doc. 463-95, pp. 5-6). 42 U.S.C. § 11112(b)(2). The 2005 Appeal Hearing was held before a panel of physicians who were not in direct economic competition with Plaintiff, as it is undisputed that none of the 2005 Appeal Hearing Panel members were nephrologists. 42 U.S.C. § 11112(b)(3)(A). At the 2005 Appeal Hearing, Plaintiff was represented by counsel, had a record of the proceedings made, was allowed to call, examine, and cross-examine witnesses, was allowed to present evidence, and was allowed to submit a written statement at the close of the hearing. 42 U.S.C. § 11112(b)(3)(C). In a letter dated March 17, 2005, Plaintiff was provided the recommendation of the 2005 Appeal Hearing Panel and the basis for its decision. (Doc. 463-113). In a letter dated July 27, 2005, Plaintiff was provided with

the Board's decision to terminate his privileges, along with the basis for the decision. (Doc. 463-116). 42 U.S.C. § 11112(b)(3)(D).

Plaintiff argues that adequate notice and hearing procedures were not afforded because he was led to believe the 2004-2005 Action only involved Patient AB and only learned that other patients were involved when he received the 2004 Study Group's report; because he was not informed prior to the 2005 Appeal Hearing that the medical record from Patient AB's chart was missing; because some of the physicians who reviewed his conduct had financial ties to the Hospital; and because some witnesses and potential witnesses were afraid to testify on Plaintiff's behalf during the 2005 Appeal Hearing and the Hospital refused to allow Plaintiff to subpoena witnesses.

Each of Plaintiff's arguments fails. First, Plaintiff was only entitled to adequate notice of the proposed professional review action, which was the termination of his privileges. He was given that notice. Whether he was told prior to the commencement of the 2004 Study Group's investigation that the investigation involved only Patient AB, which is disputed, is irrelevant, especially as he was told prior to appearing before both the MEC and the 2005 Appeal Hearing Panel all of the allegations relating to the various patients.[41] Second, the issue of the missing

---

[41]Even if the Hospital's concerns shifted during the review process, that "does not alone undermine the fairness of the procedures employed." Sugarbaker, 190 F.3d at 915. *See also* Ne. Ga. Med. Ctr., Inc. v. Davenport, 272 Ga. 173, 176, 527 S.E.3d 548, 552 (2000).

Further, nothing in HCQIA even "requires that a physician be permitted to participate in the review of his care." Singh v. Blue Cross/Blue Shield of Mass., Inc., 308 F.3d 25, 40 (1st Cir.

medical record was fully addressed during the 2005 Appeal Hearing. Ms. Bush testified as to the contents of the record, and the 2005 Appeal Hearing Panel had ample opportunity to consider the record and the fact that it was not in Patient AB's chart prior to making its decision. Third, HCQIA only requires that the members of the hearing panel not be in direct economic competition with the physician. None of the members of the 2005 Appeal Hearing Panel were nephrologists and Plaintiff did not object to their serving on the hearing panel. In any event, at least one circuit court has held that the fact that members of a peer review committee were in direct competition with the physician was insufficient to rebut the presumption that the peer review process was fair under the circumstances. *See* Wayne v. Genesis Med. Ctr., 140 F.3d 1145, 1149 (8th Cir. 1998).[42] Also, while some of the physicians who served on the peer review committees served on Hospital panels for which they were paid or had companies that leased office space from the Hospital, Plaintiff has not shown that all of the people involved in the peer review action had alleged financial ties to the Hospital, or how those financial ties served to make the process unreasonable. Finally, Plaintiff's argument with regard to the subpoenas is frivolous. As the Court stated during oral argument, neither the Hospital nor Plaintiff has any

---

2002) (citation omitted).

[42]*See also* S. Fulton Med. Ctr. v. Prakash, 237 Ga. App. 396, 399, 514 S.E.2d 233, 236 (1999). The physician plaintiff contended that certain doctors on the initial investigative committee were in economic competition with him. The Court of Appeals found that fact to be insufficient to rebut the presumption of fairness, as HCQIA only prohibits physicians in direct economic competition from serving as hearing officers or on a hearing panel.

inherent subpoena power. A subpoena issued by either the Hospital or Plaintiff would have been meaningless as neither has any power to compel attendance. In any event, the Hospital offered to write a letter to any Hospital employee Plaintiff wanted to call during the 2005 Appeal Hearing stating that the employee could testify without fear of retribution. Plaintiff rejected that offer, so any negative impact was of his own making. Also, when Plaintiff was asked at the 2005 Appeal Hearing if he had the right to call witnesses, he responded yes and could not specifically name anyone he wanted to testify that did not appear.

The Court finds that Plaintiff has failed to rebut by a preponderance of the evidence the presumption that the notice and hearing procedures afforded to him in connection with the 2004-2005 Action were fair under the circumstances.[43]

### iv. Reasonable belief that the action was warranted by the facts known

The fourth and final prong of the HCQIA immunity test requires that a professional review action be taken in the "reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the [notice and hearing] requirement of paragraph (3)." 42 U.S.C. §

---

[43]Hussein v. Duncan Reg'l Hosp., Inc., No. CIV-07-0439-F, 2009 WL 1212278 (W.D. Okla. May 1, 2009), and Chudacoff v. Univ. Med. Ctr. of Southern Nevada, 609 F.Supp.2d 1163 (D. Nev. 2009), cases relied on by Plaintiff where the district courts determined the defendants were not entitled to HCQIA immunity, can easily be distinguished. In both cases, the physician was not given any notice or opportunity to be heard prior to the hospital terminating his privileges and reporting the termination to the Data Bank. That is not the situation before the Court here.

11112(a)(4). This analysis closely tracks the analysis under § 11112(a)(1). <u>Poliner</u>, 537 F.3d at 384.

Plaintiff relies on his previously made arguments in support of his contention that Defendants' conduct was not warranted by the facts. The Court has already rejected those arguments. As discussed *supra*, Defendants reasonably believed the termination of Plaintiff's privileges was necessary to further quality health care. Defendants satisfied the conditions for adequate notice and hearing, and they made a reasonable effort to obtain the facts of the matter. The Court finds that a reasonable jury could not conclude by a preponderance of the evidence that Defendants' actions fell outside the requirement established in 42 U.S.C. § 11112(a)(4).

### v.    Conclusion for 2004-2005 Action

"[T]he role of federal courts on review of [peer review] actions is not to substitute our judgment for that of the hospital's governing board or to reweigh the evidence regarding the . . . termination of medical staff privileges." <u>Bryan</u>, 33 F.2d at 1337 (internal quotation omitted). "The intent of [HCQIA] was not to disturb, but to reinforce, the preexisting reluctance of courts to substitute their judgment on the merits for that of health care professionals and of the governing bodies of hospitals in an area within their expertise." <u>Id.</u> (internal citation and quotations omitted).

For all the reasons previously discussed, Plaintiff has not shown that the 2004-2005 Action was unreasonable. The Hospital Defendants, Peer Review

Defendants, Defendant Simms, and Defendant Beverly are entitled to immunity under HCQIA on all of Plaintiff's claims for money damages relating to the 2004-2005 Action, including his claims under the Sherman and Clayton Acts (Counts I, II, III, IV, VI), his claim for tortious interference with business relations and prospective business relations (Count VII), his claim for tortious interference with employment, trade, or profession (Count VIII), his claim for tortious interference with business relations or employment (Count IX), his claim for failure to adhere to bylaws (Count X), his claim for intentional infliction of emotional distress (Count XI), his claim for punitive damages (Count XII), and his claim for bad faith damages (Count XIII).[44]

### 2. 2001 Action

The Court will next address the 2001 peer review process, where Plaintiff voluntarily relinquished his privileges, but was ultimately reinstated to the medical staff (the "2001 Action").[45]

Before addressing the four prongs of the HCQIA test, the Court must address Plaintiff's argument that Defendants should be estopped from claiming immunity for the 2001 Action because the voluntary resignation was not reported to the BOMEX or the Data Bank.

---

[44]It is undisputed that Defendant Simms was only involved in the 2004-2005 Action, and therefore will not be discussed in connection with the 2001 Action or 1998 Evaluation.

[45]Plaintiff only objects to the actions of the 2001 Study Group, which recommended to the MEC that Plaintiff had breached the April 17, 2001 Agreement, and the MEC, who decided Plaintiff had in fact breached the Agreement and accepted his voluntary resignation. It is not necessary for the Court to address in detail the 2001 Appeal Hearing, which ended in a favorable decision for Plaintiff.

Under HCQIA, a hospital must report to the BOMEX whenever it "takes a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days." 42 U.S.C. § 11133(a)(1)(A). The record shows that Plaintiff was off staff for a period of seven months following his voluntary resignation, and it is undisputed that the Hospital did not report anything to the BOMEX. Nevertheless, the Court finds that HCQIA immunity is not defeated for the 2001 Action.

42 U.S.C. § 11111(b) provides:

> If the Secretary [of the Department of Health and Human Services] has reason to believe that a health care entity has failed to report information in accordance with section 11133(a) of this title, the Secretary shall conduct an investigation. If, after providing notice of noncompliance, an opportunity to correct the noncompliance, and an opportunity for a hearing, the Secretary determines that a health care entity has failed substantially to report information in accordance with section 11133(a) of this title, the Secretary shall publish the name of the entity in the Federal Register. The protections of subsection (a)(1) of this section shall not apply to an entity the name of which is published in the Federal Register under the previous sentence with respect to professional review actions of the entity commenced during the 3-year period beginning 30 days after the date of publication of the name.

Here, there is no evidence in the record that the Secretary made a charge that the Hospital failed to report as required by 42 U.S.C. § 11133. Further, there is no evidence that the Secretary conducted the investigation required by § 11111(b), or that the Hospital's name was ever published in the Federal Register pursuant to an

adverse finding under § 11111(b). It is only if those conditions are met that HCQIA immunity is waived. Plaintiff's argument on this point is rejected. *See* Imperial, 37 F.3d at 1030.[46]

### i. Reasonable belief that action was in furtherance of quality health care

The Court first considers whether the action to accept Plaintiff's voluntary termination was taken "in the reasonable belief that the action was in the furtherance of quality health care." 42 U.S.C. § 11112(a)(1). The question is whether "the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients." Bryan, 33 F.3d at 1334-35 (citations omitted). It is again noted that "[t]he test is an objective one, so bad faith is immaterial." Bryan, 33 F.3d at 1335 (citing Austin v. McNamara, 979 F.3d 728, 734 (9th Cir. 1992)).

Plaintiff argues that the 2001 Action was not taken in the reasonable belief that the action was in the furtherance of quality health care because the action was not reported to the BOMEX or the Data Bank, and because of Dr. Patterson's

---

[46]Plaintiff also argues that HCQIA immunity is waived because the Hospital took the position that the voluntary resignation was not a reportable event. However, Plaintiff "has not shown that this gives rise to an estoppel, particularly given that the statute contemplates that hospitals will sometimes fail to report and provides a specific remedy for such failures." Fox v. Good Samaritan, L.P., No. C 04-0874, 2010 WL 1260203 at *7 (N.D.Cal. March 29, 2010).

testimony that she questioned whether the MEC's decision to accept Plaintiff's voluntary resignation was about patient care.

The Court rejects Plaintiff's arguments. Perhaps the action should have been reported to the BOMEX or Data Bank, but in the Court's opinion, failure to do so does not mean the Defendants were not acting in the reasonable belief that the action was in the furtherance of quality health care. And with regard to Dr. Patterson, while she may have personally had questions about the true purpose of the 2001 Action, Plaintiff has not presented any evidence that any member of any panel or committee that voted as part of the 2001 Action did not believe their decisions were made with furthering quality health care in mind. In any event, Dr. Patterson testified that she believed the problem had to do with behavioral conflicts and the law is clear that "quality health care" is not limited to "clinical competence, but includes matters of general behavior and ethical conduct." Meyers, 341 F.3d at 469.

The record shows that the 2001 Action was taken in the reasonable belief that the action was in the furtherance of quality health care. Prior to recommending that Plaintiff be required to sign the April 17, 2001 Agreement, the 2001 Study Group and MEC had before it reports of Plaintiff's negative comments to the nursing staff, his failure to follow policies of the dialysis unit, concerns about patient care, and his recurring failure to attend required meetings. The 2001 Study Group, which again, had none of the individual Defendants on it, also had Plaintiff's statement that basically he was not concerned about the policies relating to meetings or medical

records. Further, prior to making their recommendations that Plaintiff's voluntary resignation should be accepted, the 2001 Study Group and MEC both had additional information before them about quality of care issues (Plaintiff positioned a patient's catheter improperly and ordered staff the dialyze a patient who was too unstable), about Plaintiff's rude and abusive behavior toward the nursing staff, and about Plaintiff's failure to follow the rules of the dialysis unit.

It is Plaintiff's burden to show by a preponderance of the evidence that the 2001 Action was not taken in the reasonable belief that the action was in the furtherance of quality health care. He has not done so here.

### ii. Reasonable effort to obtain the facts

The next question is whether the peer reviewers made "a reasonable effort to obtain the facts of the matter." 42 U.S.C. § 11112(a)(2).

Plaintiff argues that there was no reasonable effort to obtain the facts because the 2001 Study Group relied on statements from Defendants Hicks and Santos, who are Plaintiff's competitors. Plaintiff acknowledges that Ms. Edwards also appeared before the 2001 Study Group, but states that her appearance was at the behest of Defendants Hicks and Santos.

First, the Court notes that Plaintiff has not pointed to any evidence to support his contention that Ms. Edwards' appearance was at the "behest" of anyone or that there was some reason why her statements to the 2001 Study Group with regard to Plaintiff should have been disregarded or would not carry any weight. In fact, she

was the person who discussed what the Court believes to be the most concerning issues - the improperly placed catheter and the order to continue dializing a patient who was too unstable.

And while it may not be ideal that it was Defendants Hicks and Santos who appeared before the 2001 Study Group, consideration of their statements does not mean that the 2001 Study Group or MEC did not make reasonable efforts to obtain the facts of the matter. The evidence in the record shows that the committees also relied on Ms. Edwards' oral and written statements, written statements from other staff members, the fact that Plaintiff failed to attend a number of departmental meetings, information from Dr. Earley, and Plaintiff's own statements in making their decisions.

While Plaintiff complains that his direct competitors participated in his investigation, the complaint "is of little consequence here. It is inevitable in any peer review process that a physician's competitors will at some point be involved in the process." Patel v. Midland Mem. Hosp. & Med. Ctr., 298 F.3d 333, 345 (5th Cir. 2002). In any event, except for sitting on a hearing panel, a physician's competitors are not prohibited under HCQIA from participating in an investigation. Even though Defendants Hicks and Santos may have discussed Plaintiff before the PWBC and 2001 Study Group, it is undisputed that no members of the PWBC, the 2001 Study Group, or the MEC were in direct economic competition with Plaintiff.

The Court finds that no reasonable jury could conclude that a reasonable effort to obtain the facts was not made before the 2001 Study Group and MEC voted to accept Plaintiff's voluntary resignation.

### iii.    Adequate notice and hearing procedures

The next question is whether Plaintiff was afforded adequate notice and hearing procedures or other procedures as are fair to the physician under the circumstances. 42 U.S.C. § 11112(a)(3).

There is no dispute that Plaintiff was not given notice or a hearing before the MEC decided to accept his voluntary resignation. However, HCQIA does not require a hearing, and further, no hearing or notice was required here. Plaintiff signed an agreement which stated that failure to comply with the terms would yield "immediate, voluntary termination of my medical staff privileges. . . ." No notice or hearing was provided for under the April 17, 2001 Agreement. A similar situation was addressed in Singh v. Blue Cross & Blue Shield of Mass., Inc., 182 F.Supp.2d 164, 173 (D.Mass. 2001), where the Court held that no hearing was required under HCQIA in light of the agreement the plaintiff signed which did not provide for a formal hearing. In any event, Plaintiff was later given a hearing where he was afforded all of the provisions under 42 U.S.C. § 11112(b), including representation by counsel, maintenance of a hearing record, the right to call, examine, and cross-examine witnesses, the ability to present evidence, and the submission of a written statement at the conclusion of the hearing.

The Court finds that Plaintiff was provided with fair notice and hearing procedures relating to the 2001 Action.

### iv.     Reasonable belief that the action was warranted by the facts known

Finally, the Court must decide if the 2001 Action was taken in the "reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the [notice and hearing] requirement of paragraph (3)." 42 U.S.C. § 11112(a)(4).

As the Court has determined that the 2001 Action was done in the furtherance of quality health care, and that Plaintiff received adequate notice and hearing procedures, it finds that a reasonable jury could not conclude by a preponderance of the evidence that Defendants' actions fell outside the requirement established in 42 U.S.C. § 11112(a)(4).

### v.     Conclusion for 2001 Action

For all the reasons discussed above, Plaintiff has not shown that the 2001 Action was unreasonable. To the extent they are implicated in the 2001 Action, the Hospital Defendants, Peer Review Defendants, and Defendant Beverly are entitled to immunity under HCQIA on all of Plaintiff's claims for money damages relating to the 2001 Action, including his claims under the Sherman and Clayton Acts (Counts I, II, III, IV, and VI), his claim for tortious interference with business relations and prospective business relations (Count VII), his claim for tortious interference with employment, trade, or profession (Count VIII), his claim for tortious interference with

119

business relations or employment (Count IX), his claim for failure to adhere to bylaws (Count X), his claim for intentional infliction of emotional distress (Count XI), his claim for punitive damages (Count XII), and his claim for bad faith damages (Count XIII).

### 3. 1998 Evaluation

For purposes of HCQIA, the Court lastly addresses the 1998 Evaluation.

A professional review action under HCQIA is an action or recommendation which is based on the competence or professional conduct of a physician and which affects or may affect adversely the clinical privileges of the physician. 42 U.S.C. § 11151(9). Professional review activities are the precursors to professional review actions, and include a health care entity's efforts: "(a) to determine whether the physician may have clinical privileges with respect to, or membership in, the entity; (b) to determine the scope or conditions of such privileges or membership; or (c) to change or modify such privileges or membership." 42 U.S.C. § 11151(10). When determining if a health care entity is immune from damages for a professional review action, the court considers whether the action as a whole, including all the professional review activities relating to it, meets the standards of § 11112(a).

The 1998 Evaluation was a professional review activity, not a professional review action, as it was the Hospital's effort to determine whether Plaintiff should have clinical privileges, or whether his privileges should be modified. The Washington Court of Appeals considered a similar situation in <u>Morgan v.</u>

PeaceHealth, Inc., 101 Wash. App. 750, 14 P.3d 773 (2000). There, the hospital's credentials committee recommended to the executive committee that the physician obtain an evaluation within three months at his own cost at a certain facility. The executive committee agreed and forwarded the recommendation to the governing board, which approved the recommendation. The board extended the physician's time to complete the assessment, and warned that if he did not comply, his privileges would be automatically suspended. The physician's clinical privileges were eventually summarily suspended for failure to obtain the evaluation. Id. at 779-80. Plaintiff was similarly told here that if he did not have the evaluation, his privileges would be suspended.

The Morgan court determined that the recommendation for the evaluation was a professional review activity, because it was part of an assessment and fact-finding process and did not curtail the physician's privileges. The professional review action at issue was the suspension of the physician's privileges for failure to have the evaluation done. Id. at 782. Plaintiff attempts to distinguish Morgan by stating that there was no "recommendation" that Plaintiff undergo the evaluation. Instead, he was told to have the evaluation or his privileges would be immediately terminated. That is exactly what happened in Morgan, though the timing may have been somewhat different, as it was the governing board in Morgan, rather than a physicians' committee, who told the physician his privileges would be terminated if he did not have the evaluation.

As the 1998 Evaluation was a professional review activity, immunity under HCQIA does not depend on whether the actions surrounding the evaluation directive complied with HCQIA. The question is whether the professional review action - the decision of the Board to retain Plaintiff on staff in 1999 - meets the HCQIA requirements.

As discussed extensively *supra*, there is a presumption that a professional review action meets the standards set out in 42 U.S.C. § 11112(a), and that presumption must be rebutted by Plaintiff by a preponderance of the evidence. In the multitude of pages filed by Plaintiff with respect to his own Motions for Summary Judgment and in response to the various Defendants' Motions for Summary Judgment, Plaintiff has not attempted to rebut the HCQIA presumption with regard to the 1998 Evaluation. Surprisingly, he has not moved for summary judgment with regard to the 1998 Evaluation on the Defendants' affirmative defense that they are entitled to HCQIA immunity on all professional review actions and activities regarding Plaintiff. His only arguments are that the 1998 Evaluation was a professional review action, rather than a professional review activity, an argument with which the Court disagrees, and that the Hospital did not truly believe that a psychiatric evaluation was needed because Defendant Story did not mention it in a reappointment questionnaire for another hospital where Plaintiff was seeking reappointment. Even taking the questionnaire into consideration, Plaintiff has failed to rebut the presumption that HCQIA immunity applies to the decision to retain

Plaintiff on staff in 1999, a professional review action that included the professional review activity of the 1998 Evaluation.

### i. Conclusion for 1998 Evaluation

Accordingly, to the extent they are implicated in the 1999 review action and 1998 Evaluation, the Hospital Defendants, Peer Review Defendants, and Defendant Beverly are entitled to immunity under HCQIA on all of Plaintiff's claims for money damages relating to the 1999 review action and 1998 Evaluation, including his claims under the Sherman and Clayton Acts (Counts I, II, III, IV, and VI), his claim for tortious interference with business relations and prospective business relations (Count VII), his claim for tortious interference with employment, trade, or profession (Count VIII), his claim for tortious interference with business relations or employment (Count IX), his claim for failure to adhere to bylaws (Count X), his claim for intentional infliction of emotional distress (Count XI), his claim for punitive damages (Count XII), and his claim for bad faith damages (Count XIII).

## C.   Antitrust[47]

Plaintiff alleges several claims for damages under Sections 1 and 2 of the Sherman Act and Section 4 of the Clayton Act against Defendants Hicks and Santos. Defendants Hicks and Santos contend that they are entitled to summary judgment because, among other things, Plaintiff has not properly shown an antitrust injury.

The antitrust laws were "enacted for the 'protection of competition, not competitors.'" Todorov v. DCH Healthcare Auth., 921 F.2d 1438, 1450 (11th Cir. 1991) (quoting Brown Shoe Co. v. United States, 370 U.S. 294. 320, 82 S.Ct. 1502, 1521 (1962)). Antitrust standing is established by satisfying a two-pronged test. First, the plaintiff must demonstrate antitrust injury. Second, the plaintiff must be an efficient enforcer of the antitrust laws. Todorov, 921 F.2d at 1449 (11th Cir. 1991).

---

[47]For the claims against Defendants Hicks and Santos, who were not involved with the peer review actions, the normal summary judgment standard applies. Summary judgment must be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue to any material facts and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmoving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of a material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986) (internal quotation marks omitted). If the moving party meets this burden, the burden shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the nonmoving party is not entitled to judgment as a matter of law. Id. at 324-26. This evidence must consist of more than mere conclusory allegations. See Avrigan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

To the extent Plaintiff asserts his own lost income and profits as an antitrust injury, the claim fails because it describes an injury to an individual competitor, not an antitrust injury. Id. at 1453-54; Pool Water Prods. v. Olin Corp., 258 F.3d 1024, 1035 (9th Cir. 2001).

Aside from any personal lost income and profits, the antitrust injury Plaintiff relies on is an alleged reduction in the quality of care available in the relevant market following his termination from the medical staff. The problem, however, is that there is no credible evidence in the record to support that contention. It is uncontroverted that Plaintiff's economic expert, who conducted a quality-related analysis comparing the Hospital's dialysis facilities and the facilities at which Plaintiff is the medical director, only evaluated data from 2001-2005, and did not analyze any data for the time period after Plaintiff was removed from the medical staff. The situation before the Court is the same as that before the Seventh Circuit in Kochert v. Greater Lafayette Health Servs., 463 F.3d 710, 719 (2006):

> With no evidence that prices, in the normal sense, have been affected by anticompetitive activity, Kochert (and her expert) relied exclusively on her evidence of diminished quality of care as proof of anticompetitive effect, in and of itself, and as proof of higher "quality adjusted" costs. But no reasonable jury, examining Kochert's evidence of diminished quality, could find it credible as proof of such diminution. Kochert has not introduced any evidence that would allow a jury to compare the quality of care prior to defendants' anticompetitive acts with the quality of care after these acts.

Similarly, Plaintiff (or his expert) has not produced any evidence that would allow the Court or a jury to compare the quality of care prior to his termination from the medical staff with the quality of care after. Plaintiff refers to the fact that the Hospital's dialysis facility has been subject to "focused reviews," while the facilities where he serves as medical director have not, but that one fact is not sufficient to show a difference in the quality of care, especially as Plaintiff has not shown that the number of reviews or severity of review have increased since his termination. It is Plaintiff's burden to show an antitrust injury, and he has not presented sufficient evidence to support his theory that there has been a reduction in the quality of medical care available in the relevant market since his termination from the medical staff.

Finally, Plaintiff contends that he has shown an antitrust injury because Defendants' actions have interfered with his patients' choice of physicians, as Plaintiff cannot treat them when they are patients at the Hospital. This alleged injury has been thoroughly rejected by the courts. As the Eleventh Circuit has held, a patient's inability to see a certain physician at a hospital when the patient asked for the physician "does not rise to the level of an actual detrimental effect on competition." Levine v. Central Fla. Med. Affiliates, Inc., 72 F.3d 1538, 1554 (11th Cir. 1996). *See also* Mahmud v. Kaufmann, 358 Fed. Appx. 229, 231 (2d Cir. 2009) (unreported) (patients' declarations that they would rather be treated by the plaintiff

were inadequate because they did not establish that the patients could not secure treatment from the plaintiff, only that they could not do so at a particular hospital).

To recover under the Sherman and Clayton Acts, Plaintiff must establish an antitrust injury. As he has not, all of his antitrust claims against Defendants Hicks and Santos fail.[48] Defendants Hicks and Santos are entitled to summary judgment on all of Plaintiff's claims under the Sherman and Clayton Acts (Counts I, II, IV, and V).

### D. Tortious Interference

#### 1. Interference with business relations and prospective business relations and interference with employment, trade, or profession

Plaintiff next alleges that Defendants Hicks and Santos tortiously interfered with his business relations and prospective business relations, and with his employment, trade, or profession. He contends Defendants Hicks and Santos (1) caused or induced patients and referring physicians to terminate their relationships with Plaintiff; (2) caused or induced potential patients and potential referring physicians not to enter a physician-patient relationship or a physician-referral relationship with Plaintiff; (3) caused the TPA Captive to terminate its relationship with Plaintiff; (4) interfered with his relationship with RCG as its medical director; and

---

[48]Even if Plaintiff had shown an antitrust injury, it is doubtful Plaintiff would be considered an efficient enforcer of the antitrust laws. While not deciding the issue, the Court believes it is most likely that Plaintiff's patients or the government would be considered more efficient enforcers.

(5) caused Plaintiff to have future difficulty in obtaining privileges at other medical facilities and in obtaining malpractice insurance.

Under Georgia law, a claim for tortious interference with business relations requires a showing that the defendant: (1) acted improperly and without privilege; (2) acted purposely and with malice and the intent to injure; (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff; and (4) caused the plaintiff some financial injury. <u>Vito v. Inman</u>, 286 Ga. App. 646, 649, 649 S.E.2d 753, 757 (2007).

Plaintiff has produced no evidence that Defendants Hicks or Santos induced parties not to enter into or continue in a business relationship with Plaintiff. Plaintiff testified during his deposition that three patients were taken away by Defendants Hicks and Santos, but Plaintiff did not know any of their names at that time, and has not directed the Court to the names of any of the patients in response to the Motion for Summary Judgment before the Court. Plaintiff also has not shown how Defendants Hicks and Santos improperly induced any patients to leave Plaintiff's care. Patient A.J., the one patient Defendant Santos asked if she would be interested in getting another doctor since Plaintiff could not see her while she was hospitalized, declined Defendant Santos' offer and continues under Plaintiff's care. While Defendant Santos may have told patients they "should come over to the good

side,"[49] meaning transfer their care to Defendants Hicks and Santos, it is up to Plaintiff to show that patients in fact were induced by Defendants Hicks and Santos and did transfer their care, causing Plaintiff damage. He has not done so.[50] He also has not shown that any potential patients decided not to enter into a physician-patient relationship with Plaintiff as a result of actions taken by Defendants Hicks and Santos.

Similarly, Plaintiff does not present any evidence that Defendants Hicks and Santos did anything to induce physicians from referring patients to Plaintiff. To support a tortious interference claim, Plaintiff must adduce evidence of improper action, which Georgia courts have defined "as constituting conduct wrongful in itself; thus, improper conduct means wrongful action that generally involved predatory tactics such as physical violence, fraud or misrepresentation, defamation, use of confidential information, abusive civil suits, and unwarranted criminal prosecutions." Fortson v. Brown, 302 Ga. App. 89, 92, 690 S.E.2d 239, 242 (2010) (quoting Kirkland v. Tamplin, 285 Ga. App. 241, 244, 645 S.E.2d 653, 656 (2007)). Here,

---

[49]It appears Defendant Santos actually made that statement to a nurse, but for purposes of this Order, the Court will assume he made the statement to patients.

[50]When asked if he ever received any direction from Defendants Hicks and Santos that he should try to convince Plaintiff's patients to come over to NCI, Dr. Qualheim testified that "our assurance to [Plaintiff] would be that we wouldn't be trying to solicit patients, and totally left it up to the patient's decision. And some of them would make that decision." Dr. Qualheim also testified that even while working for Plaintiff, he never saw anyone from NCI or the Hospital try to actively recruit patients from Plaintiff's practice. (Doc. 464-23).

there is no evidence of improper conduct on the part of Defendants Hicks and Santos as relates to referring or potential referring physicians.

As for TPA Captive, while Defendant Hicks was a TPA Captive shareholder, he was not a member of the underwriting committee that voted to terminate Plaintiff's malpractice coverage. There is no evidence Defendant Hicks had anything to do with the termination. And while Defendant Santos was on the underwriting committee, the testimony before the Court from William A. Thompson, M.D., president of the TPA Captive, is that Defendant Santos did not speak or vote on the matter:

> Q: Sitting here today, do you remember who specifically of all the people that you named who were present at this October 21st meeting, who said what about Dr. Wood in connection with his TPA policy being renewed?
>
> A: Specifically, I know that Dr. Santos did not because, as a competitor, he was not allowed to speak, which is typical for all. So if someone is in your practice or if they're competitors of your practice, you have to refrain from discussion or vote.
>
> ****
>
> Q: But you don't recall him saying anything?
>
> A: I don't recall him saying anything, and I'm as sure as I can be that he did not because that's the rule.

(Doc. 463-168, p. 11).

Defendant Santos has also filed an affidavit in which he states he does not recall participating in the discussions about Plaintiff's insurance or voting on whether to terminate Plaintiff's policy. (Doc. 464-25). Plaintiff apparently wants the Court to

assume that just because Defendant Santos served on the underwriting committee he must have had something to do with the termination. The evidence, however, does not support that position, and the Court declines to make that assumption.

Similarly, there is no evidence Defendants Hicks and Santos wrongfully interfered with Plaintiff's relationship with RCG as its medical director. In order to maintain a tortious interference claim, Plaintiff must show that Defendants Hicks and Santos induced RCG not to enter into or continue a business relationship with the plaintiff. The undisputed evidence is that Plaintiff served as medical director for the time period RCG owned the former SGDS facilities, and Fresenius kept Plaintiff in that position after purchasing the dialysis facilities from RCG, and Plaintiff serves in that capacity to this day. There was no business relationship between Plaintiff and RCG which ended because of the actions of Defendants Hicks and Santos. (Doc. 463-131).

Finally, there is no evidence that Defendants Hicks and Santos interfered with Plaintiff's ability to obtain privileges at other medical facilities or with his ability to obtain malpractice insurance. Plaintiff testified that he was able to acquire malpractice insurance before his TPA Captive policy expired, and has had coverage without interruption since that coverage expired. He was never denied liability insurance coverage by any other carrier, though he had to pay a higher premium. (Doc. 464-4, p. 13). Having to pay a higher premium, however, does not constitute tortious interference. With regard to Plaintiff's ability to obtain privileges at other

hospitals, he testified that he has not made an application for privileges at any other hospitals. While Colquitt Regional Medical Center would not give Plaintiff an application for full permitting privileges after he requested one, there is nothing connecting that denial to any actions of Defendants Hicks and Santos. Plaintiff just assumes that Colquitt Regional's decision not to give him an application is linked to the alleged conspiracy, but admittedly has never discussed with anyone at Colquitt Regional whether the application denial was related to the termination of his privileges at the Hospital or his being reported to the Data Bank. (Doc. 464-4, pp. 24-26). Plaintiff has not shown any tortious interference on the part of Defendants Hicks and Santos with regard to obtaining privileges at another hospital. The sort of speculation advanced by Plaintiff is not sufficient to defeat summary judgment.

In his response to the Motion for Summary Judgment, Plaintiff contends that Defendants Hicks and Santos tortiously interfered with him because they were favored economically by the Hospital, because they failed to properly document their medical director activities, because they described themselves as "team players" to the Hospital administration, and because Defendant Hicks complained Plaintiff was not a "team player." Even assuming all that is true, those acts do not constitute tortious interference.

Defendants Hicks and Santos are entitled to summary judgment on Counts VII and VIII of Plaintiff's Second Amended Complaint.[51]

### 2.    Interference with business relations or employment

Plaintiff also contends that Defendants Hicks and Santos induced Dr. Qualheim to terminate his business relationship or employment with Plaintiff.

"The elements of a claim for tortious interference with employment include the existence of an employment relationship, interference by one who is a stranger to the relationship, and resulting damage to the employment relationship. In addition, it must be shown that the alleged intermeddler acted maliciously and without privilege." Lee v. Gore, 221 Ga. App. 632, 634(1), 472 S.E.2d 164 (1996) (internal citations omitted).

It is undisputed that Dr. Qualheim left Plaintiff's practice to go work for NCI. The evidence is clear on that point. Apparently, however, Plaintiff wants the Court to assume that Defendants Hicks and Santos necessarily must have done something malicious and improper in order for Dr. Qualheim to leave Plaintiff to work for NCI. Under Georgia law, to show that a defendant in a tortious interference action has engaged in improper conduct, a plaintiff must show more than that the defendant persuaded a person to break a contract. Stefano Arts v. Sui, 301 Ga. App. 857, 862, 690 S.E.2d 197, 202 (2010). The Court has been directed to no evidence

---

[51]To the extent Plaintiff's Count VIII tortious interference with employment claim is based on the fact that Plaintiff's privileges were terminated, Defendants Hicks and Santos cannot be held liable, as they at no time voted to terminate Plaintiff's privileges.

of a "solicitation with a purpose to harm or damage the employer, nor is there evidence [Defendants Hicks and Santos] actively induced, conspired with, or aided and abetted [Dr. Qualheim] to break his contract constituting tortious interference with [Dr. Qualheim's] employment contract." Purcell v. Joyner, 231 Ga. 85, 87, 200 S.E.2d 363, 366 (1973). Simply stating that there is a job available that pays a certain amount does not constitute tortious interference. Id.

As Plaintiff has not shown any improper inducement on the part of Defendants Hicks and Santos as to Dr. Qualheim, those Defendants are entitled to summary judgment on Count IX of Plaintiff's Second Amended Complaint.[52]

### 3. Pre-1998 Evaluation events

While Plaintiff has not necessarily alleged these events as a separate tortious interference claim, he argues in his brief, and counsel argued at oral argument, that the pre-1998 Evaluation actions, including the no re-hire policy, not allowing nurses to visit patients, the refusal to provide blood from the blood bank, the attempted recruitment of Dr. Woollen, the refusal to put Plaintiff's practice on the resource

---

[52]The Court also notes that Plaintiff accepted a $100,000 buyout by NCI of Dr. Qualheim's non-competition agreement with Plaintiff so that there would be no restrictions on Dr. Qualheim's ability to go work for NCI. Thus, Plaintiff actually agreed to the termination of his employment and contractual relationship with Dr. Qualheim and was compensated for the termination.

Even though Plaintiff did not make this argument, to the extent Count IX as to the Hospital Defendants and Defendant Beverly is not governed by HCQIA because it does not relate to peer review proceedings, the Hospital Defendants and Defendant Beverly would be entitled to summary judgment on the merits of Plaintiff's claim for the same reasons Defendants Hicks and Santos are.

sheet, the refusal to assign any unassigned emergency room patients to Plaintiff, not installing a Telex machine, referring to Plaintiff as "the enemy," and cancelling the renal biopsy contract, were all forms of tortious interference by some of the Hospital Defendants, Physician Defendants, and Defendant Beverly.[53]

Under Georgia law, a tortious interference claim must be brought within four years after the right of action accrues. O.C.G.A. § 9-3-33. The Hospital Defendants, Physician Defendants, and Defendant Beverly argue that they are entitled to summary judgment on any tortious interference claim arising prior to July 13, 2001, which would encompass all of these pre-1998 Evaluation events.[54] Plaintiff argues that under Georgia' continuing tort doctrine, the acts are not barred from consideration. The Court disagrees.

The continuing tort doctrine "applies where any negligent or tortious act is of continuing nature and produces injury in varying degrees over time," and provides that "the statute of limitations does not begin to run until such time as the continued tortious act producing injury is eliminated." Mears v. Gulfstream Aerospace Corp., 225 Ga. App. 636, 640, 484 S.E.2d 659 (1997). Georgia courts, however, have consistently held that in a continuing tort a cause of action accrues when a plaintiff discovers, or with reasonable diligence should have discovered, both the injury and

---

[53]Since these events were not related to a professional review action, HCQIA would not apply to them.

[54]The parties agreed between themselves that the statutes of limitations would be tolled from July 13 to September 30, 2005, so the applicable date for statute of limitations purposes is July 13, 2001.

the cause thereof. <u>Waters v. Rosenbloom</u>, 268 Ga. 482, 482, 490 S.E.2d 73 (1997). *See also* <u>Coffee v. Gen. Motors Acceptance Corp.</u>, 30 F.Supp.2d 1376, 1382 (S.D.Ga. 1998); <u>Harrison v. Beckham</u>, 238 Ga. App. 199, 204, 518 S.E.2d 435, 439 (1999). Plaintiff did or should have discovered the pre-1998 Evaluation injuries no later than 1998. So, even assuming Plaintiff is entitled to use the continuing tort theory, the statute of limitations bars any tortious interference claim regarding the pre-1998 Evaluation events. The Hospital Defendants, Physician Defendants, and Defendant Beverly are entitled to summary judgment on any claims arising from the pre-1998 Evaluation events.

### E. Intentional Infliction of Emotional Distress

Plaintiff also asserts a claim for intentional infliction of emotional distress ("IIED") against Defendants Hicks and Santos.

Defendants Hicks and Santos argue that Plaintiff's IIED claim fails on its merits, but also that the claim is barred by the applicable statute of limitations. As the Court finds that Plaintiff's IIED claim is barred in its entirety by the statute of limitations, it is not necessary to address the merits of the claim.

Under Georgia law, an IIED claim must be brought within two years after the right of action accrues. O.C.G.A. § 9-3-33. The evidence in the record shows that Plaintiff's claimed IIED symptoms, anguish, severe fright, horror, grief, shame, humiliation, embarrassment, etc., all began at the time of the 1998 Evaluation. Plaintiff even states in his response to the Motion for Summary Judgment that "[a]

reasonable jury could easily conclude that Dr. Wood was humiliated and embarrassed by being required to submit to a 96 hour psychiatric lockdown, only to be found unimpaired." (Doc. 507, p. 20). It is clear that Plaintiff's IIED claim accrued more than two years before July 13, 2005.

Plaintiff attempts to salvage his IIED claim by again relying on the continuing tort doctrine. The Mears case upon which Plaintiff relies does not support Plaintiff's position, however, as it also applies the discovery rule. Mears, 225 Ga. App. at 636. The Mears court held that the plaintiff's IIED cause of action accrued when the defendant's conduct "allegedly culminated in damage," which was when the plaintiff took medical leave as a result of the defendant's alleged actions. Because the plaintiff did not file her claim within two years of the date she discovered the injury, the statute of limitations barred it. Id.

Similarly, in Fox v. Ravinia Club, Inc., 202 Ga. App. 260, 414 S.E.2d 243 (1991), the plaintiff brought an IIED claim for a series of actions resulting in her termination from her job in August 1987. The plaintiff filed her complaint in August 1989, but the appellate court held that her cause of action for IIED accrued no later than April 1987, which was when the plaintiff began seeing a psychologist. Id. at 261.

Here, Plaintiff discovered his injury in October of 1998. He first began experiencing the embarrassment and anguish associated with his IIED claim at that time, and also began discussing those matters with his psychiatrist. Plaintiff filed his

complaint more than two years after his cause of action accrued with discovery of the IIED injury in October 1998. Plaintiff's IIED claim is barred in its entirety. Defendants Hicks and Santos are entitled to summary judgment on Count XI of Plaintiff's Second Amended Complaint.[55]

### F.    Punitive Damages

Plaintiff has requested an award of punitive damages against Defendants Hicks and Santos. In Georgia, punitive damages "may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to the consequences." O.C.G.A. § 51-12-5.1(b). Georgia courts have consistently recognized that a claim for punitive damages is effective only if there is a valid claim for actual damages to which it could attach, and that punitive damages may not be recovered if there is no entitlement to compensatory damages. J. Kinson Cook of Ga., Inc. v. Heery/Mitchell, 284 Ga. App. 552, 561, 644 S.E.2d 440, 449 (2007); Nelson & Hill, P.A. v. Wood, 245 Ga. App. 60, 67, 537 S.E.2d 670, 677 (2000).

As the Court has determined that Defendants Hicks and Santos are entitled to summary judgment on all of Plaintiff's substantive claims against them, no claim

---

[55]To the extent any of the IIED claims against the Hospital Defendants, Physician Defendants, Defendant Beverly, or Defendant Simms relate to matters outside the 2004-2005 Action, 2001 Action, and 1998 Evaluation, those claims are also barred by the statute of limitations.

exists to which a punitive damages claim can attach. Defendants Hicks and Santos are entitled to summary judgment in their favor on Count XII.[56]

### G.    Attorney's Fees

Plaintiff has also made a claim for attorney's fees and expenses of litigation against Defendants Hicks and Santos under O.C.G.A. § 13-6-11. The Eleventh Circuit has held that a claim for attorney's fees under § 13-6-11 requires an underlying claim. Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1316 (11th Cir. 2004). *See also* Hopkinson v. Hopkinson, 239 Ga. App. 518, 519, 521 S.E.2d 453, 454 (1999). Like the punitive damages claim, no claim exists to which an attorney's fees claim can attach. Defendants Hicks and Santos are entitled to summary judgment in their favor on Count XIII.[57]

### H.    Conclusion as to Defendants' Motions for Summary Judgment

For the reasons discussed above, the Hospital Defendants' Motion for Summary Judgment (Doc. 462), the Physician Defendants' Motion for Summary Judgment (Doc. 464), Defendant Simms' Motion for Summary Judgment (Doc. 466), and Defendant Beverly's Motion for Summary Judgment (Doc. 472) are granted.

---

[56]Similarly, any punitive damages claims against the Hospital Defendants, Physician Defendants, Defendant Beverly, or Defendant Simms that relate to matters outside the 2004-2005 Action, 2001 Action, and 1998 Evaluation fail as there is no substantive claim to which a punitive damages claim can attach.

[57]Like the punitive damages claim, the attorney's fees claim is barred as to the Hospital Defendants, Physician Defendants, Defendant Beverly, and Defendant Simms because there is no substantive claim to which it can attach.

## VI. ANALYSIS AS TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND AMENDED MOTION FOR SUMMARY JUDGMENT

### A. Relief Sought

Plaintiff moves for summary judgment in his favor on a number of affirmative defenses asserted by the Hospital Defendants (Doc. 401, ¶¶ 294-299, 302), the Physician Defendants, (Docs. 402-408, 410, ¶¶ 295-301; 409, ¶¶ 293-299), Defendant Beverly (Doc. 483, ¶¶ 292-296, 298), and Defendant Simms (Doc. 415, ¶¶ 295-301).[58]

Specifically, Plaintiff seeks judgment that Defendants are not:

(a)     immune from liability under HCQIA;

(b)     immune from liability under the Georgia peer review statute, O.C.G.A. § 31-7-132;

(c)     immune from liability under the Georgia medical review statute, O.C.G.A. § 31-7-141; or

(d)     entitled to a release from liability based on Plaintiff's reappointment applications.

Plaintiff also moves for summary judgment on the counterclaims brought by the Hospital Defendants. Counterclaim I is a breach of contract claim brought by the Hospital, Counterclaim II is a breach of contract claim brought by Defendants Story and Hartsfield, Counterclaim III is a claim for declaratory judgment brought by the Hospital and Defendants Story and Hartsfield, and Counterclaim IV is a claim for

---

[58]Plaintiff moves for judgment on the affirmative defenses set forth by Defendant Simms but did not provide an accurate docket reference for Defendant Simms' answer. The one provided by the Court is correct.

declaratory judgment brought by the Hospital Defendants relating to HCQIA immunity.[59]

## B.  Defendants' Affirmative Defenses

### 1.  Immunity under HCQIA

The issue of HCQIA and its applicability to the Defendants has been discussed exhaustively in this Order. The Court has determined that to the extent it is applicable to each Defendant, HCQIA provides immunity for the 1998 Evaluation, 2001 Action, and 2004-2005 Action. As the Court has determined that HCQIA does in fact provide immunity from liability to Defendants, Plaintiff's Motion for Summary Judgment and Amended Motion for Summary Judgment on that issue are denied.

### 2.  Immunity under the Georgia Peer Review Statute

In an order entered on June 29, 2006 (Doc. 42), the Court stated that for the purposes of this case, Georgia' peer review immunity statute, O.C.G.A. § 31-7-132, was preempted, and the issue of immunity would be determined under the framework of HCQIA. Thus, the affirmative defense is actually moot, and because of the mootness, Plaintiff's Motion for Summary Judgment and Amended Motion for Summary Judgment with regard to the Georgia peer review immunity statute are denied.

---

[59]Plaintiff's Motion and Amended Motion for Summary judgment are governed by the summary judgment standard under which summary judgment must be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue to any material facts and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

### 3. Immunity under the Georgia Medical Review Statute

O.C.G.A. § 31-7-141 provides that there "shall be no monetary liability on the part of and no cause of action for damages shall arise against any member of a duly appointed medical review committee for any act or proceeding undertaken or performed within the scope of the functions of any such committee if the committee member acts without malice or fraud." However, like the Georgia peer review statute, the medical review statue is preempted by HCQIA. *See* Patton, 260 Ga. App. at 208; Patrick v. Floyd Med. Ctr., 255 Ga. App. 435, 444, 565 S.E.2d 491, 499-500 (2002). Thus, the affirmative defense is moot, and because of the mootness, Plaintiff's Motion for Summary Judgment and Amended Motion for Summary Judgment with regard to the Georgia medical review statute are denied.

### 4. Release based on reappointment applications

Finally, with regard to the affirmative defenses, Plaintiff moves for judgment that Defendants are not entitled to a release from liability under Plaintiff's reappointment applications.

As the Court has determined that the Defendants are all entitled to summary judgment on the claims against them, either because they are entitled to HCQIA immunity, or on the merits of the claims, the Court finds the release affirmative defense to be moot. Because of the mootness, Plaintiff's Motion for Summary Judgment and Amended Motion for Summary Judgment with regard to the release affirmative defense are denied.

### C. Hospital Defendants' Counterclaims

#### 1. Counterclaim I

When Plaintiff applied for reappointment to the medical staff in 2002, he signed the 2002 Reappointment Agreement with the Hospital. Plaintiff agreed that if reappointed to the medical staff he would seek consultations whenever necessary or required, abide by generally recognized ethical principles applicable to his profession, and provide continuous care and supervision as needed to all patients in the Hospital for whom he had responsibility. (Doc. 401-4).

The Hospital alleges in Counterclaim I that Plaintiff breached these contractual obligations in 2004 by taking, or failing to take, the actions which ultimately led to the termination of Plaintiff's medical staff privileges in 2005. The president and chief executive officer of the Hospital has filed an affidavit in which he states that as a result of Plaintiff's breach of contract: (1) the Hospital was forced to spend enormous amounts of money in legal fees and costs associated with the 2004-2005 Action, as well as this lawsuit; (2) the Hospital has advanced attorney's fees and costs on behalf of the other Defendants in this litigation; (3) Plaintiff has acted in bad faith, been stubbornly litigious, and has caused the Hospital unnecessary trouble and expense; and (4) the Hospital's operations have been significantly disrupted by Plaintiff as a result of his breach of contract, causing the Hospital further damages. The examples of this disruption given include "the harm caused to the Hospital's nursing and support staff as a result of Dr. Wood's rude and boorish conduct, the

cost and expense including legal fees associated with the investigation of Dr. Wood's behavior in 2004 and the hearing and appeal that were occasioned by Dr. Wood's behavior, and the reluctance of the Hospital's medical staff to participate in peer review activities as a result of this litigation." (Doc. 519-12).

Plaintiff has not moved for summary judgment on the merits of the Hospital's breach of contract claim. Instead, he argues that he is entitled to summary judgment because the Hospital has not provided any facts to support its damages claims. When Plaintiff asked the Hospital in discovery to provide a specific dollar amount of damages claimed in Counterclaim I, an itemized calculation for that amount, and the facts forming the basis for that amount, the Hospital objected to the interrogatory as being overly broad and unduly burdensome, as violative of the attorney-client privileges, and as being premature. Plaintiff did not, however, file a motion to compel further response from the Hospital. There was nothing improper about the Hospital's objections, and even if there was, Plaintiff should have made that argument in a motion to compel, which he did not. If Plaintiff believed the Hospital was required to provide more information with regard to its damages claims, a motion to compel was the appropriate vehicle for that argument. The Court is not now going to grant summary judgment in Plaintiff's favor because the Hospital exercised its right to object to the discovery requests.

In any event, the failure to prove damages does not entitle Plaintiff to summary judgment because "in every action for breach of contract, even if there is

no actual damage, the injured party may recover nominal damages sufficient to cover the costs of bringing the action." O.C.G.A. § 13-6-6. *See also* <u>Trickett v. Advanced Neuromodulation Sys., Inc.</u>, 542 F.Supp.2d 1338, 1352 (S.D.Ga. 2008). A plaintiff does not have to prove monetary damages to survive summary judgment on a breach of contract claim. *See* <u>Poe v. Sears, Roebuck & Co., Inc.</u>, 1 F.Supp.2d 1472, 1477 (N.D.Ga. 1998) (holding that the possible recovery of nominal damages is sufficient to preclude summary judgment).

As Plaintiff has not met his burden to show there is no genuine issue of material fact with regard to Counterclaim I, it is up to the jury to decide whether Plaintiff breached the 2002 Reappointment Agreement with the Hospital, and what, if any, damages the Hospital is entitled to. Plaintiff's Amended Motion for Summary Judgment on Counterclaim I is denied.

### 2. Counterclaim II

In Counterclaim II, Defendants Story and Hartsfield bring a breach of contract action against Plaintiff based on the 2002 Reappointment Agreement. They argue that they were authorized representatives of the Hospital as described in the release and immunity provisions of the 2002 Reappointment Agreement between Plaintiff and the Hospital, and were therefore intended beneficiaries of the contract. Defendants Story and Hartsfield state that because of Plaintiff's alleged breach of the 2002 Reappointment Agreement they were forced to spend money in legal fees and costs in defending the action, and that Plaintiff has acted in bad faith, been

stubbornly litigious, and has caused them unnecessary trouble and expense, including have to take several days away from their jobs to respond to Plaintiff's discovery and prepare for and give a deposition.

To support a breach of contract action brought by a non-party, the contract "must contain a promise to render some performance to a third person and it must evince both parties' intent that the third person be the beneficiary. . . .The mere fact that [the third party] would benefit from performance of the agreement is not alone sufficient." <u>Allstate Ins. Co. v. Sutton</u>, 290 Ga. App. 154, 160-61, 658 S.E.2d 909, 915-16 (2008). While Defendants Story and Hartsfield certainly would benefit as members of the medical staff and Hospital administration if Plaintiff was to abide by the 2002 Reappointment Agreement, there is no promise in the Agreement by Plaintiff to render performance to Defendants Story and Hartsfield. Plaintiff agreed to render performance to the Hospital.

The Court does not believe Defendants Story or Hartsfield are entitled to recover any attorney's fees or other damages under a breach of contract theory. If Plaintiff breached the 2002 Reappointment Agreement, that is a matter between Plaintiff and the Hospital. If Defendants Story and Hartsfield believe they are entitled to recover attorney's fees, they may raise that in a motion under 42 U.S.C. § 11113, if appropriate. Plaintiff's Amended Motion for Summary Judgment as to Counterclaim II is granted.

### 3. Counterclaim III

The Hospital Defendants have requested in Counterclaim III that the Court declare that the various applications signed by Plaintiff in connection with this reappointment to the medical staff are valid and effective, and that the applications preclude Plaintiff from recovering damages on any of the counts contained in Plaintiff's Second Amended Complaint. However, the Court has already determined that the Hospital Defendants are entitled to immunity under HCQIA. As the relief requested in Counterclaim III, a determination that Plaintiff cannot recover money damages against the Hospital Defendants, has already been given to the Hospital Defendants, Counterclaim III is dismissed as moot. Because Counterclaim III has been dismissed, Plaintiff's Amended Motion for Summary Judgment on Counterclaim III is denied.

### 4. Counterclaim IV

The Hospital Defendants have requested in Counterclaim IV that the Court declare that they are immune from damages under HCQIA. The Court has discussed in depth the reasons why the Hospital Defendants are entitled to immunity under HCQIA. Accordingly, Plaintiff's Amended Motion for Summary Judgment on Counterclaim IV is denied.

### D. Conclusion as to Plaintiff's Motion for Summary Judgment and Amended Motion for Summary Judgment

For the reasons discussed above, Plaintiff's Motion for Summary Judgment on Defendants' Affirmative Defenses Claiming Immunity and Release (Doc. 468) is

denied. Plaintiff's Amended Motion for Summary Judgment on Defendants' Affirmative Defenses Claiming Immunity and Release and Hospital Defendants' Counterclaims I-IV (Doc. 500) is granted, in part, and denied, in part.

## VII.    GLOBAL CONCLUSION

The Hospital Defendants' Motion for Summary Judgment (Doc. 462) is granted, the Physician Defendants' Motion for Summary Judgment (Doc. 464) is granted, Defendant Simms' Motion for Summary Judgment (Doc. 466) is granted, Plaintiff's Motion for Summary Judgment (Doc. 468) is denied, Plaintiff's Amended Motion for Summary Judgment (Doc. 500) is granted, in part, and denied, in part, and Defendant Beverly's Motion for Summary Judgment (Doc. 472) is granted.

Counterclaim I brought by the Hospital will be tried during the October term of court in Valdosta, which is scheduled to begin on October 18, 2010.

**SO ORDERED**, this 13th day of September, 2010.

*s/ Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

mbh